IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
PleasrDAO, an exempted foundation company, :
:
        Plaintiff, :
: Case No. 24-cv-4126
:
:
        v. :
:
Martin Shkreli, :
:
:
:
        Defendant. :
---------------------------------------------------------------x

## VERIFIED COMPLAINT

Plaintiff PleasrDAO ("PleasrDAO"), by and through its undersigned counsel, brings this Verified Complaint against Defendant Martin Shkreli ("Shkreli"), for: (1) enforcement of the Court's Forfeiture Order entered in *United States v. Shkreli*, No. 15-cr-00637 (E.D.N.Y. Mar. 26, 2018), ECF No. 566; (2) violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*; (3) misappropriation of confidential information/trade secrets; (4) tortious interference with prospective economic advantage; (5) unjust enrichment; and (6) recovery of chattel/replevin, NY CPLR § 7101, *et seq.*

## INTRODUCTION

1.      Shkreli, a former pharmaceutical executive notorious for raising the price of the lifesaving drug Daraprim 5500%, was convicted in 2017 of committing securities fraud and sentenced to seven years in prison. As part of Shkreli's sentencing following his conviction, this Court ordered him to satisfy a $7.4 million forfeiture order. Among the assets forfeited pursuant to the order was his interest in the one-of-a-kind album by the hip hop group, Wu-Tang Clan ("Wu-Tang") called "Once Upon a Time in Shaolin" (the "Album"). Shkreli purchased the Album in

2015 for $2 million. Shkreli was released from federal prison in May 2022.

2. PleasrDAO bought the Album in two transactions in 2021 and 2024, for approximately $4,000,000, and $750,000, respectively. The Album was supposed to constitute the sole existing copy of the record, music, data and files, and packaging. It now appears, however, that Shkreli improperly retained copies of the data and files at the time of the forfeiture and has released and/or intends to release them to the public. Such actions would cause PleasrDAO to incur significant monetary and irreparable harm, and give rise to numerous claims for relief under the forfeiture order and common law.

## THE PARTIES

3. PleasrDAO is an exempted foundation company established in the Cayman Islands located with a registered address at Cricket Square, Hutchins Drive, PO Box 2681, Grand Cayman, KY1-1111, Cayman Islands.

4. Shkreli is an individual who, upon information and belief, resides in Queens, New York.

## JURISDICTION AND VENUE

5. Subject matter jurisdiction exists by virtue of diversity of citizenship, 28 U.S.C. § 1332. The matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs, and there is complete diversity of citizenship.

6. Jurisdiction is further proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because PleasrDAO has asserted a claim for statutory misappropriation of trade secrets under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.* ("DTSA"), and all other claims are so related to PleasrDAO's federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

7. Venue is proper in this judicial district under 28 U.S.C. § 1391(a) because, *inter alia*, it is the district in which the conduct complained of arose.

### FACTS

8. PleasrDAO is an international entity that collects and publicly displays culturally significant media and materials with the intent of creating ecosystem experiences that encourage participation and interaction throughout the United States and other countries.

9. PleasrDAO has built a reputation for acquiring culturally significant pieces and funding important movements, charities, and causes by sharing the pieces with the community in various, modern ways.

10. Shkreli is a former money manager and pharmaceutical executive who attained notoriety when his company bought the rights to a life-saving drug, Daraprim—used to treat a rare parasitic disease that strikes pregnant women, cancer patients, and AIDS patients—and raised the price of the drug from $13.50 to $750 per pill.

11. Shkreli is a convicted felon who was involved in fraudulent securities schemes resulting in a seven-year sentence in federal prison.

### Wu-Tang's Creation of the Album

12. Wu-Tang is one of the world's most famous hip-hop groups.

13. From 2007 to 2013, Wu-Tang recorded *Once Upon a Time in Shaolin*, a secret 31-track album featuring guest appearances from notable musicians, celebrity actors, and professional athletes.

14. Consistent with their intent for the Album to be a historically unique musical compilation, Wu-Tang leader Robert "RZA" Diggs and producer Tarik "Cilvaringz" Azzougarh (together, the "Producers") sold the Album adorned in an ornate, boxed set.

15. The ornate packaging included (i) the only existing hard copy of the record album,

burned onto a single, two-disc set; (ii) a hand carved, nickel and silver cased box set, comprised of three integrated nickel and silver boxes, housed by a larger leather box, all designed by the British Moroccan artist Yahya; (iii) a gold leafed certificate of authenticity; (iv) a pair of customized audio speakers; and (v) a 174-page leather-bound manuscript volume containing lyrics, credits and anecdotes on the production and recordings of each song.

16. According to the creators of the Album, it was intended as a protest to what they saw as the devaluation of music in the digital era.

17. Unlike conventional commercial album releases, Wu-Tang produced only one copy of the Album. That copy has never been publicly released.

### Sale to Shkreli

18. In September 2015, Shkreli brought the Album from the Producers for $2,000,000.

19. According to the Guinness Book of World Records, the sale made the Album the most expensive musical work ever sold.

20. The Producers and Shkreli executed a Purchase Agreement, dated September 3, 2015, to effectuate the sale (the "Original Purchase Agreement"). The Original Purchase Agreement imposed several restrictive covenants on Shkreli, including prohibiting Shkreli, for eighty-eight years following the sale, from duplicating, replicating, or exploiting the Album for any reason other than for "exhibition or playing," in "spaces not customarily used as venues for large musical concerts," or advertising or promoting the same. To the extent that Shkreli did exhibit or play the Album and earned "net profits," the Producers were entitled to a portion of the profits.

21. The Original Purchase Agreement also expressed the Producers' intent to keep ownership of the Album in one person's hands at time, as it prohibited Shkreli from selling the Album to third parties unless "under the same terms and conditions" imposed by the Original Purchase Agreement. *Id.* at 6.

4

22. To the extent Shkreli sold or transferred the Album, he promised to "bind" any third party buyer or transferee "by written agreement to the same rights, restrictions, and obligations on the use, sale, and transfer of the Work" that bound Shkreli under the Original Purchase Agreement.

23. To the extent Shkreli transferred the Album to third parties, he also violated the express transfer restrictions set out in the Original Purchase Agreement.

24. The contents of the Album's data and files remain unknown to the public at large.

### Shkreli's Criminal Conviction and Forfeiture

25. In 2017, a federal jury in the United States District Court for the Eastern District of New York found Shkreli guilty on two counts of securities fraud and one count of conspiracy to commit securities fraud. *See U.S. v. Shkreli*, Case No. 1:15-cr-00637-KAM (E.D.N.Y.).

26. On March 26, 2018, this Court entered a Judgment sentencing Shkreli to seven years in prison and requiring Shkreli to forfeit the proceeds of his fraud and criminal activity up to $7,360,450 (the "Forfeiture Money Judgment").

27. The Judgment's forfeiture order (the "Forfeiture Order") required Shkreli to forfeit his interests in, and all proceeds traceable to, certain "Substitute Assets"—including "the album 'Once Upon A Time in Shaolin' by the Wu Tang Clan"—up to the amount of the Forfeiture Money Judgment.

28. The Forfeiture Order imposed several restrictions on Shkreli's use of the substitute assets, including requirements that Shkreli:

   a. be enjoined from taking "any action that would have the effect of diminishing, damaging and/or dissipating the Substitute Assets, or any funds and/or assets that may be used to satisfy the Forfeiture Money Judgment[;]" and

   b. be "restrained, enjoined and prohibited from taking any action that would affect the availability, marketability or value of the Substitute Assets[;]" and

  c. "take all reasonable steps, and bear all costs necessary, to ensure that all the Substitute Assets are preserved and maintained in good and marketable condition, and are not damaged, diluted or diminished in value as a result of any actions taken or not taken by the defendant and his representatives."

## PleasrDAO Purchases the Album

29.  PleasrDAO acquired the Album in two transactions. In July 2021, it bought the physical asset and exclusive right to play the audio tracks for approximately $4,000,000. In January 2024, it bought the copyrights in and exclusive right to exploit the recordings for approximately $750,000.

30.  At all relevant times, PleasrDAO moved the Album by secure transport and/or kept in a secure location.

31.  The security measures undertaken included the use of armed security guards, secure entrance and exit points, and continual video surveillance, oversight and checks on the Album's condition.

## Shkreli's Unlawful Retention

32.  Shkreli was released from prison in May 2022 and began a three-year term of supervised release.

33.  As a condition of his supervised release, Shkreli is required to "[c]omply with the fine and forfeiture orders" resulting from his criminal convictions.

34.  Since his release from prison, Shkreli has frequently participated in "live stream" activity on social media platforms, including Twitter and YouTube.

35.  During these live streams, Shkreli often shares his computer screen with his followers, while engaging in online activities such as, virtual reality computer games, and attempts to meet women through online dating.

36. On June 18, 2022, during one of these live streams, Shkreli admitted that he played the Album for his followers. He stated, during the live stream, "Yeah, that's the Wu-Tang album for all you crazy streamer people."

37. On June 22, 2022, during another live stream on YouTube, Shkreli was asked if he still has a copy of "Once Upon a Time in Shaolin." Shkreli said, "I do. I was playing it on YouTube the other night even though somebody paid $4 million for it."

38. On June 30, 2022, during another live stream, Shkreli again played a portion of the Album and again admitted to having retained the Album, stating: "of course I made MP3 copies, they're like hidden in safes all around the world . . . I'm not stupid. I don't buy something for two million dollars just so I can keep one copy."

39. On April 13, 2024, a member of PleasrDAO posted a photo of the Album on X (formerly Twitter), and in the comment thread below, Shkreli made various comments in which he admitted to retaining copies of the Album's data and files and streaming them to an internet audience:

   a. "LOL i have the mp3s you moron"

   b. "i literally play it in my discord all the time. you're an idiot."

   c. "so what are you arguing about? this thread is about someone listening to a CD > 5000 people have…"

   d. "yeah i have the music, sold the plastic"

40. Shkreli also offered to further disseminate the Album's data and files, responding to an X user who commented, "You don't understand my jealously level," with "just give me your email lol." In response to another comment, Shkreli wrote, "i can just upload the mp3s if you want? email addy?"

41.     On May 13, 2024, Shkreli appeared on a video-recorded podcast posted on YouTube. In the video, Shkreli stated that he "burned the album and sent it to like, 50 different chicks[.]" He then asked the interviewer, "Do you know how many blowjobs that album got me? You think I didn't make a fucking copy of it? Are you joking?" He also stated that "thousands of people have listened to it. I sent the mp3s to all these people."

42.     On May 14, 2024, Shkreli posted a screenshot of PleasrDAO's website on his X account and included a caption stating, "look out for a torrent im sick of this shit @PleasrDAO[.]" Shkreli then responded to a comment on the post, stating "ive already sent it to 50 ppl[.]"

43.     On June 9, 2024, Shkreli stated on his X account, "well @pleasrdao blocked me from their account so I think I will play the album on spaces now." Less than an hour later, the @MartinShkreli X account hosted a "Spaces" session entitled "Wu tang official listening party" and tweeted "Never heard before wu tang stream." During the Spaces session, Shkreli played music from the Album that any participant could hear. According to X, 4.9 thousand listeners "tuned in."

44.     Thus, by his own admission, Shkreli (i) retained copies of the Album's data and files, (ii) played the Album publicly on his "live stream," and (iii) has sent it to at least 50 people. His comments demonstrate that he is also willing to disseminate copies of the Album's data and files publicly, and that as many as "> 5,000 individuals" may have already heard the Album as a result of his actions. These actions occurred after he was ordered to forfeit his interests in the Album.

45.     Shkreli therefore violated the Forfeiture Order's provisions requiring Shkreli to forfeit his interests in the Album and prohibiting him from taking any action that would reduce the Album's value.

46. Any dissemination of the Album's music to the general public greatly diminishes and/or destroys the Album's value, and significantly damages PleasrDAO's reputation and ability to commercially exploit the Album.

**Shkreli's Disregard for the Contracts and the Power of the Court**

47. Shkreli has shown a complete lack of respect for the integrity of the Album and the conditions in place to ensure its secrecy.

48. While he owned the Album, Shkreli told news outlets that he considered destroying the Album outright. Similarly, Shkreli threatened to remove all contributions by Ghostface Killah, a Wu-Tang member, in response to the artist's expression of dismay at Shkreli's ownership of the Album. Shkreli also threatened to sell the Album on eBay, saying at the time, "I am selling the Wu-Tang Clan album. Fuck Wu-Tang."

49. In a similar vein, Shkreli has shown a consistent disrespect for the Court and its authority. During his criminal trial, Shkreli engaged in a disturbing pattern of behavior, including:

   a. Engaging in conduct intending to disrupt the trial by making comments to the Financial Times that he planned to make his criminal case "more polarizing and popular" by creating a circus like atmosphere in order to obtain an acquittal, similar to the trials of "OJ Simpson, Casey Anthony, and Sean 'P Diddy' Combs…"

   b. Suggesting he was spending millions to influence the jury pool.

   c. Making numerous public statements characterizing his prosecution as a chess match of public opinion.

   d. Claiming that the criminal case against him was "all for political show" and complained he was only "being prosecuted for being a jerk."

   e. Publicly commenting on trial evidence and witnesses.

   f. Making comments suggesting that he "would do whatever he wants."

  g. Making inappropriate personal attacks on current and former prosecutors.

  h. Engaging in unrelenting harassment of a journalist, Lauren Duca, which led to Shkreli being permanently banned from Twitter.

  i. Posting to social media the day before the conclusion of the trial that "Trial's over tomorrow, bitches. Then if I'm acquitted I get to fuck Lauren Duca[.]"

50. Shkreli's misconduct continued after his conviction. On Facebook, Shkreli indicated he would pay $5,000 to anyone who assaulted Secretary Hillary Clinton, stating "on HRC's book tour, try to grab a hair from her. I must confirm the sequences I have. Will pay $5,000 per hair obtained from Hillary Clinton. Payment after the sequence matches. Good luck, patrollers." This comment triggered an investigation by the Secret Service, which prompted a social media post from Shkreli that the "Secret Service has requested an interview with me. I am declining that interview – schedule is full." On September 13, 2017, the Court revoked Shkreli's bail for this unlawful behavior.

51. This misconduct apparently continued during his prison sentence. In the June 22, 2022 live stream video on YouTube, Shkreli admitted to having a "contraband cell phone" in prison.

52. Shkreli's misconduct continues to the present. On November 6, 2023, Shkreli traveled to Maine to appear for an in-person interview with Tucker Carlson without obtaining permission for out-of-state travel from his probation officer. Although Judge Matsumoto adopted the probation officer's recommendation of no action, Shkreli's conduct was a violation of the terms of his supervised release.

53. With his recent unauthorized disclosures of the Album's data and files, Shkreli continues to engage in unlawful conduct even while on supervised release.

54. Based on the above, Shkreli's actions violated the Court's Forfeiture Order and the Defend Trade Secrets Act, and further constitute misappropriation of PleasrDAO's trade secrets, tortious interference with PleasrDAO's prospective economic advantage, unjust enrichment, and recovery of chattel/replevin. Shkreli will commit further violations by continuing to disseminate the Album's data and files.

**COUNT I**
**ENFORCEMENT OF ORDER**
**(Fed. R. Civ. Proc. Rule 71)**

55. PleasrDAO re-alleges and incorporates by reference the allegations of the proceeding paragraphs.

56. Pursuant to Federal Rule of Civil Procedure Rule 71, "[w]hen an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party."

57. The Forfeiture Order required Shkreli to forfeit all his interests in the Substitute Assets.

58. The Forfeiture Order prohibited Shkreli from taking "any action that would have the effect of diminishing, damaging and/or dissipating the Substitute Assets," or "that would affect the availability, marketability or value of the Substitute Assets."

59. The Forfeiture Order required Shkreli to "take all reasonable steps, and bear all costs necessary, to ensure that all the Substitute Assets are preserved and maintained in good and marketable condition, and are not damaged, diluted or diminished in value as a result of any actions taken or not taken by" Shkreli.

60. The Album is a Substitute Asset under the Forfeiture Order.

61. PleasrDAO is an intended beneficiary of the Forfeiture Order's provisions protecting the value of the Substitute Assets and falls within the zone of interests protected by the

Forfeiture Order's provisions on asset forfeiture.

62. At all relevant times, PleasrDAO had the right to possess the only existing copy of the Album that comprises the only lawful copy of "Once Upon a Time in Shaolin."

63. Shkreli has retained copies of the Album and will continue to use it in such a way as to significantly diminish or eliminate the Album's value, and otherwise harm PleasrDAO.

64. Based on this violation, PleasrDAO is entitled to the enforcement of the Forfeiture Order through an order, *inter alia* (i) granting injunctive relief prohibiting Shkreli from using his retained copies of the Album's data and files; (ii) compelling Shkreli to provide an inventory of his retention and distribution of his copies of the Album's data and files and an account of any profits he made from doing so; (iii) seizing or destroying Shkreli's retained copies of the Album's data and files; and (iv) disgorging any profits Shkreli made from his retention and disclosure of the same.

## COUNT II
## VIOLATIONS OF THE DEFEND TRADE SECRETS ACT
## (18 U.S.C. § 1836, *et seq*)

65. PleasrDAO re-alleges and incorporates by reference the allegations of the preceding paragraphs.

66. The Defend Trade Secrets Act ("DTSA") defines a "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information . . . whether tangible or intangible . . . (A) if the owner took reasonable measures to keep such information secret; and (B) the information derives independent economic value …from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

67. Under 18 U.S.C. § 1836(b), an owner of a trade secret that is misappropriated may bring a civil action if the trade secret is related to a product or service used in, or intended for use

in, interstate or foreign commerce.

68. A trade secret is misappropriated where an individual knowingly "receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization." 18 U.S.C. § 1832(1)(3).

69. The trade secrets at issue are the Album, comprising the only lawful copy of "Once Upon a Time in Shaolin," including its data and files.

70. PleasrDAO is the "owner" of the Album under 18 U.S.C. § 1839(4) because it has rightful legal or equitable title to, or license in, the Album, including its data and files.

71. PleasrDAO has taken reasonable measures to keep such information secret; and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

72. Shkreli misappropriated the Album under 18 U.S.C. § 1839(5)(A), by the unauthorized and impermissible reproduction and/or acquisition of copies of the Album, and continued retention of the Album.

73. Shkreli also misappropriated the Album under 18 U.S.C. § 1839(5)(B), because he knew or had reason to know of the circumstances giving rise to a duty to maintain the secrecy of the Album, and he disclosed or used the Album without the consent of PleasrDAO.

74. Shkreli's misappropriation was willful and malicious.

75. The Album is related to products used in, or intended for use in, interstate or foreign commerce.

76. Based on these violations, pursuant to 18 U.S.C. § 1836, PleasrDAO is entitled to (i) an order of inventory and accounting to effectuate the seizure of Shkreli's copies of the Album;

(ii) seizure of property necessary to prevent the propagation or dissemination of the Album, (iii) an injunction to prevent further misappropriation, (iv) an award of damages, (v) an award of exemplary damages, and (vi) an award of attorneys' fees.

## COUNT III
## MISAPPROPRIATION OF CONFIDENTIAL INFORMATION/TRADE SECRETS

77. PleasrDAO re-alleges and incorporates by reference the allegations of the preceding paragraphs.

78. While in his possession, Shkreli made unauthorized copies of the Album's data and files.

79. The Album is confidential and proprietary, and PleasrDAO has taken reasonable steps to maintain the confidential and proprietary nature of the Album.

80. The Album is PleasrDAO's trade secret, subject to protection under New York law.

81. Upon information and belief, Shkreli did not disclose the existence of his copies of the Album when the Court ordered him to forfeit the Album as part of his criminal sentencing.

82. Shkreli has used and will continue to use the Album if the Court does not intervene.

83. By virtue of the foregoing conduct, Shkreli has misappropriated PleasrDAO's confidential information/trade secrets.

84. Shkreli's misappropriation was willful and malicious.

85. As a direct and proximate result of Shkreli's conduct, PleasrDAO has suffered, and continues to suffer, immediate and irreparable harm and loss.

86. Shkreli's actions will continue to cause PleasrDAO irreparable harm if not enjoined.

87. Based on this conduct, PleasrDAO is entitled to (i) an order of inventory and accounting to effectuate the seizure of Shkreli's copies of the Album; (ii) seizure of property

necessary to prevent the propagation or dissemination of the Album, (iii) an injunction to prevent further misappropriation, (iv) an award of damages, (v) an award of exemplary damages, and (vi) an award of attorneys' fees.

## COUNT IV
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

88. PleasrDAO re-alleges and incorporates by reference the allegations of the proceeding paragraphs.

89. PleasrDAO purchased the Album because of the value inherent in its one-of-a-kind nature.

90. Shkreli's retention of the Album's data and files has interfered with PleasrDAO's economic prospects by diminishing the value of the Album in any future use, sale, or transaction.

91. Shkreli's distribution of the Album's data and files has interfered with PleasrDAO's rights by publicizing what PleasrDAO has intentionally kept private.

92. Shkreli's interference was willful and malicious in that it was done for the sole purpose of harming PleasrDAO.

93. Shkreli knows that PleasrDAO purchased the Album and is taking great efforts to cause harm to PleasrDAO.

94. Shkreli's conduct was and is independently wrong and unlawful.

95. Based on this conduct, PleasrDAO is entitled to (i) an order of inventory and accounting to effectuate the seizure of Shkreli's copies of the Album; (ii) seizure of property necessary to prevent the propagation or dissemination of the Album, (iii) an injunction to prevent further misappropriation, (iv) an award of damages, (v) an award of exemplary damages, and (vi) an award of attorneys' fees.

# COUNT V
# UNJUST ENRICHMENT

96. PleasrDAO re-alleges and incorporates by reference the allegations of the proceeding paragraphs.

97. Upon information and belief, Shkreli has gained additional viewership on his social media platforms as a result of his unauthorized retention of the Album's data and files, including his streaming channels and discord network.

98. Upon information and belief, Shkreli has profited from the increased viewership on his social media platforms, either through increased advertisement revenue or direct viewer donations.

99. Upon information and belief, Shkreli has profited from the sale of unlawfully retained MP3 copies of the Album.

100. Shkreli's benefit from his unauthorized retention and distribution of the Album has come at PleasrDAO's expense.

101. Equity and good conscience require Shkreli to pay restitution to PleasrDAO equal to his unjust enrichment, in an amount to be determined at trial, from unlawfully retaining and distributing the Album's data and files.

102. Based on this conduct, PleasrDAO is entitled to (i) an order of accounting to effectuate the restitution or disgorgement of any profits Shkreli made from retaining or disclosing the Album; and (ii) an order disgorging, or ordering restitution for, any profits Shkreli made from retaining or disclosing the Album.

# COUNT VI
# RECOVERY OF CHATTEL/REPLEVIN
# (NY CPLR § 7101, *et seq.*)

103. PleasrDAO re-alleges and incorporates by reference the allegations of the

proceeding paragraphs.

104. PleasrDAO is entitled to possession of Shkreli's retained copies of the Album, including its data and files.

105. Shkreli's retention of the Album's data and files is wrongful.

106. Upon information and belief, Shkreli is holding copies of the Album's data and files on his personal computer and elsewhere.

107. The value of each wrongfully retained copy of the Album is to be proven at trial.

108. Based on this conduct, PleasrDAO is entitled to (i) seizure of property necessary to prevent the propagation or dissemination of the Album, under NY CPLR § 7102, and (ii) an order to examine Shkreli for the purpose obtaining information regarding the location of his retained and distributed copies of the Album, under NY CPLR § 7112.

**PRAYER FOR RELIEF**

WHEREFORE, PleasrDAO respectfully requests that the Court enter judgment against Shkreli on this Complaint as follows:

1. Injunctive relief against Shkreli, including a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Shkreli from possessing, using, disseminating, or selling any interests in the Album, or in any way causing further damage to PleasrDAO respecting the Album;

2. An order compelling Shkreli to provide an inventory and accounting of (i) the copies of the Album data and files he retained, (ii) the individuals to whom he distributed those data and files, and (iii) the profits traceable to his retention and distribution of those files, and/or an order compelling Shkreli to submit to an examination regarding the same, and/or, an order authorizing PleasrDAO to examine Shkreli for the purpose

obtaining information regarding the location of his retained and distributed copies of the Album and its data and files, under NY CPLR § 7112;

3. An order seizing all of Shkreli's remaining copies of the Album's data and files;

4. An award of monetary damages in an amount to be determined at trial;

5. Restitution or disgorgement of profits earned as a result of any unjust enrichment;

6. An award of exemplary damages;

7. An award of attorneys' fees, and costs and expenses; and

8. Any other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to the Federal Rules of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 10, 2024

Respectfully Submitted,

/s/ Steven Cooper
Steven Cooper
Charles P. Hyun
Rob Carnes (*pro hac vice admission pending*)
REED SMITH LLP
599 Lexington Ave., 22nd Floor
New York, New York 10022
Tel. 212-521-5400
*Attorneys for Plaintiff*

## VERIFICATION OF MATTHEW MATKOV

I, Matthew Matkov, am a member of Plaintiff, PleasrDAO. I make this verification on behalf of Plaintiff. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the allegations in the foregoing Verified Complaint are true and correct.

Executed on June 10, 2024

_____
Matthew Matkov