**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

PleasrDAO, an exempted foundation company,　　　**:**

　　　　　　　　　　　　　　　　　　　　　　　　**:**

　　　　　　　　　　*Plaintiff*,　　　　　　　　**:**　　　Case No. 24-cv-04126

　　　　　　　　　　　　　　　　　　　　　　　　**:**

　　　　　　　　　　　　　　　　　　　　　　　　**:**

　　　　　　　　　　　　　　　　　　　　　　　　**:**

　　　　　　　　　　v.　　　　　　　　　　　　**:**

　　　　　　　　　　　　　　　　　　　　　　　　**:**

Martin Shkreli,　　　　　　　　　　　　　　　**:**

　　　　　　　　　　　　　　　　　　　　　　　　**:**

　　　　　　　　　　　　　　　　　　　　　　　　**:**

　　　　　　　　　　*Defendant*.　　　　　　　　**:**

------------------------------------------------------------x

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR
TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, ORDER
SEIZING ASSETS, AND ORDER FOR DISGORGEMENT AND ACCOUNTING**</u>

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................................. 1

II.    STATEMENT OF FACTS ............................................................................... 3

    A.    Wu-Tang Clan Records And Sells A Historically Unique Album To Shkreli ............ 3

    B.    Shkreli Is Convicted Of Securities Fraud And Ordered To Forfeit All Interest And Rights To The Album ................................................................................... 4

    C.    PleasrDAO Purchases The Album ................................................................. 6

    D.    Shkreli Retains And Possibly Distributes The Album's Data And Files In Violation Of The Forfeiture Order ............................................................................... 6

    E.    Shkreli Other Displays of Contempt for PleasrDAO, Wu-Tang, and The Judicial System ...................................................................................................... 8

III.    ARGUMENT ................................................................................................ 9

    A.    The Court Should Issue A Temporary Restraining Order and Preliminary Injunction To Preserve The Status Quo .......................................................... 10

        1.    PleasrDAO Is Substantially Likely To Succeed On The Merits Of Its Claims .... 11

        2.    PleasrDAO Will Suffer Irreparable Harm If Shkreli Is Not Immediately Restrained .................................................................................. 18

        3.    The Balance Of Hardships Weighs Strongly In PleasrDAO's Favor .................. 19

        4.    The Public Interest Supports An Injunction ......................................... 20

        5.    No Security Bond is Necessary under Rule 65. ...................................... 21

    B.    An Inventory And Accounting Of The Copies Retained And The Individuals To Whom Shkreli Distributed The Data And Files, And Any Attendant Profits, is Necessary. .............................................................................................. 21

    C.    Civil Seizure and Disgorgement Is Necessary To Prevent Shkreli From Further Disseminating The Album's Data And Files ................................................... 22

        1.    The Court Has Authority To Order Seizure Under The DTSA ........................... 22

        2.    The Court Has Authority To Order Seizure Under FRCP 64 And The State Law Doctrine Of Replevin .................................................................... 24

IV.    CONCLUSION .............................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.H. v. French*,
  985 F.3d 165 (2d Cir. 2021)......................................................................................10

*Aventri, Inc. v. Tenholder*,
  No. 3:18-CV-02071 (KAD), 2018 U.S. Dist. LEXIS 212607 (D. Conn. Dec. 18, 2018) .......20

*BaseCap Analytics Inc. v. Amenn*,
  No. 1:23-cv-09370-MKV, 2023 U.S. Dist. LEXIS 209808 (S.D.N.Y. Nov. 22, 2023)..........20

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
  784 F.3d 887 (2d Cir. 2015).......................................................................................10

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
  666 F. Supp. 3d 328 (S.D.N.Y. 2023)..........................................................................12

*Broker Genius, Inc. v. Zalta*,
  280 F. Supp. 3d 495 (S.D.N.Y. 2017)..........................................................................11

*Carnegie E. House Hous. Dev. Fund Co., Inc. v. Interiors Grp. LLC*,
  No. 23-cv-8384 (JSR), 2024 U.S. Dist. LEXIS 47655 (S.D.N.Y. Mar. 13, 2024).................17

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
  598 F.3d 30 (2d Cir. 2010)........................................................................................11

*Corsello v. Verizon N.Y., Inc.*,
  18 N.Y.3d 777 (N.Y. 2012) .......................................................................................17

*David Tunick, Inc. v. Kornfeld*,
  838 F. Supp. 848 (S.D.N.Y. 1993) .............................................................................18

*DFO Glob. Performance Commerce Ltd. (Nev.) v. Nirmel*,
  No. 20-CV-6093 (JPO), 2021 U.S. Dist. LEXIS 148009 (S.D.N.Y. Aug. 6, 2021)...............12

*Doctor's Assocs. v. Distajo*,
  107 F.3d 126 (2d Cir. 1997).......................................................................................21

*Doctor's Assocs. v. Stuart*,
  85 F.3d 975 (2d Cir. 1996).........................................................................................21

*Dymax Corp. v. Kalach*,
  No. 3:22-CV-00516 (KAD), 2022 U.S. Dist. LEXIS 65404 (D. Conn. Apr. 8, 2022) ..........20

*EEOC v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Local 580*,
   139 F. Supp. 2d 512 (S.D.N.Y. 2001) ........................................................................11

*eShares, Inc. v. Talton*,
   No. 22-CV-10987, 2024 U.S. Dist. LEXIS 59936 (S.D.N.Y. Mar. 29, 2024) .......................12

*Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng.*,
   985 F. Supp. 2d 262 (D. Conn. 2013), aff'd, 557 Fed. Appx. 53 (2d Cir. 2014) ...................10

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009) ................................................................................19

*Federal Trade Commission v. Vyera Pharmaceuticals, LLC*,
   No. 20-cv-00706 (S.D.N.Y. Jan. 14, 2022), ECF No. 865 .........................................9

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
   730 F.2d 61 (2d Cir. 1984) ................................................................................19

*Gucci Am. v. Bank of China*,
   768 F.3d 122 (2d Cir. 2014) ................................................................................21

*Hanyzkiewicz v. Allegiance Retail Servs.*,
   LLC, No. 22-CV-4051 (ALC), 2023 U.S. Dist. LEXIS 58489 (S.D.N.Y. Mar. 31, 2023).....11

*Integrated Cash Mgmt. Servs. v. Dig. Transactions, Inc.*,
   920 F.2d 171 (2d Cir. 1990) ................................................................................15

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
   596 F.2d 70 (2d Cir. 1979) ................................................................................18

*JBrick, LLC v. Chazak Kinder, Inc.*,
   No. 21-CV-02883 (HG) (RLM), 2023 U.S. Dist. LEXIS 168647 (E.D.N.Y.
   Sep. 21, 2023) ................................................................................................16

*Kaye v. Grossman*,
   202 F.3d 611 (2d Cir. 2000) ................................................................................17

*KCG Holdings, Inc. v. Khandekar*,
   No. 17 Civ. 3533, 2020 U.S. Dist. LEXIS 44298, 2020 WL 1189302
   (S.D.N.Y. Mar. 12, 2020) ................................................................................19

*Keybanc Capital Mkts., Inc. v. Extreme Steel, Inc.*,
   No. 23-cv-8535 (JSR), 2024 U.S. Dist. LEXIS 3047 (S.D.N.Y. Jan. 5, 2024) .................17

*Kirch v. Liberty Media Corp.*,
   449 F.3d 388 (2d Cir. 2006) ................................................................................16

*Lasky v. Quinlan*,
558 F.2d 1133 (2d Cir. 1977)..................................................................11

*Loandepot.Com, LLC v. Crosscountry Mortg., LLC*,
2022 U.S. Dist. LEXIS 167104 (S.D.N.Y. Sep. 15, 2022)......................19

*Markovits v. Venture Info. Capital, Inc.*,
129 F. Supp. 2d 647 (S.D.N.Y. 2001).....................................................19

*Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*,
893 F. Supp. 285 (S.D.N.Y. 1995) ..........................................................10

*Reuters Ltd. v. United Press Int'l Inc.*,
903 F.2d 904 (2d Cir. 1990).....................................................................18

*Robins v. Zwirner*,
713 F. Supp. 2d 367 (S.D.N.Y. 2010) ......................................................18

*Shamrock Power Sales, LLC v. Scherer*,
No. 12-CV-8959 (KMK) (JCM), 2016 U.S. Dist. LEXIS 144773 (S.D.N.Y.
Oct. 18, 2016) ...........................................................................................21

*Southland Corp. v. Froelich*,
41 F. Supp. 2d 227 (E.D.N.Y. 1999) ........................................................24

*Tom Doherty Assocs., Inc v. Saban Entm't, Inc.*,
60 F.3d 27 (2d Cir. 1995).........................................................................18

*Turret Labs USA, Inc. v. CargoSprint, LLC*,
No. 21-952, 2022 U.S. App. LEXIS 6070 (2d Cir. Mar. 9, 2022)...........13

*United Serv. Prot. Corp. v. Lowe*,
354 F. Supp. 2d 651 (S.D. W. Va. 2005) .................................................12

*United States Polo Ass'n v. PRL USA Holdings, Inc.*,
800 F. Supp. 2d 515 (S.D.N.Y. 2011)......................................................20

*United States v. Shkreli*,
No. 15-cr-00637 (E.D.N.Y. Dec. 14, 2015)....................................4, 5, 6, 9

*Warner-Lambert Co. v. Northside Dev. Corp.*,
86 F.3d 3 (2d Cir. 1996)...........................................................................19

*Yang v. Kosinki*,
960 F.3d 119 (2d Cir. 2020)......................................................................10

**Statutes**

15 U.S.C. § 1116.................................................................................................1

18 U.S.C. § 1836(2) ...................................................................................................1

18 U.S.C. § 1836(3)(A) ............................................................................................10

18 U.S.C. § 1836(b)(1) .............................................................................................12

18 U.S.C. § 1836(b)(2)(A)(i) ....................................................................................22

18 U.S.C. § 1836(b)(2)(A)(ii) ...................................................................................23

18 U.S.C. § 1839(3) ..................................................................................................13

18 U.S.C. § 1839(5)(B)(ii)(II) ..................................................................................13

28 U.S.C. § 1651(a), (ii) ............................................................................................1

**Rules**

CPLR § 7102(d)(1) ...................................................................................................25

Plaintiff PleasrDAO ("PleasrDAO") seeks entry of (i) a temporary restraining order and preliminary injunction pursuant to 15 U.S.C. § 1116, Federal Rule of Civil Procedure 65, and 28 U.S.C. § 1651(a), (ii) an order of inventory and accounting pursuant to the Court's equitable powers, and (iii) an order for the civil seizure of property necessary to prevent the propagation or dissemination of the trade secret, pursuant to 18 U.S.C. § 1836(2) and Federal Rule of Civil Procedure 64, and (iv) an award of damages, against Defendant Martin Shkreli ("Shkreli").

## I.      **INTRODUCTION**

This case involves more bad acts by Shkreli, an individual well-known to this Court, and in particular, his violations of his forfeiture order and misappropriation of trade secrets.

Shkreli is the ex-pharmaceutical executive who famously increased the price of a life-saving drug by over five thousand percent and subsequently served seven years in prison after being convicted in this Court of securities fraud. Plaintiff PleasrDAO ("PleasrDAO") is a collective of digital artists in the business of acquiring culturally significant pieces of art. On March 26, 2018, this Court entered a judgment adopting a Preliminary Order of Forfeiture which, among other things, ordered Shkreli to surrender "the album, 'Once Upon a Time in Shaolin' by the Wu-Tang Clan (the "Album") to satisfy a judgment approximating $7.4 million. In 2021, the United States Marshals Service ("USMS") sold the Album, and PleasrDAO is its present owner.

The Album is novel and unique in that only one original exists. Wu-Tang conditioned the Album's original sale to Shkreli on the agreement not to broadcast, copy or exploit the Album and its recordings, except under certain narrow circumstances. These restrictions ensured that any present and future purchaser would own not only Wu-Tang's music, but also the exclusivity and privileges that come with being the only person who can listen to the Album at his or her leisure. In 2015, Shkreli purchased the Album for approximately $2,000,000. PleasrDAO acquired the Album in two transactions in 2021 and 2024, for approximately $4,000,000, and $750,000, respectively.

PleasrDAO has recently learned from Shkreli's own admissions that Shkreli unlawfully retained copies of the Album and intends to distribute them publicly. Such actions threaten to

greatly diminish or eliminate the Album's value, which derives largely from restrictions surrounding the Album. Shkreli has bragged on social media, for example, that he retained "mp3" copies of the Album's data and files and admitted to playing the files on live, virtual broadcasts. These statements have increased of late, including representations that he is willing to transfer the data and files to willing recipients.

Demonstrating a malicious disregard for the Plaintiff's rights, and his forfeiture order, on *June 9, 2024,* Shkreli apparently played music from the Album publicly, after expressing dismay that PleasrDAO had "blocked" him from its X account. Shkreli posted about a "Wu Tang official listening party," on the social media platform, X (formerly Twitter). On *May 14, 2024*, Shkreli tagged PleasrDAO on his X account, posted a screenshot of PleasrDAO's website stating that the album would not be released until 2103, and stated "look out for a torrent," suggesting he would upload the files for public download. On *April 13, 2024*, Shkreli commented on a posting by one of PleasrDAO's members on the social media platform "X" (formerly Twitter) regarding the Album by stating that "LOL i have the mp3s you moron[,]" "this thread is about someone listening to a CD > 5000 people have[,]" and "i can just upload the mp3s if you want?[,]" "just give me your email lol[.]"

Shkreli's admitted retention and contemplated distribution of the Album's recordings, if true, violate the terms of the Court's forfeiture order and the Defense of Trade Secrets Act, and constitutes a misappropriation of trade secrets, tortious interference with a prospective economic advantage, and unjust enrichment. PleasrDAO must ascertain the extent to which Shkreli took these acts; any further distributions will continue to diminish the value of the unique Album. PleasrDAO thus seeks (i) a temporary restraining order and preliminary injunction preventing further retention and/or distribution, (ii) an inventory and accounting of the copies retained and the individuals to whom Shkreli distributed the data and files, and any attendant profits, and (iii) an order for civil seizure, and (iv) monetary damages.

## II.     STATEMENT OF FACTS

### A.     Wu-Tang Clan Records And Sells A Historically Unique Album To Shkreli

Wu-Tang is one of the world's most famous hip-hop groups and has been described by some critics as one of the greatest rap groups of all time.[1] From 2007 to 2013, Wu-Tang recorded the Album, a secret 31-track album featuring guest appearances from notable individuals such as musical artists Cher and Redman, celebrity actors, and professional athletes. Declaration of Matthew Matkov in Support of PleasrDAO's Request for an Application for Temporary Restraining Order, Preliminary Injunction, Order Seizing Assets, and Order for Disgorgement and Accounting ("Matkov Decl.") ¶ 4, Ex. A. According to the consortium that funded and coordinated the Album's creation, the Album was a protest to what they saw as the devaluation of music in the digital era. *Id.* In this spirit, and unlike conventional commercial album releases, Wu-Tang never released the Album to the public. Instead, Wu-Tang produced only one copy of the Album.

Consistent with their intent for the Album to be a historically unique musical compilation, Wu-Tang leader Robert "RZA" Diggs and producer Tarik "Cilvaringz" Azzougarh (together, the "Producers") sold the Album adorned in an ornate, boxed set. *Id.* at Ex. A. The boxed set included (i) the only existing hard copy of the Album, burned onto a single two-disc set; (ii) a hand carved, nickel and silver cased box designed by the British Moroccan artist Yahya; (iii) a gold leafed certificate of authenticity; (iv) a pair of customized audio speakers; and (v) a 174-page leather-bound manuscript volume containing lyrics, credits and anecdotes on the production and recordings of each song.  *Id.*; Matkov Decl. Ex. A.

On September 3, 2015, the Producers sold the Album to Shkreli for a reported sum of $2,000,000. *Id.* ¶ 6. The sale reportedly made the Album the most expensive musical work ever sold, as certified by the Guinness Book of World Records.  Matkov Decl. ¶ 7, Ex. C. The Producers and Shkreli executed a Purchase Agreement to effectuate the sale (the "Original Purchase Agreement") imposing several restrictive covenants on Shkreli. *See* Matkov Decl. Ex. B. Among

---

[1] *See, e.g.*, Nefertiti Austin, et al., *50 Greatest Rap Groups of All Time*, BILLBOARD (June 28, 2023), https://www.billboard.com/lists/best-rap-groups-hip-hop-all-time/2-wu-tang-clan/.

these covenants, the Original Purchase Agreement prohibited Shkreli, for eighty-eight years following the sale's closing, from duplicating, replicating, or exploiting the Album for any reason other than for "exhibition or playing" of the Album in "spaces not customarily used as venues for large musical concerts," or for advertising or promoting the same. *Id*. at 5-6. To the extent that Shkreli did exhibit or play the music and earned "net profits," the Producers were entitled to a portion of the profits. *Id.* at 6.

The Original Purchase Agreement also expressed Wu-Tang and the Producers' intent to keep ownership of the Album in one person's hands at time, as it prohibited Shkreli from selling the Album to third parties unless "under the same terms and conditions" imposed by the Original Purchase Agreement. *Id.* at 6. So to the extent Shkreli sold *or* transferred the Album, he promised to "bind" any third party buyer or transferee "by written agreement to the same rights, restrictions, and obligations on the use, sale, and transfer of the Work" as Shkreli was subject to in the Original Purchase Agreement. *Id.* at 9.

### B.   Shkreli Is Convicted Of Securities Fraud And Ordered To Forfeit All Interest And Rights To The Album

Just over two months after Shkreli purchased the Album, a grand jury in the United States District Court for the Eastern District of New York indicted him on two counts of conspiracy to commit securities fraud, two counts of conspiracy to commit wire fraud, two counts of securities fraud, and one count of wire fraud. Indictment at 19-27, *United States v. Shkreli*, No. 15-cr-00637 (E.D.N.Y. Dec. 14, 2015), ECF No. 1. Shkreli's social media posts and comments to the press about trial evidence and witnesses were the subject of several collateral disputes during the trial, prompting the United States to request this Court to place a gag order on Shkreli. *See* Letter Motion for Order Limiting Extrajudicial Statements By Defendant and Counsel for All Parties as to Martin Shkreli, *United States v. Shkreli*, No. 15-cr-00637 (E.D.N.Y. July 3, 2017), ECF No. 261. The Court ordered Shkreli not to make further comments to the press regarding the case, evidence or witnesses within the courthouse. Order, *United States v. Shkreli*, No. 15-cr-00637 (E.D.N.Y. July 5, 2017). Nevertheless, Shkreli did not relent, posting inflammatory comments on his social media

pages in the following weeks such as "My case is a silly witch hunt perpetrated by self-serving prosecutors." Matkov Decl. ¶ 14, Ex. F.

On August 4, 2017, a federal jury found Shkreli guilty of two counts of securities fraud, and one count of conspiracy to commit securities fraud. *See* Verdict Sheet at 1-2, *United States v. Shkreli*, No. 15-cr-00637 (E.D.N.Y. Aug. 4, 2017), ECF No. 305. On September 13, 2017, with Shkreli's sentencing hearing still pending, the Court revoked Shkreli's bail and ordered him to be detained after he threatened former Secretary of State Hillary Clinton by publicly offering $5,000 to anyone who would "'grab' some of her hair" on his behalf. *See* Motion to Revoke Bail by USA as to Martin Shkreli at 1, *United States v. Shkreli*, No. 15-cr-00637 (E.D.N.Y. Sep. 7, 2017), ECF No. 362; Order of Detention at 1-3, *United States v. Shkreli*, No. 15-cr-00637 (E.D.N.Y. Sep. 13, 2017), ECF No. 367. In response to the Government's request to revoke bail, Shkreli posted on social media: "Fuck the government. I will never kiss their ring or snitch." Matkov Aff. ¶ 14c, Ex. F.

On March 26, 2018, the Court entered Judgment imprisoning Shkreli for eighty-four months. Judgment in a Criminal Case at 2, *United States v. Shkreli*, No. 15-cr-00637 (E.D.N.Y. Mar. 26, 2018), ECF No. 566 (Matkov Decl. Ex. D) (the "Forfeiture Order"). The Forfeiture Order also required Shkreli to forfeit the proceeds of his fraud and criminal activity up to $7,360,450 (the "Forfeiture Money Judgment"). To satisfy this money judgment, the Forfeiture Order required Shkreli to forfeit "***his interest in[,]*** and ***all proceeds traceable to[,]***" certain assets including the Album. *Id.* at 9-10 (emphasis added). The Forfeiture Order also prohibited Shkreli from taking actions that could negatively affect the Album's value. Specifically, it prohibited him from taking "any action that would have the effect of diminishing, damaging and/or dissipating" the Album, "restrained, enjoined and prohibited" Shkreli "from taking any action that would affect the availability, marketability or value of" the Album, and required Shkreli to "take all reasonable steps . . . to ensure that" the Album is "preserved . . . and are not damaged, diluted or diminished in value as a result of any" of Shkreli's actions. *Id.* at 11-12. Shkreli was also to be placed under supervised release for three years with "special conditions" upon release from prison. *Id.* at 3.

Among these special conditions, the Forfeiture Order required Shkreli to "[c]omply with the fine and forfeiture orders" in the case. *Id.* at 5 and 7. Moreover, the terms of Shkreli's supervision prohibited him from "knowingly leav[ing] the federal judicial district where [he was] authorized to reside without first getting permission from the court or the probation officer." *Id.* at 4.

**C.     PleasrDAO Purchases The Album**

PleasrDAO acquired the Album in two transactions. In July 2021, it bought the physical asset and exclusive right to play the audio tracks for approximately $4,000,000. Matkov Decl. ¶ 9. In January 2024, it bought the copyrights in and exclusive right to exploit the recordings for approximately $750,000. *Id.* At all relevant times, the Album was moved by secure transport and/or kept in a secure location. The security measures undertaken included the use of armed security guards, secure entrance and exit points, and continual video surveillance, oversight and checks on the Album's condition. *Id.* ¶ 11.

**D.     Shkreli Retains And Possibly Distributes The Album's Data And Files In Violation Of The Forfeiture Order**

Since his release from prison in May 2022, Shkreli has maintained an active social media presence. *Id.* ¶ 13. He frequently posts on websites like facebook and X (formerly Twitter) and participates in "live stream" activity on websites including on Discord and YouTube. *Id.* ¶ 15. Live streamers often make money through viewership either by advertising revenue or paid channel memberships. *Id.* ¶ 16. During his live streams, Shkreli often shares his computer screen with his audience while he engages in online activities including virtual reality computer games and attempts to meet women through online dating. *Id.* ¶ 15. Presently, Shkreli's YouTube Channel has over fifty-seven thousand subscribers. *Id.* ¶ 17.

On several occasions, Shkreli has purportedly broadcast music from the Album over his live stream, and/or told viewers that he had retained copies of the Album's data and files. For example, on or about June 18, 2022, Shkreli played certain files from the Album on his YouTube channel, stating "[y]eah, that's the Wu Tang album for all you crazy streamer people." *Id.* ¶ 18. During another YouTube live stream four days later, a viewer asked Shkreli if he still had a copy

of "Once Upon a Time in Shaolin." Shkreli said, "I do. I was playing it on YouTube the other night even though somebody paid $4 million for it." *Id.* That "somebody" was, of course, PleasrDAO.

On June 30, 2022, Shkreli again played the music from the Album on his YouTube channel and stated, "of course I made MP3 copies, they're like hidden in safes all around the world . . . I'm not stupid. I don't buy something for two million dollars just so I can keep one copy." *Id.* In March 2023, writing about the Album on his personal blog, Shkreli stated that he "timed the sale of the album to take advantage of the NFT boom and made a great profit and still kept the mp3s," which he had "played online a number of times since returning" from prison. *Id.* ¶ 19, Ex. H.

Shkreli's conduct and threats have accelerated of late as Shkreli has recently indicated his willingness to distribute his copies of the Album's data and files to third parties. *On April 13, 2024,* a member of PleasrDAO posted a photo of the Album on X. *Id.* ¶ 20, Ex. I. Shkreli commented on the post, stating among other things, "LOL i have the mp3s you moron[,]" "i literally play it in my discord all the time. you're an idiot[,]" and "this thread is about someone listening to a CD > 5000 people have . . . ." *Id.* Shkreli indicated that he was willing to email the Album's data and files to at least two commenters on the post, stating "i can just upload the mp3s if you want? email addy?" and "just give me your email lol[.]" *Id.* ¶ 21; Exs. J and K. *On May 13, 2024,* Shkreli appeared as a guest on a podcast and stated that he "burned the album and sent it to like, 50 different chicks," asking the host, "Do you know how many blowjobs that album got me? You think I didn't make a fucking copy of it? Are you joking?" *Id.* ¶ 22. *On May 14, 2024,* Shkreli posted a screenshot of PleasrDAO's website to his X account with the caption "look out for a torrent im sick of this shit @PleasrDAO[,]" indicating that he would upload his copies for other X users to download. *Id.* ¶ 23; Ex. L. In responding to a comment on this post, Shkreli wrote "ive already sent it to 50 ppl[.]" *Id. On June 9, 2024,* Shkreli purportedly hosted a "Wu Tang official listening party" on his X account in which he played music from the Album to potentially over 4,900 listeners. *Id.* ¶ 24; Ex. M.

**E.      Shkreli Other Displays of Contempt for PleasrDAO, Wu-Tang, and The Judicial System**

Shkreli has been a vocal opponent of PleasrDAO, Wu-Tang, the U.S. judicial system and this Court. In addition to the above, in recent social media posts, Shkreli tagged PleasrDAO and stated "look out for a torrent im sick of this shit." *Id.* ¶ 23. Shkreli carried out a public feud with Wu-Tang members, posting a video online in which he threatened to "erase" Wu-Tang member "Ghostface Killah" from the Album and "the record books of rap" and another video in which he used the Work's casing as a beverage coaster. *Id.* ¶¶ 24-25. When Shkreli attempted to sell the album on eBay in 2017, he posted on Facebook, "I am selling the Wu-Tang Clan album. Fuck Wu-Tang." *Id.* ¶ 14, Ex. F.

Shkreli also has criticized the judicial system on various occasions and violated court orders. While still in prison, Shkreli appears to have directed his friends and acquaintances to publish statements on his Facebook page on his behalf that criticized the justice system and, particularly, this Court. Matkov Decl. ¶ 14; Ex. F. A December 9, 2018 Facebook post from Shkreli's Facebook account presumably written in response to the indictment of Chinese conglomerate Huawei's Chief Financial Officer states, "The insecure bureaucrats at the EDNY are at it again, . . . . Hire judges who aren't former prosecutors." *Id*. A January 25, 2019 Facebook post from Shkreli's Facebook account addressed to Roger Stone Jr. calls the justice system "rigged" and advised Stone that it was "probably better to make a polite mockery of the 'justice' system than hang on to the 1% chance you can beat illegal Brady suppression, FBI coercion, jury 'instructions,' two prosecutor closing statements, media leaks and trial-by-public-opinion, FBI agents getting to take the witness stand, etc." *Id.*

More recently, Shkreli has demonstrated his continued willingness to obfuscate and frustrate judicial proceedings. In a separate lawsuit brought by the Federal Trade Commission, the United States Court for the Southern District of New York banned Shkreli "for life from directly or indirectly participating in any manner in the pharmaceutical industry." Opinion and Order at 127, *Federal Trade Commission v. Vyera Pharmaceuticals, LLC*, No. 20-cv-00706 (S.D.N.Y. Jan. 14, 2022), ECF No. 865. Later in 2022, however, Shkreli announced the formation of a new

company called Druglike with the stated purpose to "disrupt the economics of the drug business by allowing a wide pool of innovators and contributors, rather than only pharmaceutical giants, to profit from drug discovery." Plaintiffs' Memorandum of Law in Support of Motion for an Order to Show Cause Why Defendant Shkreli Should Not Be Found in Civil Contempt for Violating the Court's February 4, 2022 Order at 5, *Federal Trade Commission v. Vyera Pharmaceuticals, LLC*, No. 20-cv-00706 (S.D.N.Y. Jan. 20, 2023), ECF No. 922. To assess whether Shkreli's involvement with Druglike violated the lifetime pharmaceutical industry ban, the FTC sought information regarding the company and Shkreli's involvement that Shkreli was obligated to provide under court order. *Id.* After several months of receiving no substantive responses from Shkreli, the FTC moved for an order placing Shkreli in civil contempt. *Id.* Only after facing a contempt order did Shkreli agree to comply. Letter addressed to Judge Denise L. Cote from Markus H. Meier and Brianne E. Murphy dated 03/06/2023 re: Defendant Shkreli's Intent to Comply with Plaintiffs' Compliance Requests, *Federal Trade Commission v. Vyera Pharmaceuticals, LLC*, No. 20-cv-00706 (S.D.N.Y. Mar. 13, 2023), ECF No. 933.

Finally, on or around November 6, 2023, Shkreli violated the terms of his supervised release by travelling out of state without permission from his probation office. Order and Report on Person Under Supervision at 2, *United States v. Shkreli*, No. 15-cr-00637 (E.D.N.Y. Dec. 6, 2023), ECF No. 794.

### III.      ARGUMENT

PleasrDAO requests three general forms of equitable relief.  *First*, the Court should issue a temporary restraining order and preliminary injunction to prevent Shkreli from possessing, using, disseminating, or selling any interests in the Album, or in any way causing further damage to PleasrDAO respecting the Album. *Second*, the Court should issue an order compelling Shkreli to provide an inventory and accounting of (i) the copies of the Album data and files he retained, (ii) the individuals to whom he distributed those data and files, and (iii) the profits traceable to his retention and distribution of those files. *Third*, the Court should issue civil seizure order seizing all of Shkreli's remaining copies of the Album's data and files. *Finally,* the Court should issue an

order compelling Shkreli to disgorge any wrongfully gained profits from his retention and distribution of the Album's data and files.

### A. The Court Should Issue A Temporary Restraining Order and Preliminary Injunction To Preserve The Status Quo

The Court should issue a temporary restraining order and preliminary injunction to prevent Shkreli from possessing, using, disseminating, and/or selling any interests in the Album, or in any way causing further damage to PleasrDAO's respecting the Album. The standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction. *See Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), aff'd, 557 Fed. Appx. 53 (2d Cir. 2014). To prevail on a motion for a preliminary injunction or a temporary restraining order, the movant must show: (1) irreparable harm, (2) either a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, (3) that the balance of hardships tips decidedly in the movant's favor, and (4) that the public interest would not be disserved by the issuance of the injunction. *See Yang v. Kosinki*, 960 F.3d 119, 127 (2d Cir. 2020); *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015). Where the movant seeks to modify the status quo by virtue of a mandatory preliminary injunction," he "must also make a strong showing of irreparable harm and demonstrate a clear or substantial likelihood of success on the merits." *See A.H. v. French*, 985 F.3d 165, 176 (2d Cir. 2021).

As detailed below, PleasrDAO easily satisfies both the normal and heightened standards for prohibitive and mandatory injunctions, respectively. Injunctive relief is an appropriate remedy for each of PleasrDAO's claims. *See, e.g.*, 18 U.S.C. § 1836(3)(A) ("In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may . . . grant an injunction."); *Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 293 (S.D.N.Y. 1995) (injunctive relief is appropriate where the plaintiff "will suffer irreparable harm because of the conduct, e.g., that they have no adequate remedy at law, and that the balance of equities weighs in their favor.")

1.      **PleasrDAO Is Substantially Likely To Succeed On The Merits Of Its Claims**

The Second Circuit has adopted a flexible standard regarding the "likelihood of success" requirement, allowing a party seeking a preliminary injunction to show either a likelihood of success on the merits or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *See Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainly. [It] need only make a showing that the probability of his prevailing is better than fifty percent." *See Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 509 (S.D.N.Y. 2017) (citation omitted). PleasrDAO is substantially likely to succeed on the merits of its claims for third party enforcement of the Forfeiture Order, violation of the Defend Trade Secrets Act ("DTSA"), state law trade secret misappropriation, and tortious interference with prospective economic advantage.

a.   Shkreli Violated The Forfeiture Order

Under Rule 71 of the Federal Rules of Civil Procedure ("FRCP"), "a non-party may enforce obedience to a court's order if he is an intended beneficiary of the order and if he has standing, i.e. if his complaint comes within the zone-of-interests protected by the order." *EEOC v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Local 580*, 139 F. Supp. 2d 512, 520-21 (S.D.N.Y. 2001) (citing FRCP 71); *see also Hanyzkiewicz v. Allegiance Retail Servs.*, LLC, No. 22-CV-4051 (ALC), 2023 U.S. Dist. LEXIS 58489, at *9 (S.D.N.Y. Mar. 31, 2023). While typically used by intervening non-parties in the underlying proceeding in which the relevant order was made, Rule 71 "may support a separate action" by a non-party to enforce an injunction if the nonparty still has standing to sue. *See Lasky v. Quinlan*, 558 F.2d 1133, 1137 (2d Cir. 1977).

The Forfeiture Order intended to benefit the purchasers of Shkreli's forfeited assets, including PleasrDAO as an immediate purchaser of the Album. The order affirmatively restrained Shkreli from taking "any action that would affect the availability, marketability or value of the"

- 11 -

Album and imposed affirmative obligations on Shkreli to "take all reasonable steps . . . to ensure that" the Album was "preserved . . . [and] not damaged, diluted or diminished in value as a result of any" of Shkreli's actions. *See* Matkov Decl. Ex. D at 12. PleasrDAO's interests likewise fall within the zone-of-interests protected by the order because the order's purpose, *inter alia*, is to preserve the value of Shkreli's Substitute Assets, including the Album. *Id.* Enforcement of the order's value preserving provisions is necessary to maintain the integrity of the USMS' ability to sell unencumbered forfeited items.

> b.   <u>Shkreli Has And Continues To Violate The Defend Trade Secrets Act</u>

Shkreli has violated and threatens to further violate the DTSA by misappropriating the Album's data and files. "The DTSA provides a private right of action for the misappropriation of trade secrets, if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *eShares, Inc. v. Talton*, No. 22-CV-10987 (JGLC), 2024 U.S. Dist. LEXIS 59936, at *14 (S.D.N.Y. Mar. 29, 2024) (citing 18 U.S.C. § 1836(b)(1)). To state a claim for trade secret misappropriation under the DTSA, "a plaintiff must prove that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 384 (S.D.N.Y. 2023) (internal citation and quotation marks omitted). Given that PleasrDAO, the purchaser of the Album, is a foreign entity, there can be no dispute that the trade secret at issue involves a product used in interstate commerce. *United Serv. Prot. Corp. v. Lowe*, 354 F. Supp. 2d 651, 658 (S.D. W. Va. 2005) (finding transaction related to interstate commerce because it was entered into between citizens of different states).

The Album's data and files are also trade secrets. "The DTSA sets forth a ***broad*** definition of 'trade secret' that encompasses '***all forms and types*** of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, ***compilations***, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible[.]'" *DFO Glob. Performance Commerce Ltd. (Nev.) v. Nirmel*, No. 20-CV-6093 (JPO), 2021 U.S. Dist. LEXIS 148009, at *11 (S.D.N.Y. Aug. 6, 2021) (emphasis

added) (quoting 18 U.S.C. § 1839(3)). Moreover, the owner must have "taken reasonable measures to keep such information secret," and the "information [must] derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]" 18 U.S.C. § 1839(3); *see Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 21-952, 2022 U.S. App. LEXIS 6070, at *3 (2d Cir. Mar. 9, 2022).

Here, the Album's data and files comprise business, scientific, technical, economic, or engineering information, i.e., a compilation of data and files comprising Wu-Tang's proprietary musical recordings, compositions, lyrics, and sound engineering.[2] PleasrDAO has taken abundant measures to keep the Album's data and files secret, including travelling by secure transport, accompanied by armed security guards, to retrieve the Album, and then storing the Album in a secure location protected by a gated and guarded entrance and exit, video surveillance, and constant oversight and checks on condition and required restoration. Matkov Decl. ¶ 11.

The Album's data and files clearly derive independent economic value from their secrecy. This is evidenced by the Album's record-breaking purchase prices. *Id.* ¶ 7. Both the Original Purchase Agreement and Resale Purchase Agreement contemplate that the Album's owner may earn profits from privately playing and exhibiting the data and files. *Id.* Ex. B at 2. Indeed, PleasrDAO acquired the Album in part to arrange for private performances of the data and files throughout the world. *Id.* ¶ 12.

Shkreli misappropriated the Album's data and files by surreptitiously withholding such information from the USMS and others, when it was legally compelled to disgorge all interests in the Album. Shkreli indisputably knew that the Album was a trade secret based on the contractual restrictions regarding dissemination that he was aware of, and entered into, and his numerous posts

---

[2] This classification is supported by the Department of Justice's treatment of the Album under the Freedom of Information Act ("FOIA.") On August 4, 2021, an individual submitted a FOIA request for various documents pertaining to the Album. On January 5, 2022, the Department of Justice responded to the request stating that it was withholding information responsive to the request under FOIA Exemption (b)(4), which "protects trade secrets and commercial or financial information obtained from a person that is privileged or confidential." Matkov Decl. ¶ 27, Ex. N.

proclaiming the confidential nature of the Album. A trade secret is misappropriated when, *inter alia,* one "disclos[es] or use[s]" another's "trade secret" without the other's "express or implied consent," and the discloser "knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret[.]" 18 U.S.C. § 1839(5)(B)(ii)(II). Shkreli knowingly and maliciously disclosed the music over public live streams. Matkov Decl. ¶¶ 18, 24. His social media activity suggests that he intends to distribute the Album's data and files. *Id.* ¶¶ 21-23. Shkreli does not have (and has not ever had) PleasrDAO's express or implied consent to disclose or use the music or the data and files. *Id.* ¶ 28.

As noted, Shkreli acquired the Album's data and files under several circumstances giving rise to a duty to maintain the Album's secrecy or to limit its use. *First*, under the Original Purchase Agreement, Shkreli was prohibited from duplicating, replicating, or exploiting the Album's data and files for any reason other than for limited "exhibition and playing" purposes. Matkov Decl. Ex. B at 5-6. As a separate condition to the Original Purchase Agreement, Shkreli represented and warranted to the Producers that "[f]or 88 years after the Closing" he would "not engage in any" activity "outside of the scope" of these permitted exhibition and playing purposes. *Id.* at 9. The Original Purchase Agreement thus imposed a duty on Shkreli to maintain the Album's secrecy and to limit its use to those permitted uses defined in the Original Purchase Agreement.

*Second*, Shkreli represented under the Original Purchase Agreement that in the event of his "resale or transfer" of the Album to another entity, he would "bind such buyer or transferee by written agreement ***to the same rights, restrictions, and obligations on the use***, sale, and transfer of the Work" as Shkreli was subject to in the Original Purchase Agreement. *Id.* (emphasis added). This representation clearly established a duty that flowed with the contract to maintain the Album's secrecy and limit its use.

*Third*, under the Forfeiture Order, Shkreli was prohibited from taking any action that would "have the effect of diminishing, damaging and/or dissipating" the Album, or "affect the availability, marketability or value" of the Album. Matkov Decl. Ex. D at 11. Shkreli knew that

the Album's primary value and marketability was in its exclusivity because he purchased the Album under materially similar terms. He knew that by distributing copies of Album's data and files or by playing it publicly, his actions would decrease the Album's marketability and value. Accordingly, the Forfeiture Order also established a duty on Shkreli to maintain the Album's secrecy and limit its use.

> c.  Shkreli Has And Continues To Misappropriate Trade Secrets Under New York Law

Under New York law, "a plaintiff claiming misappropriation of a trade secret must prove: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Mgmt. Servs. v. Dig. Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990). "In determining whether a trade secret exists, the New York courts have considered the following factors to be relevant:"

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Integrated Cash Mgmt. Servs. v. Dig. Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990).

Applied here, nearly every *Integrated Cash Management Services* factor suggests that the Album's data and files are protected trade secrets which Shkreli threatens to misappropriate. The Album's data and files are generally unknown to anybody other than, e.g., Wu-Tang, the Producers, Shkreli, the USMS, and PleasrDAO. Matkov Decl. at ¶ 5. The data and files are not generally known inside or outside the music industry. *Id.* As noted, PleasrDAO has taken measures to protect the secrecy of the data and files. *Id.* at ¶ 11. The value of the data and files is great to PleasrDAO, as the Album's premium value depends almost entirely on the exclusivity of the data and files. The data and files are not "readily ascertainable" but for Shkreli's improper disclosure and use[.]" *Integrated Cash Mgmt. Servs*, 920 F.2d at 174.

*Finally*, and as discussed above, Shkreli's retention, playing, and dissemination of his copies of the Album's data and files breaches the Forfeiture Order *and* duties flowing from the Original Purchase Agreement restricting transfer of those files.

### d. Shkreli Tortiously Interfered With PleasrDAO's Prospective Economic Advantage

"Under New York law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that[:] (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *JBrick, LLC v. Chazak Kinder, Inc.*, No. 21-CV-02883 (HG) (RLM), 2023 U.S. Dist. LEXIS 168647, at *12 (E.D.N.Y. Sep. 21, 2023) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006)). Those elements are easily satisfied here.

*First*, PleasrDAO contracted to buy the Album and its playing rights. The Resale Purchase Agreement, like the Original Purchase Agreement, contemplated that PleasrDAO would share in any profits obtained from exhibiting and playing the Album along with Shkreli's counterparties to the Original Purchase Agreement—RZA and Azzougarh. Matkov Decl. ¶ 12; Ex. B. PleasrDAO has plans for such exhibition and playing and is seeking to monetize the Album with third parties in the near future. *Id.* ¶ 31. Shkreli's actions are tortiously interfering with PleasrDAO's economic rights.

*Second*, Shkreli knew about PleasrDAO's purchase of the Album. *Id.* ¶ 18 (acknowledging that "somebody paid $4 million for it"); ¶ 21 (commenting about the Album in response to a social media post made by a PleasrDAO member); ¶ 23 (tagging PleasrDAO on X); ¶ 24 (stating that he would play the music on X because PleasrDAO's X account had blocked him). Shkreli intentionally interfered with PleasrDAO's business relationship by, inter alia, playing the music over his live streams and threatening to further interfere by distributing the Album data and files.

- 16 -

*Id.* ¶¶ 18-24. Both actions, real or contemplated, would diminish the value of the Album. *See supra* Sec. II.D.

*Third*, Shkreli used malice, or used dishonest, unfair, or improper means to cause this interference. Shkreli's animosity toward PleasrDAO, the court and others is set forth above. He, (i) repeatedly threatened to publicly disseminate his copies of the album in social media posts, at times, tagging PleasrDAO and posting a screenshot of PleasrDAO's website; (ii) purportedly played music from the Album on social media in response to PleasrDAO's social media activity, and (iii) publicly feuded with Wu-Tang and threatened to erase their work. Matkov Decl. ¶¶ 23-26. Shkreli at no time notified the USMS that he was withholding the data and files of the Album in violation of the Forfeiture Order. The Forfeiture Order prohibits Shkreli from doing anything that would diminish the Album's value, and he cannot profit from the Album. Matkov Decl. Ex. D at 9-12. Accordingly, he should have stopped possessing, using, disseminating or selling any aspects of the Album.[3] Shkreli's actions reflect that he acted purely out of malice.

*Finally,* Shkreli's past and future acts of disseminating the Album copies has and will continue to injure PleasrDAO by impeding its ability to sell this unique artwork, and diminishing the Album's value.

> e. <u>Shkreli was Unjustly Enriched by Misappropriating the Album.</u>

"The basis of a claim for unjust enrichment under New York law is that the defendant has obtained a benefit which in equity and good conscience should be paid to the plaintiff." *Carnegie E. House Hous. Dev. Fund Co., Inc. v. Interiors Grp. LLC*, No. 23-cv-8384 (JSR), 2024 U.S. Dist. LEXIS 47655, at *3-4 (S.D.N.Y. Mar. 13, 2024) (quoting *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (N.Y. 2012). The elements of unjust enrichment are "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution." *Keybanc*

---

[3] Had Shkreli *not* forfeited all interests in the Album as a condition of the Forfeiture Order, his interference would still be improper under the Original Purchase Agreement. Under that agreement, Shkreli never had the right to transfer any duplicated or replicated copies of the Album; he only had the right to resell or transfer the Album and all appurtenant "rights, restrictions, and obligations on the use, sale, and transfer of the" Album. Matkov Decl. Ex. B at 9.

*Capital Mkts., Inc. v. Extreme Steel, Inc.*, No. 23-cv-8535 (JSR), 2024 U.S. Dist. LEXIS 3047, at *10 (S.D.N.Y. Jan. 5, 2024) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)). "Typical [unjust enrichment] cases are those in which the defendant . . . has received money to which he or she is not entitled." *Id.*

Shkreli's intimations that he has played the data and files for others on his streams means he more likely than not obtained some benefit from improperly retaining the data and files, whether by increased advertising revenue on his stream, member donations and channel subscriptions, or direct compensation. This benefit to Shkreli comes at PleasrDAO's expense, as the Album's value, both in its resale potential and the potential profits it commands from exhibition and playing rights, will decrease as more people can freely hear the Album's music or gain access to the data and files. Equity and good conscience require restitution for myriad reasons including that: (1) Shkreli has not done anything to benefit PleasrDAO; (2) Shkreli's benefit is derived from violating a court order; and (3) PleasrDAO's harm undermines the credibility of the Court's forfeiture powers and the USMS' ability to sell unencumbered assets.

### 2. PleasrDAO Will Suffer Irreparable Harm If Shkreli Is Not Immediately Restrained

Irreparable harm is "injury for which a monetary award cannot be adequate compensation." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979). It often stems from the loss of a unique product. *See Tom Doherty Assocs., Inc v. Saban Entm't, Inc.*, 60 F.3d 27, 37-38 (2d Cir. 1995); *Reuters Ltd. v. United Press Int'l Inc.*, 903 F.2d 904, 907-08 (2d Cir. 1990). "In this regard, a showing of irreparable harm is similar to the showing required for specific performance of a contract[;] . . . [o]riginal works of art are within the small category of intrinsically unique goods for which a specific performance remedy is appropriate." *Robins v. Zwirner*, 713 F. Supp. 2d 367, 374 (S.D.N.Y. 2010) (holding that the sale of unique paintings could cause irreparable harm); *Cf. David Tunick, Inc. v. Kornfeld*, 838 F. Supp. 848, 852 (S.D.N.Y. 1993) (finding two photo prints, even where produced by the same artist and same plate, to be unique).

The Album is an original piece of art and only one original copy of the Album exists. The Album's uniqueness was a material condition of PleasrDAO's purchase, as the purchase price was based on representations that the data and files on the two-CD set comprised the only copy of 'Once Upon a Time in Shaolin.' *See* Matkov Decl. Ex. B at 1-2. While Shkreli's retention of copies of the Album's data and files alone diminishes the value of the Album, his threatened distribution of these copies to the broader public would further erode the relative uniqueness of the Album. The lost value from such distribution is not determinable, rendering the calculation of an appropriate monetary remedy difficult, if not impossible.

Moreover, "[a] rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will . . . irreparably impair the value of those secrets." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009); *accord Loandepot.Com, LLC v. Crosscountry Mortg., LLC*, 2022 U.S. Dist. LEXIS 167104, at *4 (S.D.N.Y. Sep. 15, 2022); *KCG Holdings, Inc. v. Khandekar*, No. 17 Civ. 3533, 2020 U.S. Dist. LEXIS 44298, 2020 WL 1189302, at *16 (S.D.N.Y. Mar. 12, 2020). Irreparable harm is presumed because a "trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984). "[I]t is clear that the loss of trade secrets cannot be measured in money damages." *Id.*

Here, Shkreli has apparently possessed, used, disseminated and/or sold the data and files of the Album and threatens to continue to do so. The Album is PleasrDAO's property, and all aspects of it comprise confidential and protected trade secrets. Shkreli's misappropriation has caused irreparable harm necessitating a temporary restraining order and preliminary injunction.

### 3.   The Balance Of Hardships Weighs Strongly In PleasrDAO's Favor

If Shkreli is allowed to continue his unauthorized use of the Album's data and files, PleasrDAO will suffer incalculable monetary loss, damage to its reputation, loss of control of its reputation, and loss of industry and consumer trust and goodwill. The Album's potential resale value and the profits that PleasrDAO may earn from playing or exhibiting the music will diminish as the data and files become more widely available. Further, PleasrDAO's reputation as a purveyor

of culturally significant pieces will also suffer, and members of the PleasrDAO members-only ecosystem may lose trust in PleasrDAO and its ability to procure truly unique pieces of art. Matkov Decl. ¶ 3.

By contrast, if an injunction is entered, Shkreli will not suffer at all. An injunction would simply compel him to comply with the Forfeiture Order and honor PleasrDAO's rights. It will require him to refrain from his malicious behavior in which he improperly and arrogantly seeks to damage PleasrDAO without any justification. He would simply be compelled to abide by what he is already legally obligated to do.

When the moving party will suffer harm that is not compensable in the absence of an injunction and the defendant is harmed only economically, courts in this circuit routinely find that the balance of hardships tips decidedly in the movants' favor. *See Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 8 (2d Cir. 1996); *see also Markovits v. Venture Info. Capital, Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001) (award of damages would not compensate moving party where threat of harm was to party's viability in marketplace).

### 4.  The Public Interest Supports An Injunction

Finally, an injunction barring Shkreli from distributing the Album's data and files is in the public interest. Should Shkreli distribute copies of the Album at will, the public's perception of the United States's forfeiture powers will be undermined.  Also, "[t]he consuming public has a protectable interest in being free from confusion, deception and mistake." *United States Polo Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011). Confusion and deception would result if Shkreli continues to possess, use or disseminate copies of the Album. Shkreli's purchase—and forfeiture—of the Album garnered national attention, and many of the terms of the Original Purchase Agreement are publicly known. It is public information that "the album is subject to various restrictions, including those relating to the duplication of its sound recordings," and that Shkreli was forced to give up his interest in the Album as a condition of the Forfeiture Order. Matkov Decl. ¶ 10, Ex. E; *id.* Ex. D at 9-10.

Moreover, "[t]here is a substantial public interest in the protection of trade secrets and proprietary information as well as the enforceability of contracts." *BaseCap Analytics Inc. v. Amenn*, No. 1:23-cv-09370-MKV, 2023 U.S. Dist. LEXIS 209808, at *10-11 (S.D.N.Y. Nov. 22, 2023) (internal quotations omitted); *Dymax Corp. v. Kalach*, No. 3:22-CV-00516 (KAD), 2022 U.S. Dist. LEXIS 65404, at *3 (D. Conn. Apr. 8, 2022); *Aventri, Inc. v. Tenholder*, No. 3:18-CV-02071 (KAD), 2018 U.S. Dist. LEXIS 212607, at *2 (D. Conn. Dec. 18, 2018). Where, as here, the Album's data and files is a trade secret and PleasrDAO is its lawful owner, affirming PleasrDAO's unencumbered interests in the Album will serve the public interest.

### 5.  No Security Bond is Necessary under Rule 65.

Rule 65 of the Federal Rules of Civil Procedure requires the applicant for a temporary restraining order or preliminary injunction to give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FRCP 65.  However, "Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement 'where there has been no proof of likelihood of harm.'" *Doctor's Assocs. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (quoting *Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996)).  As the violations here are blatant and egregious, and there is no likelihood of harm to Shkreli should the Court enjoin him from further distributing the Album, the Court should not require PleasrDAO to post a security bond.

### B.  <u>An Inventory And Accounting Of The Copies Retained And The Individuals To Whom Shkreli Distributed The Data And Files, And Any Attendant Profits, is Necessary.</u>

The Court should also issue an order compelling Shkreli to provide an inventory and account of (i) the copies of the Album data and files he retained, (ii) the individuals to whom he distributed those data and files, and (iii) the profits traceable to his retention and distribution of those files, if any.   Shkreli's social media posts indicate that other individuals may already have copies of the Album's data and files. Matkov Decl. ¶ 20, Ex. I ("this thread is about someone listening to a CD > 5000 people have"); ¶¶ 22-23, Ex. L ("ive already sent it to 50 people"). It is therefore possible, if not probable, that Shkreli has already distributed copies of the data and files

to third parties and may have profited from doing so (whether through direct compensation or increased viewership on his streaming platforms). An inventory and accounting is therefore necessary to determine the scope of Shkreli's wrongdoing and to effectuate the seizure of said data and files and to determine an appropriate amount for disgorgement. *See, e.g. Shamrock Power Sales, LLC v. Scherer*, No. 12-CV-8959 (KMK) (JCM), 2016 U.S. Dist. LEXIS 144773, at *14-16 (S.D.N.Y. Oct. 18, 2016) (finding that the equitable remedy of accounting is permissible where the claim seeks equitable relief, "considering the basis for the plaintiff's claim and the nature of the underlying remedies sought.") (internal quotes omitted); *see also Gucci Am. v. Bank of China*, 768 F.3d 122, 132 (2d Cir. 2014) (accounting proper as a prerequisite for disgorgement).

### C. Civil Seizure and Disgorgement Is Necessary To Prevent Shkreli From Further Disseminating The Album's Data And Files

Finally, given Shkreli's threatened dissemination of the Album's data and files and his penchant for disobeying court orders, civil seizure of Shkreli's copies of the data and files is also necessary to prevent irreparable harm to PleasrDAO. Federal courts are empowered to grant a seizure order under the DTSA and, through Rule 64 of the Federal Rules of Civil Procedure, pursuant to Section 7102 of the New York Civil Practice Law and Rules ("CPLR").

### 1. The Court Has Authority To Order Seizure Under The DTSA

The DTSA permits courts to, in "extraordinary circumstances, issue an order providing for the seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action." 18 U.S.C. § 1836(b)(2)(A)(i). Prior to issuing a seizure order, the Court must find "that it clearly appears from specific facts" that:

> 1) an order issued pursuant to Rule 65 of the Federal Rules of Civil Procedure or another form of equitable relief would be inadequate because the party to which the order would be issued would evade, avoid, or otherwise not comply with such an order;
>
> 2) an immediate and irreparable injury will occur if such seizure is not ordered;
>
> 3) the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of

- 22 -

granting the application and substantially outweighs the harm to any third parties who may be harmed by such seizure;

4) the applicant is likely to succeed in showing that the information at issue is a trade secret and the defendant misappropriated the trade secret by inappropriate means or conspired to do so;

5) the person against whom seizure would be ordered has actual possession of the trade secret, and any property to be seized;

6) the application describes with reasonable particularity the matter to be seized and, to the extent reasonable under the circumstances, the location where the matter is to be seized;

7) if the applicant were to provide notice, the person against whom seizure would be ordered would destroy, move, hide, or otherwise make such matter inaccessible to the court; and

8) the applicant has not publicized the requested seizure.

18 U.S.C. § 1836(b)(2)(A)(ii). This case presents "extraordinary circumstances" in which a civil seizure order is necessary.

*First*, there is a high probability that Shkreli would "evade, avoid, or otherwise not comply" with other forms of equitable relief. Shkreli has flouted the law on numerous occasions and is an outspoken critic of the justice system. *See supra* Sec. II.5. He has already failed to comply with the Forfeiture Order's requirement that he forfeit his interests in the Album. He has evaded other court orders, including the terms of his supervised release from prison and, potentially, his lifetime ban on pharmaceutical industry involvement. *Id.* And he has expressed, on numerous occasions, his conviction that he is entitled to retain copies of the Album's data and files, distributing them as he sees fit. *See supra* Sec. II.4.

*Second*, an immediate and irreparable injury will occur if such seizure is not ordered. As discussed at length above, the Album is a unique and historical record. *See supra* at Secs. II.A and III.A.2. Shkreli may have already distributed copies of the Album's data and files and threatens to continue to do so. *See supra* Sec. II.4. As the Album's data and files are more widely circulated, the value of the Album will continue to diminish to an unquantifiable extent.

*Third*, the harm to PleasrDAO in denying this application would outweigh any potential the harm to Shkreli (if any) by granting the application. Shkreli has no "legitimate interests" in retaining his copies of the Album's data and files because he already forfeited those interests under the Forfeiture Order. Likewise, no third parties would be harmed by such a seizure.

*Fourth*, PleasrDAO is likely to succeed in showing that the Album's data and files constitute a trade secret and that Shkreli misappropriated the data and files by inappropriate means for the same reasons as discussed in this Application's request for a TRO. *See infra* Secs. (i)(B)(1) and (i)(B)(2).

*Fifth*, Shkreli claimed multiple times to have actual possession of the data and files. *See supra* Sec. II.4.

*Sixth*, this application describes with reasonable particularity the matter to be seized— Shkreli's digital and hard copies of the Album's data and files. As Shkreli has live streamed his music, he presumably owns copies of the data and files on his computer. A search of his computer is also likely to reveal the location of any hard copies of such data and files.

*Seventh*, if the PleasrDAO were to provide notice, Shkreli would likely move or hide the data and files, as he allegedly *has* already hidden copies around the world.

*Eighth*, PleasrDAO has not publicized this requested seizure.

### 2. The Court Has Authority To Order Seizure Under FRCP 64 And The State Law Doctrine Of Replevin

Federal Courts may issue the remedy of seizure as permitted by State Law under Federal Rule of Civil Procedure 64. *See* FRCP 64. "The issuance of an order of seizure for chattels in New York is governed by Article 71 of the CPLR." *Southland Corp. v. Froelich*, 41 F. Supp. 2d 227, 248 (E.D.N.Y. 1999). Under CPLR Article 71, any "application for an order of seizure shall be supported by an affidavit which shall clearly identify the chattel to be seized and shall state:"

1. that the plaintiff is entitled to possession by virtue of facts set forth;

2. that the chattel is wrongfully held by the defendant named;

- 24 -

3. whether an action to recover the chattel has been commenced, the defendants served, whether they are in default, and, if they have appeared, where papers may be served upon them;

4. the value of each chattel or class of chattels claimed, or the aggregate value of all chattels claimed;

5. if the plaintiff seeks the inclusion in the order of seizure of a provision authorizing the sheriff to break open, enter and search for the chattel, the place where the chattel is located and facts sufficient to establish probable cause to believe that the chattel is located at that place;

6. that no defense to the claim is known to the plaintiff; and

7. if the plaintiff seeks an order of seizure without notice, facts sufficient to establish that unless such order is granted without notice, it is probable the chattel will become unavailable for seizure by reason of being transferred, concealed, disposed of, or removed from the state, or will become substantially impaired in value.

CPLR § 7102(d)(1).

As set forth above, PleasrDAO seeks the seizure of all of Shkreli's retained copies of the Album data and files. PleasrDAO owns Shkreli's prior interest in the Album, including any copies he made of the Album's data and files. Matkov Decl. ¶¶ 9-10, Accordingly, Shkreli is wrongfully withholding PleasrDAO's data and files. PleasrDAO is not aware of any defenses that Shkreli has that would demonstrate his ownership in those data and files.

Rule 7102(e) requires the movant to provide an undertaking in an amount that is not less than at least twice the value of the chattel. CPLR 7102(e). The total current market value of the misappropriated data and files is unknown at this time given, inter alia, the uncertainty in how many copies Shkreli has made. Accordingly, PleasrDAO proposes that the Court calculate security, if necessary, after an accounting and inventory of Shkreli's unlawful retention and dissemination has been undertaken.

## IV.      __CONCLUSION__

For these reasons, the Court should issue a temporary restraining order and preliminary injunction to prevent Shkreli from continuing to possess and cause further damage to PleasrDAO's interests in the Album, grant an inventory and accounting, issue a civil seizure order, award monetary damages, and grant such other and further relief the court deems just and proper.

Dated: June 10, 2024                            Respectfully Submitted,

                                                              */s/ Steven Cooper*
                                                              Steven Cooper
                                                              Charles P. Hyun
                                                              Robert Carnes (*pro hac vice admission pending*)
                                                              REED SMITH LLP
                                                              599 Lexington Ave., 22nd Floor
                                                              New York, New York 10022
                                                              Tel. 212-521-5400
                                                              Fax. 212-521-5250
                                                              *Attorneys for PleasrDAO*