1

```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2     - - - - - - - - - - - - - - - X
                                     :
 3     PLEASRDAO, an exempted        :   24-CV-4126(PKC)
       foundation company,          :
 4                                   :
                     Plaintiff,      :
 5                                   :   United States Courthouse
           -against-                 :   Brooklyn, New York
 6                                   :
       MARTIN SHKRELI,               :
 7                                   :   August 23, 2024
                     Defendant.      :   10:00 a.m.
 8                                   :
                                     :
 9     - - - - - - - - - - - - - - - X
```

10

```
            TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
11            BEFORE THE HONORABLE PAMELA K. CHEN
                   UNITED STATES DISTRICT JUDGE
```

12

13                        A P P E A R A N C E S :

14     For the Plaintiff:   REED SMITH LLP
                                 599 Lexington Avenue
15                               New York, New York 10022
                            BY:  STEVEN COOPER, ESQ.
16                               ROBERT CARNES, ESQ.

17     For the Defendant:   BOCHNER PLLC
                                 1040 Avenue of the Americas,
18                               15th Floor
                                 New York, New York 10018
19                          BY:  ERIK J. DYKEMA, ESQ.
                                 SERGE KRIMNUS, ESQ.

20

21     REPORTED BY:

22     Kristi Cruz, RMR, CRR, RPR
       Official Court Reporter
23     kristi.edny@gmail.com

24     Proceedings recorded by computerized stenography.  Transcript produced by
       Computer-Aided Transcription.

25
                        *     *     *     *     *
```

PROCEEDINGS                                    2

1           (In open court.)

2           THE COURTROOM DEPUTY:  Civil Cause For a

3   Preliminary Injunction Hearing, docket number 24-CV-4126,

4   *PleasrDAO v. Shkreli*.

5           Will the parties please state their appearances

6   for the record, starting with the plaintiff.

7           MR. COOPER:  Good morning, Your Honor.

8           Steven Cooper, Reed Smith, for the plaintiff.

9           THE COURT:  Good morning.

10          MR. CARNES:  Good morning, Your Honor.

11          Rob Carnes for the plaintiff.

12          THE COURT:  Good morning to you, as well.

13          MR. DYKEMA:  Good morning, Your Honor.

14          Erik Dykema for the defendant, Mr. Shkreli.

15          THE COURT:  Good morning.

16          MR. KRIMNUS:  Good morning, Your Honor.

17          Serge Krimnus, Bochner PLLC, for defendant.

18          THE COURT:  Good morning to you, as well.

19          So we're here nominally for a preliminary

20  injunction hearing.  But as I clarified in the docket order

21  issued yesterday, I'm not anticipating or requesting that

22  any evidence be produced, but rather I want to hear argument

23  on the relevant factors relating to the request for a

24  preliminary injunction.

25          This is how we're going to proceed.  I'm going to

PROCEEDINGS                                    3

1   let the plaintiff obviously begin because it's your motion,

2   and the focus should be on irreparable harm, because the

3   defendant has only argued that issue in the written

4   submissions and quite frankly, Mr. Dykema, I do view the

5   defendant as having waived argument about the other factors.

6   I don't think it would be fair for you now to make arguments

7   on the other three factors beyond irreparable harm since you

8   didn't include those in your written submission.  So I don't

9   want any, for lack of a better word, sandbagging going on.

10         That being said, of course, I have to consider

11  those factors independently and make a determination before

12  I rule on the motion.  But I view you as having forfeited,

13  to an extent, any argument on the three other factors.

14         I will note that one of your arguments on the

15  irreparable harm issue, namely that the album is not a trade

16  secret, borders on an argument about the merits, you know,

17  likelihood of success or the serious question raised by the

18  trade secret claim, or the two trade secret claims.  But

19  again, I don't think you can really argue the other three

20  factors, having not submitted anything in writing on those

21  issues.  It does appear to me that your focus or your

22  reliance is solely on this irreparable harm issue.

23         So with that opening, let me hear from you,

24  Mr. Cooper, and then of course I'll hear from Mr. Dykema.

25         MR. COOPER:  Your Honor, would you like me to use

PROCEEDINGS                                  4

1    the podium?

2            THE COURT:  No.  You know what I'd actually

3    prefer, I know it's a little awkward and it's probably

4    contrary to your habit, but use the microphone and remain

5    seated because it will just make it easier for the court

6    reporter to hear you.

7            MR. COOPER:  Okay.

8            THE COURT:  And this is going to end up being more

9    of a discussion, if you will, or a debate.  So have a seat,

10   use the microphone.  Just remember to speak slowly and

11   clearly.

12           MR. COOPER:  Okay.  I will, Your Honor.

13           Again, good morning, Your Honor.  As you pointed

14   out, the only issue with which the defendant took issue was

15   the irreparable harm element.  And, interestingly, there was

16   also no refutation of the fact that Mr. Shkreli has copies

17   of the album, that he has broadcast at least parts of the

18   album, and that he made money from the album.  And, in fact,

19   there is a YouTube social media discussion/interview with

20   him where he makes some flippant remark about, well, I'll

21   pay the $6 back or something like that, which we had

22   provided actually in connection with our motion for

23   alternative service.

24           So there seems to be, at least at this point, no

25   question that the factual allegations that we made are

PROCEEDINGS                                    5

1    accurate.

2          As we pointed out in our opening brief, this is

3    certainly a unique object.  It is novel, it is singular,

4    there's only one copy of it.  In fact, the whole point of it

5    goes against the MO of the music industry.  The music

6    industry is all about the widest circulation of the music,

7    making the most money based on the most sales.  This was a

8    statement the other way.  This was a statement against that

9    mentality, against the digital age, creating a singular

10   piece.

11         And as a result, it became quite available.  I

12   mean, Mr. Shkreli bought it in the first instance for

13   $2 million.  My client bought it for almost $5 million.  The

14   album, if you recall, has 31 tracks.  I want to point out

15   that the album runs over two hours, and I think that's

16   relevant and I'll bring it up a little later as to why these

17   little five-minute snippets do not embody a release of the

18   album.  They are little samplers.  They're hors d'oeuvres.

19         THE COURT:  Five, one-minute samplers all merged

20   together, basically?

21         MR. COOPER:  Well, we put out a five-minute

22   sampler of one song.  Mr. Shkreli relies on our complaint

23   when he talks about the releases, largely.  He does not

24   offer independent evidence of what he released.  So it's

25   still somewhat unclear.  But again, those weren't refuted.

PROCEEDINGS                                6

1   Mr. Shkreli apparently made certain limited disclosures

2   along the way.  But there is no doubt that there has not

3   been a full-throated release of two hours and 11 minutes of

4   this album.  And there's no support for that in the record

5   and it's simply not true.

6            And interestingly, you know, when Mr. Shkreli

7   argues in his opposition about the release, because he makes

8   a very big point of the fact that there can be no

9   irreparable harm because it's been released.  But if you

10  read it carefully on page 10, he provides caveats.  He says

11  release -- limited release, or he says release subject to

12  certain restrictions, in parentheses.  He himself is

13  acknowledging any release has been very limited.

14           So in addition to the album, as you know, it had a

15  very ornate case, it had these customized speakers that went

16  with it, and there was a 174-page manuscript that went along

17  with it.

18           THE COURT:  Can I ask you a question?  And this is

19  somewhat trivial, to be honest.  But I notice that maybe the

20  speakers didn't actually convey to your client.  Is that

21  incorrect?

22           MR. COOPER:  Were they forwarded to the client?

23           THE COURT:  Well, no.  Did they actually receive

24  them?  Because I was comparing the original purchase

25  agreement and then I looked at the agreement which is the

PROCEEDINGS                          7

1    asset purchase agreement docketed at 22-3.

2             MR. COOPER:  Right.

3             THE COURT:  And I didn't -- and I may have missed

4    it, where the attachment is, the asset list, it doesn't seem

5    to show the speakers.

6             MR. COOPER:  I'm not sure if they were actually

7    conveyed.  I saw the same thing.

8             THE COURT:  Okay.

9             MR. COOPER:  It was a complete forfeiture.  So if

10   he had them, he would have had to convey them, but I haven't

11   checked on that particular point.

12            THE COURT:  Okay.  Go ahead.

13            MR. COOPER:  So just to wrap up this notion of the

14   uniqueness, the novelty, the value of this piece of art is

15   in its uniqueness and its secrecy.  The value is not that

16   it's the greatest record of all time, that it's Frank

17   Sinatra's Greatest Hits or Bruce Springsteen's Born to Run.

18   People don't know what's in there.  What makes it so

19   valuable and so interesting is the fact that people don't

20   know what's in it, the secrecy that's around it.  So

21   obviously any disclosure is going to diminish, if not

22   totally eliminate, you know, the value of it.

23            The forfeiture order was a typical clear

24   forfeiture order.  Mr. Shkreli was to forfeit all his right,

25   title, and interest in the artwork, in the album.  There

1    were no carve-outs, there were no caveats that he could keep

2    copies.  And for him now to argue he was permitted to do

3    this, I would submit to you is another example of his

4    disingenuous conduct and his thumbing his nose at the

5    process.  He was supposed to absolutely forfeit everything.

6    And the forfeiture order says including the proceeds, the

7    proceeds from the album.  So to the extent he's making any

8    money on this album, it is in violation of the forfeiture

9    order.  He was to have no ongoing rights to it.

10              And what he's trying to do is, he's trying to

11   actually profit or benefit twice, because he benefited the

12   first time by having the $4 million credited towards a

13   $7.4 million forfeiture order, and now he wants to continue

14   to benefit by keeping copies of it and making money from it,

15   which is obviously totally improper and to some degree it

16   makes a mockery, honestly, of the forfeiture order.  If

17   parties can claim they forfeited everything and make

18   representations to that effect in connection with federal

19   criminal court sentencing, yet somehow keep something on the

20   side, keep certain aspects of it, it really makes it very

21   difficult for the U.S. Marshal Service to enforce these

22   orders and to have them have any real meaning.

23              I want to talk a little about the law here.

24   Obviously every case with regard to irreparable harm is

25   different; they're fact-specific.  I would submit that this

PROCEEDINGS                                  9

1   is the quintessential case where injunctive relief is

2   appropriate.  It is certainly a unique object.  And when the

3   cases look at irreparable harm, they don't say there's no

4   way to be compensated, because frankly everything can be

5   compensated to some degree with money.  It is difficult to

6   compensate or it is not adequate to compensate.  And this is

7   certainly an example of that.  This is one of a kind.  There

8   is no market for this.  There's no way to say, oh, Picassos

9   sell for this or that.  Even if that was something that

10  didn't cause irreparable harm, there's no market for it.

11  And there are no contracts here.  One of the case that

12  Mr. Shkreli relies on is this *Liberty Power* case where the

13  Court denied irreparable harm, but it was because there were

14  already contracts in place that were going to be renewed, so

15  it was very easy to make a calculation that was accurate.

16  Here, there's no way.  There's just no way.  And there are a

17  lot of ways to commercialize or monetize this asset.  This

18  is an NFT digital company.  Very much a 2024 type of

19  business.  It is, you know, a Cayman-based exempt

20  foundation.  This is not your run-of-the-mill company.  And

21  what they're doing now, if you saw in the record, is their

22  first way to do it was to create a launch where they allow

23  someone to -- for paying $1, I believe -- like hear five

24  minutes of the album.  And each person who does that reduces

25  the time, the 88-year restriction by like five minutes.

PROCEEDINGS                          10

1          So how much that's going to generate?  I mean,

2    there's just no way to know.  There's just no way to know.

3    And, frankly, they could go about this a whole bunch of

4    different ways.  Have listening parties, private listening

5    parties, et cetera.

6          So difficult?  I would say virtually impossible to

7    have an accurate damages award in this situation.  So it's

8    certainly unique in that respect.

9          The second way courts find irreparable harm are

10   lost business opportunities.  Not just the uniqueness of the

11   object, but a lost business opportunity.  The *Tom Doherty*

12   case from the Second Circuit is the leading case of this

13   area.  And there the Court granted an injunction with regard

14   to Power Rangers toys where they're found to be essential to

15   the lifeblood of the business.

16         This company is fairly new.  They paid almost

17   $5 million for this art, this album, and it goes to the

18   lifeblood of the business.  If you allow Mr. Shkreli to

19   continue in a wholly inappropriate way, improper way to

20   maintain copies and to play them, it diminishes greatly the

21   ability of PleasrDAO to effectuate its business plan as to

22   what it wants to do with this album, why he wants to do the

23   album.

24         In fact, the *Paisley Park* case, which is the case

25   they rely on very heavily, which is the Prince case, two

1    things I want to say about that.  One is that the Court

2    makes clear that it's up to Pleasr, it's up to the agreed

3    party to decide what it wants to do with the product:  When,

4    how, where it wants to exploit it, release it.  It is not up

5    to, you know, Mr. Shkreli.  So allowing him, again, to have

6    these copies impinges on PleasrDAO's ability to make those

7    decisions with it.

8            The second thing is, I think *Paisley Park* supports

9    our side, not their side, even though they rely so heavily

10   on it.  That's a situation where Prince had I think it was

11   half a dozen unreleased songs --

12           THE COURT:  I'm familiar with the facts of Pince.

13   It was the engineer who had these 11 recordings.

14           MR. COOPER:  Correct.  11.

15           THE COURT:  And one of them was disclosed, and I

16   think that's the part that the defense relies on, but that's

17   different than the ten unreleased recordings.

18           MR. COOPER:  Correct.  But that was widely

19   disclosed.  I mean, that was put up for sale like you would

20   see in any other album where you're trying to maximize the

21   revenue from it and have the widest possible exposure.  We

22   have nothing like that here.

23           THE COURT:  Right.

24           MR. COOPER:  I understand why the Court found

25   that.  Once it's out, seriously out, it's out.  This is not

1    under any construction of the relevant facts.

2            A few other things just on this release of the

3    music.  As I pointed out, the opposition brief, you know,

4    itself caveats everything it says about that.  They

5    reference a Staten Island video, which I watched recently.

6    It's 57 seconds.  There is no music on it.  None.  I mean,

7    at least from the watcher of the video.  So you have no idea

8    if they're hearing something or they're not hearing

9    something, if these are actors, not actors.  And they're

10   very short snippets, again.  So that does not lead to any

11   sort of a conclusion as to a wider release.

12           The Billboard article that they cite, first of

13   all, I question whether it's really admissible evidence for

14   this proceeding.  But assuming it is, you know, I think it's

15   all captured by the title which says the album is being

16   offered to the public, that's sort of true.  It hasn't been

17   offered to the public.  The parties that they reference

18   where people did listening were private, which is what is

19   one of the restrictions that's in the agreement.  They were

20   ticketed.  People's phones were taken away, their cell

21   phones were taken away.  Everything was done in a very

22   secure way.  And going back to the launch they're doing, to

23   the extent people pay and become owners in the future, they

24   get encrypted copies.  They do not get copies that they can

25   assess themselves.

PROCEEDINGS                                    13

1            So I'm just going to sum up.  Mr. Shkreli --

2            THE COURT:  Before you sum up, I have one question

3    for you.

4            MR. COOPER:  Go ahead.

5            THE COURT:  You also rely to some extent, it seems

6    to me, on the rebuttable presumption that would apply under

7    the DTSA.

8            MR. COOPER:  Right.

9            THE COURT:  But wouldn't you agree that in order

10   for me to apply that rebuttable presumption, I would

11   actually have to make a finding that the album is a trade

12   secret?  And I have to tell you, I don't think that's

13   something I'm prepared to do at this stage, which doesn't

14   mean I can't find that there's not a serious question as to

15   the merits of those claims.  I just think making that

16   finding would be premature.  And obviously there's some

17   briefing I think in the offing on those issues, namely the

18   merits of the claims themselves.

19           So I don't think even if I were to say there's a

20   serious question as to the merits of your trade

21   secret-related claims, the DTSA, and also the

22   misappropriation claim, that that would then enable me to

23   apply the rebuttable presumption.

24           MR. COOPER:  Well, as you sort of --

25           THE COURT:  You obviously cite the *Faiveley* case,

PROCEEDINGS                                      14

1    F-A-I-V-E-L-E-Y --

2              MR. COOPER:  Yeah.

3              THE COURT:  -- for the proposition that such a

4    presumption can be applied where there's a finding that the

5    item in question is a trade secret.

6              MR. COOPER:  No, it would have to be a trade

7    secret, and I do not think you need to go there, honestly,

8    in order to impose the injunction.  I think you have plenty

9    of other grounds for it.

10             However, the definition of trade secret is pretty

11   broad under 1839(3).  It talks about digital works.  It

12   talks about compilations.  I don't think there's any doubt

13   that this is a formula, a compilation, a collection that is

14   not in the public domain, that gives an economic competitive

15   advantage by its secrecy.  So I think you could find a

16   likelihood of success on that and potentially rely on that.

17             There also really isn't a full-throated rebuttal

18   of the fact that it's a trade secret.

19             THE COURT:  Yeah, there's not much of a --

20             MR. COOPER:  Not much.

21             THE COURT:  But let me just say this, and the only

22   reason I'm cutting you off is because, as I said at the

23   beginning, I want the focus to be on the irreparable harm.

24   Now, obviously I guess the argument would be that if it's

25   not a trade secret, then there can't be any irreparable harm

PROCEEDINGS                                          15

1   because there's no legal claim to prevent dissemination or

2   misappropriation of the trade secret because there isn't

3   one.  But I don't want to go too far down this road.

4           I will say that I, and I'm previewing it, I am not

5   prepared to find that there's a likelihood of success and my

6   focus is mostly on the serious questions prong of the first

7   element, which, and this is a preview for you, Mr. Dykema, I

8   am inclined to find, I don't think it's a slam dunk, if you

9   will, that this is a trade secret and, in fact, the *Paisley*

10  *Park* case addresses that fully or squarely, and I think in a

11  very -- and I thought this myself, it's phrased in a way

12  that I think makes perfect sense, which is one could argue

13  that there's something different about a recording, the

14  value of which is derived from actually playing it or

15  disclosing it, performing it, if you will, than there is,

16  for example, the formula to Coca-Cola, where the value is

17  derived from keeping the formula secret, but disclosing, if

18  you will, or distributing the product that comes out of that

19  formula.

20          We don't the need to debate this now, and this is

21  more by way of preview for your motion to dismiss, I think

22  the *Paisley* -- I think I commend your attention to the

23  *Paisley Park* analysis, which precedes the part we were

24  discussing about the irreparable harm, because I think that

25  that really crystallizes a problem.

1          I know it could be viewed a different way,

2   Mr. Cooper, and you're going to argue that it's the

3   recording that is the trade secret.  It is the ability to

4   replicate those songs that is a trade secret that is held in

5   secret, under lock and key.  I understand that your client

6   has armed guards that protect this.  I have a visual in my

7   mind that strikes me as some sort of comical movie almost in

8   a way.  But nonetheless, like -- who's that guy?  It doesn't

9   matter.

10         Anyway, the point is, and I'm not mocking this,

11  I'm just saying I understand that the argument can go both

12  ways, but I don't think that is a foregone conclusion, but I

13  do think at this point there is a serious question as to the

14  merits of that argument and your claim therefor.  But I

15  don't want to go too far down that road.  That's the only

16  reason I'm cutting you off.

17         Let me hear from Mr. Dykema.  And in particular,

18  Mr. Dykema, what I want you to explain to me is what we just

19  discussed, *Paisley Park*, I agree with Mr. Cooper, doesn't

20  really go your way.  In fact, I think it's the most

21  straightforward application of the irreparable harm standard

22  in a situation that is remarkably similar.  We're talking

23  about the release of previously-undisclosed, and I know

24  you're going to debate a little bit about the facts, but I

25  want you to answer another question on that issue, but

1    previously-undisclosed recordings, artistic recordings.  And

2    the case clearly says that the rightful possessor of those

3    or owner of those recordings is the person who should be

4    able to decide or the company who should be able to decide

5    when, how, and where those are released.  And therefore,

6    there is a potential violation of the Trade Secret Act by

7    virtue of that.  Or that's at least a protectable interest.

8            So I'm surprised you rely on *Paisley Park* because

9    I think it actually cuts exactly against your position about

10   the irreparable harm because that case very clearly stands

11   for the proposition that it can't really calculate or you

12   cannot adequately calculate the value of being able to

13   control the release of this unique object, these unreleased

14   songs.

15           But the second thing I'd say to you is on the

16   facts that are being discussed, which haven't been fully

17   developed, but I don't feel that there's a need to, about

18   your client's disclosure of the songs themselves or even the

19   disclosure by way of sampling by the plaintiff, even if the

20   music is played for small groups of people, that -- and this

21   goes back to what is actually the trade secret -- that

22   doesn't mean that there's been a disclosure of the trade

23   secret which under one construction is really the actual

24   recordings themselves along with the box and the whole

25   experience, if you will, of listening to it, however it's

1    curated by plaintiff.

2           So even if I accept the fact that your client, by

3    his own admissions or statements, has disclosed it to 50

4    people here or 50 people there, the songs, that is, there's

5    no evidence that the actual recordings themselves have been

6    made accessible in any public way or that the recordings

7    have been distributed in any way.  And that, to me, is

8    really the trade secret, if there is one, that's being

9    protected here or being alleged.  Do you see what I'm

10   saying?

11          So, therefore, I don't think you really go -- even

12   if I accept your argument that your client has played the

13   music for some of the people, that that actually undermines

14   the irreparable harm that the plaintiffs are claiming, that

15   that's not really disclosure at all comparable to what

16   happened in *Paisley Park*, where the album was available for

17   everybody to download or to play for themselves whenever

18   they wanted to.

19          MR. DYKEMA:  Thank you, Your Honor.

20          Let me first just say that I've been a big fan of

21   the Wu-Tang Clan and their music for close to 30 years and I

22   consider it a great privilege to be able to be here and

23   argue this case with everybody.  So thank you.

24          THE COURT:  All right.

25          MR. DYKEMA:  I'd also like to say initially that

1   both in the papers and in his remarks just now, my adversary

2   makes a lot of my client's colorful history, experiences

3   before this in other courts and so on.  Again, his record

4   and his statements speak for themselves, and I'd just like

5   to point out that whatever his notoriety or public

6   statements may be, under the Constitution of the United

7   States, he has the equal protection of the laws as anybody

8   else.  And on these very narrow issues, in my view, most if

9   not all of his prior conduct and his public statements are

10  simply irrelevant to the claims at issue in this TRO

11  proceeding other than his statements relating to the musical

12  work in question.

13          THE COURT:  I don't know how you can pick and

14  choose in that regard.  Why should I disregard some, but

15  only credit the ones that you think are some kind of

16  evidence?  Because I actually think his, what I would say

17  is, contumacious behavior throughout the criminal trial is

18  relevant to what remedy or the scope of that preliminary

19  injunction, should I issue one, should be.  And I'm happy to

20  talk about that later.  But I'm not sure I accept your

21  proposition that you can tell me, well, take these

22  statements that he made seriously that he distributed the

23  work in some way, but don't take any of his other statements

24  seriously that he made throughout the course of his

25  proceedings in this very court that gave rise to this

PROCEEDINGS                            20

1    situation that we're facing now.

2              MR. DYKEMA:  Thank you, Your Honor.  I believe you

3    might have misunderstood me.  I'm not suggesting that you

4    couldn't or must not take note of his other statements in

5    fashioning some sort of remedy.

6              Per our briefing and per your instruction earlier,

7    today we're just focusing on the irreparable harm standard

8    and whether that prong has been met.  And on this point, on

9    the point of whether the plaintiff's going to suffer

10   irreparable harm, again, most if not all of the statements

11   and conduct alluded to in the motion, with the exception of

12   statements and so on relating to his contact with the album,

13   are not relevant.  Whether they come in at some other stage,

14   including the appropriateness of the remedy or the

15   likelihood of success on the merits, I leave that with the

16   Court.

17             THE COURT:  Okay.

18             MR. DYKEMA:  Briefly, Your Honor, I'd like to sort

19   of categorize the issues in sort of three small buckets.

20             One issue, and Mr. Cooper spoke on this and you

21   mentioned it yourself, is what are the actual facts at issue

22   on the record before the Court now going to whether the

23   plaintiff has shown irreparable harm or not.

24             Number two is, aside from sort of actual facts,

25   what does the law including the contracts at issue, what

PROCEEDINGS                                    21

 1    does the law on the contracts say on these points.

 2          And third, and again my adversary raised this

 3    briefly now in his remarks, although it wasn't in the

 4    papers, whether or not a monetary value can be assigned to

 5    the work or to its remuneration or distribution.

 6          On the first thing, Your Honor, I think that the

 7    other side is somewhat -- not somewhat -- substantially

 8    underplaying the previous exposure of the musical work and

 9    the tracks at issue in this case.  Just going by the papers

10    that are on the record before this court, the plaintiff

11    alleges that the defendant has already released the album

12    via the internet back in 2015 or 2016 before the forfeiture

13    order took place, then again in June of 2022 --

14          THE COURT:  Again, let me ask you, when you say

15    the word release the album, let's be more precise, meaning

16    played it for people or actually made it so that other

17    people could just play it whenever they wanted to?  Because

18    I think there's a meaningful distinction here when we're

19    talking about the potential for irreparable harm.  If people

20    hear it once -- because he was restricted as he acknowledged

21    by the original purchase agreement to only play it in

22    non-concert venues and if he was going to make money from

23    it, then he had to share the royalties or whatever that was.

24    But there's no evidence that he violated and he's certainly

25    not saying he violated the original purchase agreement.  And

PROCEEDINGS                    22

1    so at most, he might have convened some small listening

2    groups in a non-concert venue where he didn't charge any

3    money, if he's staying true to the agreement.  But he didn't

4    distribute copies of it.  So it's not released in the sense

5    that no one has that recording still and no one can control

6    the replaying of it.

7              MR. DYKEMA:  Allow me to touch on both of those

8    points, Your Honor.

9              THE COURT:  Okay.

10             MR. DYKEMA:  First, as to the, to use my

11   adversary's words, you know, small groups of people that he

12   purportedly played the album to, plaintiffs themselves

13   allege that in one of these small listening groups on the

14   internet, over 4,900 people were there and heard the album.

15   And obviously in this age of digital technology, any one of

16   those people could have recorded it and frankly it seems

17   very unlikely that nobody recorded it and --

18             THE COURT:  But let me say this.  If that were the

19   case, you don't think we would have seen this all over the

20   internet?  And moreover, only your client knows, what were

21   the conditions under which they were allowed to view it?

22   Because I don't know if it was in a setting where he

23   controlled the entire environment.  We obviously all know

24   that often you view things on Zoom, but you can't record it

25   unless I guess you're sitting there with some sort of

PROCEEDINGS                          23

1    recording device up to the screen.  But there is no evidence

2    before me that somehow that listening party, even assuming

3    it was 4,900 people, led to the dissemination of any of the

4    songs.  And I don't know, for example, if the entire album

5    was played.  I guess was it represented that it was, all

6    two-plus hours of it?

7            Whatever it is, I mean, I think the length of it

8    does matter and I think the fact that there's no evidence

9    before me that somehow someone did record it.  I mean,

10   you're speculating.  Because it seems to me that between

11   2015 and now, certainly there would be some evidence of

12   that, if someone recorded it and then distributed it even

13   more broadly because it has value, or because somebody, if

14   they were recording it, I don't know, maybe they were doing

15   it for their own pleasure, but it seems more likely they

16   were doing it for profit.

17           So bottom line is I'd have to speculate that some

18   of those 4,900 people, even accepting that that happened,

19   recorded it.  But still, it doesn't lead to any wider

20   distribution, period.

21           MR. DYKEMA:  Perhaps I should have discussed these

22   in reverse order, Your Honor.

23           So with respect to entire copies of the album

24   being distributed that people could play on their own

25   outside of the control of either party or of a YouTube

PROCEEDINGS                              24

1    stream or a Twitter stream or whatever, the plaintiff's
2    papers allege, first, that he sent copies of the CDs to at
3    least 50 different people.  They also allege that he said --
4    and I believe it's true that he said this -- that over 5,000
5    people have this CD.  I agree with Your Honor that there's
6    not a lot of evidence before the Court on this point other
7    than the plaintiff's papers and pleadings and allegations.
8    That's it.  They wrote it, and it would be unfair, in my
9    view, to sort of allow them to back away from those
10   statements now.

11          And furthermore, if there's some question about
12   these numbers or what's been decided, in my view, to -- to
13   say it differently, you'd have to engage in some speculation
14   either way, right?

15          THE COURT:  Well, no.  I mean, let me say this,
16   and I apologize that I keep cutting you off.  I'm going to
17   accept like an outside number of 10,000 people, for example,
18   have heard some or all of the songs on the album.  Even if
19   that were true, I do not think that that diminishes the
20   notion that there would be irreparable harm from further
21   distribution, that somehow it's been disclosed in a way that
22   it doesn't retain some incalculable value based on the
23   plaintiff being able to curate how people listen to it and
24   release some or more of the songs in whatever form they
25   choose, not just playing it sometimes, but maybe even

PROCEEDINGS                    25

1    selling copies of it.

2            So there's no evidence before me that suggests

3    that the value to plaintiff at least of having this album

4    has been diminished significantly, if at all, by even

5    assuming 10,000 playings of the recording for other people.

6    And that's the outside number, right?

7            MR. DYKEMA:  If I may, Your Honor, I think

8    there's -- again, I just want to distinguish between two

9    different things.

10           Again, on the record before us, it's been alleged

11   that there were approximately, let's say, 10,000 people have

12   listened to streams of the album, I believe.  There were

13   multiple instances where the plaintiff alleges that Shkreli

14   played the album in his Twitter spaces or otherwise on the

15   internet --

16           THE COURT:  Is this on Discord or something else?

17           MR. DYKEMA:  There's Discord, there's Twitter

18   spaces.

19           THE COURT:  Oh, right.

20           MR. DYKEMA:  I'm not super familiar with all of

21   these different websites.

22           But then separately, there's the allegation in the

23   plaintiff's pleadings and their papers on this TRO motion

24   that at least 5,050 people have copies of the CDs.  I agree

25   with Your Honor from the standpoint of potential damages for

1  copyright infringement, which plaintiff hasn't pled here,

2  that distribution may have in the past caused them harm and

3  they could make claims for copyright infringement and

4  damages and so on.

5          But the analysis under a trade secret or

6  irreparable harm standard is, respectfully, we believe it's

7  different, Your Honor.  Courts in this district, the Second

8  Circuit and the Supreme Court, in fact, have held that once

9  a secret or a purported secret is disclosed to others who

10  are under no obligation to maintain its confidentiality, the

11  property right in that secret is extinguished.  And I'd like

12  to touch on that in a moment when I get to the contract

13  language.

14          But here again, just maintaining this discussion

15  for this moment to the facts, on the fact that plaintiff has

16  put before this court, over 5,000 people have a copy of this

17  record.

18          THE COURT:  Where in the plaintiff's submission

19  are you referring to?  Because I'm looking at page 7 which

20  talks about him bragging about -- oh, I see it here.  This

21  thread is about someone listening to a CD, and then there

22  seems to be a greater than sign, 5,000 people have.

23          MR. COOPER:  Where are you, Your Honor?

24          THE COURT:  I'm on page 7 of your memo.  I don't

25  know who asked that.  Mr. Cooper?

PROCEEDINGS                    27

1          MR. COOPER:  Yes, Your Honor.

2          THE COURT:  In your original memo.  That's what

3   they say.  But that's different.  That doesn't mean they

4   have a copy of a CD.  It just says they were listening to a

5   CD, over 5,000 people.  Is that what you're referring to?

6   This is where he's talking, the plaintiff, by saying -- I'm

7   looking at page 7 of the motion paper, which is docket

8   number 4.  This is the plaintiff's memorandum of law.

9          MR. DYKEMA:  Yes, Your Honor.

10         THE COURT:  Now maybe it's excerpting something

11  from the complaint and I haven't gone back to look at the

12  complaint, but the allegation seems to me that Shkreli said

13  this thread is about someone listening to a CD, over 5,000

14  people have.  It doesn't say have the CD.  It says have

15  listened to it.

16         Am I misinterpreting what Mr. Shkreli said?

17         MR. DYKEMA:  I understood, Your Honor, that quote

18  to mean that 5,000 people have the CD.

19         THE COURT:  Well, to me it doesn't say that.  It

20  pretty clearly says it's about people listening, or about

21  someone listening to a CD, over 5,000 people have, have

22  listened to it.  Again, if 5,000 people have a CD with all

23  the Wu-Tang Clan songs on it, I don't think we'd be sitting

24  here having this conversation because surely people would

25  have been posting it online.  I mean, it defies common sense

PROCEEDINGS                                    28

1   that I have not -- or that there's no evidence out there

2   that anyone has an actual physical recording of what's on

3   that album.  Surely it would have been released.  If 5,000

4   people had a CD with it, given the notoriety of this

5   singular album, you mean to tell me that nobody would have

6   said, hey, I've got a copy of the album, I'm going to play

7   it for you?

8           MR. DYKEMA:  Respectfully, Your Honor, allow me to

9   push back for two reasons --

10          THE COURT:  Let me go back for one second.

11          MR. DYKEMA:  Yes, Your Honor.

12          THE COURT:  Let's just bear in mind that we're

13  relying on Mr. Shkreli's own statements, right?  Obviously

14  he's the one who knows what he meant when he said that.  You

15  could ask him:  Did you mean that 5,000 people have a CD of

16  it or do you mean that 5,000 people listened to the CD?

17          MR. DYKEMA:  I will ask him, Your Honor.  I don't

18  have that information right now.

19          Separately from the 5,000, though, there is an

20  allegation in the papers that at least 50 people have a CD,

21  that he sent copies to 50 different individuals.

22          THE COURT:  Where is that now?

23          MR. DYKEMA:  That is --

24          THE COURT:  Oh, at the bottom he says in

25  responding to a comment on this post, again still referring

PROCEEDINGS                    29

1    to page 7, Mr. Shkreli wrote:  I've already sent it to 50

2    people.  And this would refer back, I guess, to some copies

3    he downloaded.

4               MR. DYKEMA:  That's right, Your Honor.  Where he

5    says burned the album.  In the language of computers that

6    means that he took the MP3 recordings of the music and

7    burned it on to physical CDs.  That's what burning refers

8    to, I believe.

9               And so again here, on the plaintiff's papers, 50

10   different people have copies of the album and are under no

11   obligation to maintain its secrecy.

12              But regardless of the exact number, I'd just like

13   to push back on two things.

14              First, Your Honor, it doesn't surprise me that

15   people aren't distributing this album all over the place

16   because to do so would be an infringement of the copyrights

17   on the album.

18              THE COURT:  Well, I want to ask you about that,

19   because the original agreement reserved 50 percent of the

20   copyrights to the Wu-Tang Clan members who sold the album

21   and 50 percent to Mr. Shkreli, which obviously he forfeited

22   at the time that his interest in the album was forfeited to

23   the Government.  So he doesn't have any copyrights, correct?

24              MR. DYKEMA:  No, Your Honor.

25              THE COURT:  We say that, but how could he

PROCEEDINGS                              30

1   possibly?

2              MR. DYKEMA:  I wasn't going to go here because

3   we're talking about the -- but I'm happy to discuss it, Your

4   Honor.

5              The forfeiture order lists several different items

6   of property that Mr. Shkreli is to forfeit according to the

7   criminal forfeiture --

8              THE COURT:  Not items of property; interest in

9   property.  There's a big difference.  And that's why what

10  you wrote I don't think is a fair characterization of the

11  forfeiture order, and I can pretty much guaranty you that

12  based on having talked to Judge Matsumoto as well.  It

13  didn't say right, title, and interest, but it said interest

14  in the following property.  To me, interest definitely

15  covers the contents of that album.  This is why I

16  fundamentally disagree with you that he didn't violate the

17  forfeiture order by keeping copies of the recordings, the

18  contents of the album.  I don't know under what construction

19  he could have thought that forfeiting the album, his

20  interest in the album, didn't include forfeiting the

21  contents, given that the interest depends on the uniqueness

22  or the singular possession of the contents of that album.

23             MR. DYKEMA:  I respectfully disagree, Your Honor.

24  Whether we want to describe it as property or interests that

25  are listed in the forfeiture order, several of the items in

PROCEEDINGS                                      31

1  the forfeiture order have no copyright or other intellectual

2  property interest attached to them.  The Picasso painting,

3  for example, has nothing to do with copyrights.  The E*Trade

4  account has nothing to do with copyrights.  Another album

5  that Mr. Shkreli has no copyrights in, that forfeiture item

6  has nothing to do with copyrights.

7           THE COURT:  That may well be, but the phrase is:

8  Defendant shall forfeit his interest in the following

9  assets.  So "interest" is obviously specific to the item.

10  Here you have an item that is an album, a physical thing,

11  just like a painting or something like that, but it also has

12  electronic data in it, or however you want to call it;

13  digital or analog data in it.  That's part of the object and

14  that's part of his interest in the object, and the

15  copyrights are also part of his interest in the album.  I

16  don't know how you could disagree with that.

17           MR. DYKEMA:  I apologize --

18           THE COURT:  You do disagree.

19           MR. DYKEMA:  I do respectfully disagree, Your

20  Honor.  I'd be happy to provide supplemental briefing on

21  this.  But generally speaking, in intellectual property law,

22  the intellectual property associated with an object is a

23  res, it's a property interest separate and apart from any

24  interest in the object itself.  We do not disagree that

25  Mr. Shkreli forfeited the engraved box and the copies of the

PROCEEDINGS                        32

1   CDs and the book and so on.  Those items were forfeited to

2   the Marshal Service by the forfeiture order.  There's no

3   question about that.

4         The question is, does the forfeiture order

5   additionally order Mr. Shkreli or forfeit Mr. Shkreli's sort

6   of other intangible rights, specifically the copyright.

7   Which the copyright statute itself -- and I don't have it

8   before me, but I can look it up -- generally says if you're

9   going to transfer copyrights of an object, it has to be

10  specifically listed in the written document.

11        THE COURT:  But we're talking about a forfeiture

12  order, obviously, and the interpretation of that.  You may

13  be speaking about copyright law, which I think is separate

14  from that.  And obviously this was not an issue raised by

15  defense counsel or the Government at the time I think with

16  Judge Matsumoto.

17        But when you say, well, he did forfeit all the

18  other trappings in the album, they're not specified here

19  either, but yet you say that was covered by the reference to

20  the album.  To me, the contents of the album certainly have

21  to go with it too, and the contents of those albums includes

22  the right to control those contents.  It says "the

23  interest."  It doesn't say the following items.  It says the

24  interest in it.  The interest is the ability to control that

25  item; what's in it, what comes with it, everything.  So you

1    and I could disagree, but ultimately I'm not going to adopt

2    your interpretation.

3            I'll obviously let you brief this issue more, but

4    again, the reason I don't want to get too much into it is

5    because I think there's at least a question, a serious

6    question raised about whether he violated the forfeiture

7    order.  Although I'll say this, and again by way of spoiler

8    alert, I'm not sure that I agree with plaintiff's argument

9    that they are the third-party beneficiary of the forfeiture

10   order or have the right or ability to enforce the order.

11           Quite honestly, I think the forfeiture order

12   should be enforced by the Government by way of his violation

13   of his supervised release because he's required to comply

14   with the forfeiture order, or some belated finding of

15   contempt with respect to the forfeiture order because he

16   didn't turn over the recordings of the album itself.  That

17   is beside the point, because I don't necessarily need to

18   find that there's a serious question as to all of the

19   claims.  I just need to find that there's a serious question

20   as to one or more I think in order to issue the preliminary

21   injunction.

22           But again, we're getting a little farther down the

23   road, and I'm sorry I dragged you there with me.  I

24   appreciate what you're saying.  This is all to me a preview

25   to your motion that you're going to file about a motion to

1    dismiss.

2          But go back to your argument.  Let's talk about

3    this distribution issue.  As you can tell, I'm not convinced

4    that there is evidence that there has been actual

5    distribution of the alleged trade secret.  I admit that this

6    is an unusual trade secret claim, right, because you could

7    parse it different ways.  Is it the album itself?  Is it the

8    recording within the album?  Because, as the *Paisley Park*

9    case says, the songs themselves, the value that's derived

10   from this alleged trade secret is the playing of the songs,

11   the disclosure of the songs, if you will.  But the other way

12   to look at it is, it's the digital recording, the analog

13   recording; if you want to liken it to a program, a formula,

14   et cetera, that may be the trade secret.  That's the

15   Coca-Cola formula, and then the song is the Coca-Cola that

16   you distribute, if you will.

17         So that's how I view this issue and I think it's a

18   tricky one at best, but I do think there's a serious

19   question about the merits.  I'm not prepared to find a

20   likelihood of success, but I do think there's a serious

21   question about it.

22         Then your argument is that, okay, fine, even if

23   you accept it's a trade secret, that there's a serious

24   question about the merits of their claim, there's no

25   irreparable harm because there's been a distribution of the

1    songs to some extent.  At least maybe 10,000 people have

2    listened to the stream; that's how I interpret the comment.

3    Or you would say 5,000 CDs, therefore the formula, if we're

4    going to accept that formulation of the trade secret, right?

5    The actual formula being distributed.

6              MR. DYKEMA:  If I may, Your Honor, I would phrase

7    it a little bit differently.  In our view, it's black letter

8    law.  I know that we're talking about music distribution, so

9    we're thinking about large numbers and we're thinking about

10    value and dollar amounts from plaintiff selling their NFT

11    thing, which I'll get to in a moment.

12              But trade secret law and the Supreme Court

13    precedent on this issue is not sort of adaptable to the

14    different circumstances of distribution or whatever.  Under

15    trade secret law, it only takes one.  It only takes one

16    disclosure to one person who's not commanded to sort of

17    maintaining the confidentiality of that material for the

18    trade secret rights to be extinguished.  It's not --

19    plaintiff goes to great lengths in their papers to discuss

20    they have armed guards and so on and so forth.  Fair enough.

21    But the disclosure that made the -- took away, extinguished

22    the trade secret rights happened before plaintiff ever

23    acquired the work.

24              THE COURT:  Let me say this:  Then we have an

25    evidentiary issue, because I'll tell you this:  I'm not

PROCEEDINGS                                    36

1    going to accept Mr. Shkreli's claim after this lawsuit was

2    filed, I think, if it was in May of 2024, saying that I've

3    destroyed the value already, therefore they can't make any

4    claim of irreparable harm against me.  I am not accepting

5    that, because this is not a person who has a record of

6    credibility or fidelity to the law, let's put it that way.

7    So that I would not accept.

8              If you want to have a hearing where you bring

9    Mr. Shkreli in and he provides the actual details of who he

10   distributed it to, which is what the plaintiff wants

11   anyway -- an accounting, if you will -- then maybe we could

12   have a different discussion.

13             But even if I accept that there are 5,000 copies

14   of a CD distributed, I think the reason I'm so skeptical of

15   it is exactly what I've said before.  You can argue just

16   one, and I'd like to see the case law on that, where there's

17   no restriction on it.  I guess I am really more focused on

18   it is an evidentiary issue.  I don't accept that

19   representation in large part because there has been no

20   further distribution of it.  No posting of it.  No

21   dissemination.  No attempt to profit from it.  It defies

22   logic and common sense that anyone has an actual copy, an

23   analog, CD copy, whatever you want to call it, of the

24   contents of the album.

25             MR. DYKEMA:  Thank you, Your Honor.

PROCEEDINGS                                    37

1          Two quick points, and with your indulgence I'll

2     return to my argument.

3          THE COURT:  Please.

4          MR. DYKEMA:  First, if this Court thinks we need

5     to have an evidentiary hearing to resolve some of these

6     issues, we're completely open to it and we'd love to do it.

7     We didn't bring more evidence per your instructions.

8          But on that point, again, I don't think you have

9     to go there because plaintiff's own words in their papers

10    here cite allegations that Mr. Shkreli made these

11    disclosures before the lawsuit started, before they

12    purchased the work --

13         THE COURT:  But I have to believe the allegation,

14    right?  I don't believe it.

15         Oh, wait, the allegation about the 5,000 CDs being

16    distributed?

17         MR. DYKEMA:  Yes, Your Honor.

18         THE COURT:  Okay.

19         MR. DYKEMA:  So there are allegations I believe in

20    the Complaint that he was distributing it or playing it

21    online at least before the forfeiture order took effect and

22    that he made copies back then.

23         THE COURT:  Well, remember, playing it online and

24    distributing it are very different to me.  Playing it online

25    means someone gets to listen to it.  That, to me, doesn't

PROCEEDINGS                              38

1    diminish the value of it such that they cannot claim

2    irreparable harm.  Actually handing out CDs of it, which is

3    really getting to what I think at core is the alleged trade

4    secret, the digits, the analog recording of it, that's a

5    different story.

6              And let me look back to see when exactly he made

7    this statement.

8              It said on May 13, 2024, Shkreli appeared as a

9    guest on a podcast and stated that he burned the album and

10   sent it to like the 50 different chicks, and then he said

11   something really crass and disgusting.  And then on May 14,

12   2024, he said something about already sending it to 50

13   people.

14             Now, I don't know if in those post-litigation,

15   post filing of this lawsuit comments he also said but I did

16   it back in 2015, you know, before I was forced to turn over

17   the album.  And quite honestly, again, I'm skeptical of his

18   claim even if he claimed to have done it then, because it

19   seems like before he got prosecuted or before he was forced

20   to turn it over, it seems to me somebody would have posted

21   those songs.

22             So again, I'm inherently skeptical of any claim he

23   made, especially because he was limited by the purchase

24   agreement.  I don't think he was allowed to, by the original

25   purchase agreement, to make copies of it and disseminate it.

PROCEEDINGS                    39

1    Isn't that correct?

2           MR. DYKEMA:  It is not correct, Your Honor.  But

3    let me touch on that in one moment.

4           THE COURT:  Go ahead.

5           MR. DYKEMA:  So first, again, if the Court would

6    like to have an evidentiary hearing, at that hearing I

7    believe we would be able to present evidence that, in fact,

8    copies of the album are available on the internet.  That, in

9    fact, it is circulating on BitTorrent and other networks --

10          THE COURT:  Well, why didn't you produce that now

11   even by way of declaration?  That certainly would have gone

12   a much further distance in making your argument that there's

13   no irreparable harm possible.

14          MR. DYKEMA:  I thought that the plaintiff's own

15   statements in their papers on this point were sufficient.

16   But --

17          THE COURT:  Let's do this.  I do think that this

18   is potentially relevant, although I also want to see your

19   case law that says that even one distribution of this would

20   be enough, and then I certainly want to see some evidence

21   that it actually has been distributed in its analog format.

22   And I'm going to call it that even though that may be the

23   wrong terminology.

24          MR. DYKEMA:  Could I speak on two more quick

25   points, Your Honor?

PROCEEDINGS                    40

1          THE COURT:  Yes.

2          MR. DYKEMA:  So first I'd like to take a look at

3     the contract.  I'm talking now about the original contract

4     between the sellers of the album, Wu-Tang, and Mr. Shkreli

5     when he purchased it.  It's document 4-3 in the record.  It

6     was attached to plaintiff's motion for a TRO.

7          THE COURT:  Hold on one second.

8          MR. DYKEMA:  Yes, Your Honor.

9          THE COURT:  Yes, okay.  Go ahead.

10         MR. DYKEMA:  First, Your Honor, I'd just like to

11    point out on page 5, paragraph 4(b)(1), this paragraph

12    states, and I'm going to read from the document, Your Honor:

13    The work includes the following rights which are assigned to

14    the buyer.  50 percent of the copyrights and renewal

15    copyrights in the recordings and musical compositions

16    embodied in the work.  Then the buyer agrees to some

17    restrictions, including that buyer may duplicate or

18    replicate the work for prior use, but shall not duplicate,

19    replicate, or exploit the work for any commercial or

20    noncommercial purpose by any means.  But the owner is then

21    allowed permitted uses which are limited to the public or

22    private exhibition or playing of the work, with or without,

23    charge in a variety of locations.

24         THE COURT:  Which are not concert venues.

25         MR. DYKEMA:  Yes, Your Honor, which are not

PROCEEDINGS                                41

1    concert venues.

2            So two things, Your Honor.

3            First, the contract right there on page 5 says

4    that the buyer may duplicate or replicate the work for

5    private use.

6            THE COURT:  What does "private use" mean, though?

7    His own use?

8            MR. DYKEMA:  I would say it certainly includes his

9    own use, and he did duplicate the work for his own use.  And

10   I would say duplicating or replicating the work for your own

11   use also includes giving a copy to one of your friends.  As

12   a copyright owner, Your Honor, I believe he's entitled to do

13   that.

14           THE COURT:  Right.  But again, we're debating the

15   facts of when he actually did that.  If doesn't go to the

16   irreparable harm issue.  Like I said, I'm still skeptical of

17   the notion that he gave it to anybody.  I actually raise it

18   as an aside, but it's really not relevant, that he was not

19   permitted to do so as another reason that I question he did

20   so.

21           I'm not necessarily convinced about your

22   interpretation because "private use" suggests his use, not

23   private versus public, I guess; meaning commercial versus

24   noncommercial.  Private, to me, suggests his own use.  But

25   shall not duplicate, replicate, or exploit it for any

PROCEEDINGS                              42

1    commercial or noncommercial purposes by any means today

2    known or that come to be known.

3           So I don't know how you don't think that that

4    second part makes clear that he could only replicate it for

5    his own purpose or record it for his own purpose, but not to

6    exploit it for any commercial or noncommercial purpose,

7    which I think includes giving it to his friends for some

8    benefit; perhaps this disgusting thing he references in his

9    text.

10          MR. DYKEMA:  If I may, Your Honor, as opposed to

11   the first part of the argument talking about the facts and

12   whether the work was actually disclosed to 5,000 or 10,000

13   or 50 people as the plaintiff wrote in their papers, I

14   believe that here, the issue here is not with respect to the

15   contract and the law on trade secrets.  The issue is not

16   whether it actually happened.  The issue is whether the work

17   was disclosed to an individual who was not under an

18   obligation to maintain its confidentiality.  And under this

19   original contract, that individual was Mr. Shkreli.  Wu-Tang

20   Clan disclosed the work to him and he was under no

21   obligation to maintain its confidentiality because he was

22   explicitly allowed to make copies and publicly exhibit it

23   with or without charge in locations such as his home,

24   museums, art galleries, restaurants, bars, exhibition

25   spaces, and so on.

PROCEEDINGS                          43

1          THE COURT:  But I think we're confusing two

2    things.  One is, again, irreparable harm.  You're trying to

3    prove to me that there has been at least one dissemination

4    of the actual recording itself, and, in fact, you would say

5    there's 50 copies of the CD out there.

6          The second issue much whether he had the right to

7    do it or not doesn't weigh on that except I was skeptical of

8    the notion that he actually did it because I thought the

9    agreement prohibited him from doing that.  But let's put

10   that aside because that requires us to interpret the

11   contract, and moreover, it requires us to interpret what he

12   believes the contract means.  And also it obviously doesn't

13   affect what happened after the forfeiture, but that's not

14   relevant either.

15         Again, the only question is an evidentiary one:

16   Did he actually, as he claims to have back in 2015 or before

17   the criminal case or the forfeiture order, distribute copies

18   of the actual recording itself, the album's contents, to any

19   individuals via CD or otherwise.  You say I should believe

20   that.  I'm extremely skeptical of it because they've never

21   come up in the internet sphere.  You also suggest that they

22   are out there, but you didn't provide it because you thought

23   this was enough.

24         Listen, you can proceed however you want to, but

25   you're not going to convince me based on his claims that

PROCEEDINGS                              44

1    he's resurrecting now supposedly that did it back in 2015,

2    because obviously he has an incentive to muddy the waters

3    and try to argue, as you're doing, that there is no

4    irreparable harm because I've already disclosed it,

5    potentially contrary to the purchase agreement.

6              But we'll put that aside.

7              Let me also ask you, does your argument carry any

8    water with respect to his unjust enrichment claim?  In other

9    words, isn't there a different argument about irreparable

10   harm if the claim is, listen, he's unjustly benefitting from

11   dissemination of the CDs that he was supposed to have --

12   sorry, not CDs -- the album that he was supposed to have

13   forfeited all interest in?

14             MR. DYKEMA:  Thank you, Your Honor.  Let me touch

15   on that and then return to something you just mentioned --

16             THE COURT:  The reason I ask you that is because

17   you're focused on trade secret law, right?  So let's open

18   that up to common law.

19             Can an argument still be made that there is

20   irreparable harm if the claim is unjust enrichment?  He's

21   now going to completely eliminate the value.  If there's no

22   injunction, he's going to go now tomorrow and blast whatever

23   he has, whatever recordings he has all over the internet and

24   completely gut the value of the album -- not completely, but

25   largely gut the value of the album that the plaintiff

PROCEEDINGS                      45

1   purchased.

2           MR. DYKEMA:  Thank you, Your Honor.

3           So a couple of points.  I understand that Your

4   Honor is skeptical of the truth of Mr. Shkreli's statements.

5   Fair enough.  It's an evidentiary issue that we can get into

6   later.

7           I would only point out that, again, these aren't

8   statements that Mr. Shkreli made in a declaration or for the

9   benefit of the Court to believe here.  These are statements

10  that the plaintiff is relying on to establish their case.

11  This is how the plaintiff is trying to establish that

12  Mr. Shkreli is a wrongdoer who has done this before and is

13  going to do it again.  And fair enough, if the Court isn't

14  inclined to believe that, then I feel that the plaintiff's

15  case here falls apart because there's not evidence that he

16  has done it, like if we're going to toss all those

17  statements out.

18          That said, I want to go back to two things and

19  just clarify a very small point.  Your Honor said that

20  there's --

21          THE COURT:  Can I say one thing?  I don't think I

22  need to find that he will do it in order to decide an

23  injunction.  You're saying, you're right, maybe you can't,

24  as I accused you of before, selectively accept his

25  statements for one purpose, but not for the other, to accept

PROCEEDINGS                                46

1    that he's going to defy the law or try to get back at the

2    plaintiff by releasing it and not accept the fact that he

3    has already released it, he claims.

4            So putting that aside, do I actually have to find

5    that he's likely to release it in order to impose an

6    injunction?

7            MR. DYKEMA:  Yes, Your Honor, you do.  If he's not

8    likely to release it, then there's no likelihood of

9    irreparable harm.  The irreparable harm here flows from the

10   fact that plaintiff alleges he's about to release this and

11   the album is going to become public and --

12           THE COURT:  Well, they will suffer irreparable

13   harm if I don't impose an injunction is really what the

14   standard --

15           MR. DYKEMA:  Because he's likely to release it.

16           THE COURT:  Right.

17           MR. DYKEMA:  I don't want to put arguments in his

18   mouth.

19           THE COURT:  No, you're right.  Go ahead.

20           MR. DYKEMA:  One other thing, Your Honor.

21           A moment ago we were talking about, again, this

22   factual question of has he already released it, and then

23   separately, has there been a -- you know, it's an

24   evidentiary question we're not willing to talk about now --

25   whether or not there has been a release.  I just want to

PROCEEDINGS                    47

1   clarify that my argument on this point there is no question

2   on the factual record before us, and I think plaintiff would

3   agree, that the work was transferred to Mr. Shkreli.  He had

4   possession of the work when he purchased it from Wu-Tang

5   Clan.

6              THE COURT:  Right.

7              MR. DYKEMA:  My argument is not that he had it and

8   then the Court has to believe that he then recopied it and

9   disseminated it.  The fact that he himself was not under an

10  obligation to maintain its confidentiality destroys the

11  trade secret interest in the property.  And that's pursuant

12  to the Structured Capital Solutions case in 2016.

13             THE COURT:  I mean, unfortunately now that feels

14  like really kind of a serious -- a merits question, right?

15  Can they make a claim under trade secrets given the facts of

16  this case as they allege, right, that he had the rights back

17  in 2015 or whenever he owned the album.  And your argument,

18  though, is that that somehow shows that there's not going to

19  be irreparable harm if he now chooses to release it.  There

20  still will be harm even though he may have a right to do it.

21             So I view those as two separate issues, and that's

22  why I was focused on the fact that you seem to be focused on

23  the irreparable harm.  There will be irreparable harm, I

24  think, of the nature we discussed if he decides to massively

25  release the contents of the album.  That's different from

1  whether he has a right to.

2          MR. DYKEMA:  Well, I agree, Your Honor.  But there

3  will be harm if he -- or there might allegedly be harm if he

4  does release the album and competes with plaintiff in the

5  marketplace.  But I would put it to the Court that this is a

6  very fine legal distinction and the question of whether the

7  harm is, irreparable or compensable with damages turns on

8  this very precise point.  Because the album was -- the data,

9  the album, whatever it is, it's sort of a bedrock principle

10  of property law that you can't buy something more than the

11  other person has to sell you.

12          When Mr. Shkreli received the album, he was under

13  no obligation to maintain its confidentiality, thus the

14  album's value or any trade secret rights that might have

15  been in the album were extinguished.  Whether or not he

16  actually released it is beside the point.  He had it.  He

17  had no obligation to maintain its confidentiality, he could

18  play it all day long in front of his house or at a museum or

19  make his own copies of it.  He frequently did so.  I know

20  we're not necessarily believing what he says, but the

21  plaintiff suggests that he claimed that he played it on

22  internet streams and so everyone was able to listen to it

23  and the trade secret value has been destroyed.  Again --

24          THE COURT:  How about unjust enrichment, then?  In

25  other words, you're saying that the trade secret value.

PROCEEDINGS                              49

1          MR. DYKEMA:  There is no trade secret because the

2      trade secret was extinguished, is my argument.

3          THE COURT:  Okay, I get that.  So even at the time

4      the plaintiff purchased it, it had no trade secret value?

5          MR. DYKEMA:  Effectively, Your Honor, our argument

6      here is that when --

7          THE COURT:  Hang on.  The other than what they

8      paid for the album.  You would agree with that.

9          MR. DYKEMA:  That's damages.  If they want to make

10     an argument for damages, that's fine, but that's different

11     from irreparable harm that requires a mandatory -- that

12     requires an injunction.

13         THE COURT:  Well, actually, I'm trying to

14     understand your argument.  Irreparable harm is something

15     that either you can calculate or can't be compensated by

16     damages or the damages would be inadequate.  You're saying

17     here the appropriate measure or the measure of any damages

18     they should get, assuming they could prove one of their

19     claims, the trade secret claim, is that they only get

20     whatever they paid for the album because they've lost the

21     value of that because he already -- you would argue he gets

22     nothing because he had already destroyed the trade secret

23     value of the album by the time they got it at the forfeiture

24     sale.

25         MR. DYKEMA:  Let me say, I'm really enjoying this

PROCEEDINGS                               50

 1  discussion because we're getting right into the heart of the

 2  matter, Your Honor.

 3          THE COURT:  Right.

 4          MR. DYKEMA:  So I'm not -- I'm definitely not

 5  trying to make the plaintiff's damages case for them or make

 6  any admissions like that.  I would just say on this very

 7  specific question of whether there has been irreparable harm

 8  as opposed to other harm that could be compensable by

 9  damages, again, if I was to go down to the bookstore on or

10  Boerum Street and photocopy a Harry Potter book and start

11  selling copies of it on the street, that might be harm, I

12  might be liable in copyright or for other theories, but it's

13  not irreparable harm, right?  The book's already out there.

14  It's just a straight damages case.

15          Here, because Mr. Shkreli received the work and

16  was under no obligation to maintain its confidentiality, we

17  simply argue there is no trade secret.  And again, when the

18  Marshal Service sold the work -- I'm sorry, not the work,

19  the album, the physical -- whatever they sold to them; we

20  maintain it was just the physical objects.  But when that

21  was sold to the plaintiffs, the Marshal Service explicitly

22  disclaimed that it was unique, that anything else came with

23  it, and the plaintiff signed that contract.  They were under

24  no illusions that the album hadn't been duplicated or

25  disseminated or anything else.  What they're effectively

PROCEEDINGS                              51

1    trying to do, Your Honor, is put the rabbit back in the bag,

2    Your Honor; or the cat, if we're mixing metaphors here.  Now

3    that it is not a trade secret, there's nothing that can be

4    done to make it a trade secret again.  That ship has simply

5    sailed.

6              With respect to the unjust enrichment claims, Your

7    Honor, again, we were going to deal with it on the motion to

8    dismiss, but just to preview, all of those other state law

9    claims are preempted by the Copyright Act because they're

10   all effectively copyright claims cloaked in other state law

11   language.

12             THE COURT:  Well, I mean, that's not an issue I

13   can decide right now.

14             MR. DYKEMA:  Yes, Your Honor.

15             THE COURT:  But it seems to me it changes the

16   argument somewhat about irreparable harm because your

17   argument hinges on the notion that he had the right back in

18   2015 to copy the work and distribute it, although I'm not

19   sure I agree with your interpretation of the purchase

20   agreement, the original one.

21             But if we're talking about unjust enrichment, that

22   sort of brings us forward into the here and now, which is

23   that his dissemination to benefit himself in some way would

24   be unjust enrichment vis-a-vis the plaintiff and they would

25   be harmed by it.  It doesn't depend on it being a trade

1  secret at all, but it has to be unjust in some way.

2          Hang on one second.

3          (Pause in proceedings.)

4          THE COURT:  That may make it different because the

5  element is that the defendant benefits at the plaintiff's

6  expense and that equity and good conscience would require

7  restitution, right?  And then the question still is at this

8  moment in time based on what I know or at least what

9  evidence is before me about the non-dissemination or the

10  non-accessibility of the contents of that album, it does

11  seem to me it's an irreparable harm to them, and it doesn't

12  depend on a trade secret that he had a right to exploit

13  then.

14          What we're talking about is now.  He would be

15  benefitting at their expense, and there's a serious question

16  as to whether equity and good conscience requires

17  restitution.  I think it makes it kind of different.  You're

18  arguing preemption.  As I said a moment ago, you didn't make

19  that argument before on the question of serious merits or

20  likelihood of success.  That's where it should have come in.

21  I don't know if you're correct or not and you didn't make

22  that argument until just now, unless I missed it.

23          MR. DYKEMA:  I believe we did, Your Honor, in our

24  papers -- I'm sorry, in our opposition to the motion for a

25  TRO.

1          THE COURT:  Point that out to me.

2          MR. DYKEMA:  Give me one moment, please.

3          THE COURT:  On page 11 you argue it's not a trade

4   secret.

5          (Pause in proceedings.)

6          MR. DYKEMA:  It's not elaborated on very much,

7   Your Honor, but on the first paragraph of page 12, I'm going

8   to quote from our argument:  Because defendant legally

9   possessed and shared the work before the forfeiture order

10  and asset purchase agreement, the work is no longer a trade

11  secret, quoting *Sorias v. National Cellular*.  Once a trade

12  secret becomes public, it is no longer a trade secret.

13         THE COURT:  Right.  But that's your trade secret

14  argument.  I'm talking about, what's your argument that

15  there isn't irreparable harm based on the unjust enrichment

16  claim, which is the here and now?

17         MR. DYKEMA:  Oh.

18         THE COURT:  Not back when he said, in theory --

19  and quite honestly, I still don't agree with you about your

20  interpretation of the original purchase agreement because I

21  think he did have some requirement not to diminish the value

22  of the object by maintaining its confidentiality -- I read

23  "private" as different than you do.

24         But putting that aside, your argument is more

25  based on trade secret.  It could never have been a trade

1    secret or it can't be a trade secret now because back then

2    he already disclosed it; it wasn't kept secret, right, it

3    when he possessed the right to control it.  But unjust

4    enrichment simply says if at this moment in time he decides

5    to disclose it, he will benefit at plaintiff's expense, and

6    then equity and good conscience requires some compensation

7    for that.

8         MR. DYKEMA:  I understand, Your Honor.  You're

9    correct, we did not brief the distinction between the trade

10    secret argument and the unjust enrichment argument in our

11    papers.  That said, I don't want to sandbag my opponent, but

12    to preview our motion to dismiss, the unjust enrichment

13    argument cannot stand as a matter of copyright law separate

14    from a copyright claim.

15         THE COURT:  Okay.

16         Let me ask the plaintiff that question, though,

17    too, because what happened to the 50 percent copyrights that

18    existed under the original purchase agreement when the

19    forfeiture happened and when your client then bought it from

20    I guess, the Marshal Service or a third party?

21         MR. COOPER:  It was supposed to be forfeited.

22    Everything was supposed to be forfeited.  He has no

23    remaining interest in --

24         THE COURT:  But did your client buy it?  I guess

25    there could be some daylight there, although I don't know --

PROCEEDINGS                      55

1    you know, because there's an album and then there are these

2    copyrights which, I guess in theory, could exist separate

3    from the album, right?  They were sold to Mr. Shkreli in the

4    beginning, but one could make the argument that the interest

5    in the album might or might not convey this 50 percent

6    copyright interest.

7              MR. COOPER:  My understanding is they got all the

8    interests in connection with the album.

9              MR. DYKEMA:  I have only two more small points,

10   Your Honor.

11             THE COURT:  Yes, please.

12             MR. DYKEMA:  On that point, I'd just refer the

13   Court to, again, the original purchase agreement, document

14   4-3 on page 5, where, indeed, what Mr. Shkreli purchased

15   from the original producers is described in two sections.

16   1 through 5 is a set of objects, and then part B is the

17   50 percent copyrights and his related rights to disseminate

18   the work and so on.  Indeed, it is, as I've discussed

19   before, in our view, it's crystal clear that generally

20   speaking, rights to physical property and rights to

21   intellectual property are treated separately.

22             And I know we'll be briefing this later and I know

23   the Court might not be inclined to believe this now, but in

24   our view, the forfeiture order did not transfer the

25   copyrights because it did not specifically list them as

PROCEEDINGS                                    56

1   required by the Federal Rules of Criminal Procedure that the

2   copyrights were included, especially when this physical

3   work, which on its own it's really valuable; it has precious

4   metals, in a great box, it's a one-of-a-kind object.

5   There's no question that the box, the work, the sole copy is

6   extremely valuable.  There's just no indication, in my view,

7   that Mr. Shkreli's copyrights and his right to receive

8   copyrights in the future were disturbed by the forfeiture

9   order.

10          THE COURT:  But aren't you just reading out the

11   word "interest in the asset" from the forfeiture agreement

12   with this interpretation of yours?  You're superimposing

13   some copyright notion on top of the forfeiture order when

14   the forfeiture order mainly says he is forfeiting, he's

15   required to forfeit and being disgorged of his interest in

16   this album.  How could that not include the copyright

17   interest?  Because otherwise the property doesn't have the

18   purported value, right, because owning the rights to play

19   the music is the value of it; is a good part of the value of

20   it.

21          MR. DYKEMA:  I understand the nuance Your Honor is

22   pointing to here, and there's two ways to view it.  As Your

23   Honor set forth, one way is that we're excluding copyrights

24   from interest in.  And the other is by listing a physical

25   object, the prosecutor or the Court -- the forfeiture order

PROCEEDINGS                    57

1    reads in other intangible intellectual property rights that

2    aren't specified in the order, and it would make this

3    particular item in the forfeiture order unusual and very

4    different from the other items.  The Picasso painting that's

5    in the forfeiture order, there are no copyrights attached to

6    that.  There were no copyrights attached to the E*Trade

7    account.  There's no copyrights attached to the Lil Wayne

8    album.  And so on.  It doesn't specifically state that these

9    other rights were to be included.

10           Additionally, as my adversary admitted earlier or

11   suggested earlier, other things that were listed in here,

12   other items of physical property, including the speakers,

13   they weren't forfeited or collected by the Marshal Service.

14   There's no notice of that.  It's difficult for me to read

15   the forfeiture order and know, okay, well, when the

16   forfeiture order lists this musical work or this physical

17   box, this album, does it include the speakers or not?  Hard

18   to say.  Does it include the copyrights or not?  I don't

19   know.  Again, we'll be briefing this later, but I believe

20   the rule of leniency here sort of implies that the Court

21   should read the forfeiture order narrowly and specifically

22   to include his ownership interest, his property interest in

23   the physical album.

24           THE COURT:  I disagree with you.  I mean, as a

25   judge who issues these forfeiture orders, I would not, and I

PROCEEDINGS                              58

1    don't think Judge Matsumoto did either, intend that it

2    wouldn't include a very important aspect of the control of

3    the item.  How could you give away an album and let the

4    malfeasor keep the copyrights to it?  I mean, you're right,

5    the only reason it doesn't apply to the other things is

6    because it's inapplicable.

7            And I don't know about the album, the Lil Wayne

8    album because I don't know if there was copyrights attached

9    to it.  He might just own a nice album.  But that's

10   disclosed already, that album.  That's not this.  This is a

11   very unique thing.  It is like those electronic EFTs or

12   whatever that are produced, only one person possesses it.

13   And only one person possesses this, and it's consistent with

14   copyright and it allowed them to disclose it or monetize it

15   in some way.  And I think to separate the copyright from the

16   album and read it out of his interest in is a contortion

17   that I think is not logical here and it's not a plain

18   reading of the forfeiture order.

19           What you really are suggesting is that there's

20   some superseding general principle of copyright law or

21   property law or intellectual property law that should

22   somehow undermine what seems to me is the plain meaning of

23   the forfeiture order.  But maybe there's case law saying

24   where a forfeiture order is less precise than it needs to

25   be, it doesn't -- it can't be enforced in a broader, you

PROCEEDINGS                                    59

1   know, unspecified way.

2           But we'll save that for another day, because the

3   relevance of that to the interpretation of irreparable harm

4   to me is minimal, because I am really just sort of staring

5   at the cold hard facts that are on the record before me and

6   I don't see anything that really convinces me that there's

7   been such dissemination of the actual or disclosure of the

8   actual formula -- I'm going to call it that just to make

9   life easier -- which is the recording, the ability to

10  actually play it and perform it for someone else, such that

11  the plaintiff can't demonstrate irreparable harm if

12  Mr. Shkreli were allowed to broadcast his or distribute his

13  formula and recordings of it, assuming he has them.

14          So let me just say this:  I do appreciate your

15  argument and I certainly will consider all of your arguments

16  more fully, because I think they go more to the merits of

17  the claims themselves and whether they should be dismissed

18  or have been sufficiently stated or are even legally

19  cognizable.  Those I'll listen to.  But for now, I don't

20  think they bear on the question of irreparable harm.

21          That being said, and I don't want you to spend a

22  lot of time unnecessarily chasing down facts, even if I were

23  to accept that there are 5,000 CDs that Mr. Shkreli

24  distributed back in 2015, I really would need to see

25  evidence that there's some greater dissemination of it or

PROCEEDINGS                    60

1    availability of it, really, that would destroy the value

2    that the plaintiff is claiming that is not quantifiable for

3    purposes of damages, because fundamentally this is a unique

4    piece of work and it even goes beyond some of the artwork

5    that was discussed in other cases, because in artwork, you

6    do display it.  That's the value of it.  There's no magic

7    formula.  I guess you get into how someone paints it, but

8    that's not really what's the value of the painting.

9           This is different, and I think it's different

10   because the playing of it is the performance, the showing of

11   it, but it's the recording that in some way is the thing

12   that has to be kept secret.

13          MR. DYKEMA:  May I make one more small point?

14          THE COURT:  Yes.

15          MR. DYKEMA:  Again, with respect to these factual

16   issues, if the Court would like us to, we'd be happy to

17   submit evidence or have an evidentiary hearing.

18          I'd like to talk really in closing about my last

19   argument, which is about whether the -- again, whether or

20   not the damages here are quantifiable or addressable in

21   money damages.  Again, it's an extremely important fact in

22   going to whether there is irreparable harm.  Frankly,

23   contrary to what was in the plaintiff's papers, I think the

24   damages here are easily quantifiable in dollar numbers and

25   such could be addressed by ordinary damages.  I think

PROCEEDINGS                                    61

 1    there's two -- I mean, I'm not trying to make their damages

 2    case for them, but I just want to outline two ways the Court

 3    could go about it.

 4          One is that as the plaintiff suggested in the

 5    papers and early in oral argument, they paid approximately

 6    $5 million for the record.  To me, that's a very

 7    straightforward number.  You know, if he damaged them, he

 8    damaged them sort of no more than this $5 million amount.

 9          There's another possibility.  And this wasn't in

10    the papers, wasn't in the plaintiff's briefing, but it was

11    brought up and I'd just like to address it quickly.  One of

12    the things the plaintiff is doing, and this is in their

13    public statements, there's a website about it and my

14    adversary discussed it earlier, is that they are selling off

15    what are called NFTs, which give the user certain rights in

16    the album, allegedly.  And I might -- I don't have the

17    website printed in front of me because, again, we weren't

18    bringing this evidence.

19          But as I understand the basic scheme, the idea is

20    that the album is supposed to be -- the copyrights of the

21    album are going to be publicly released 88 years from when

22    it was first purchased in 2015, and that every time somebody

23    buys one of these NFTs, the release date of the album

24    advances by a little over a minute.  And I'm sure I'll be

25    corrected if I've got this wrong somehow.  But --

PROCEEDINGS                    62

1    THE COURT:  I think it's 88 second.

2    MR. DYKEMA:  That's right, 88 seconds, Your Honor.

3  And the plaintiff has been doing a very brisk business in

4  these NFTs.  According to their website as of this morning,

5  they've sold 351,000 of this for $1 apiece.  And so forgive

6  me if I get the math ever so slightly wrong here, but to

7  advance the album all the way to it being released today or

8  around today would require simply the purchase of enough of

9  these NFTs, and then it's public.  Regardless of whether

10  it's a trade secret or not, the album is public.

11    So the plaintiff themselves has put an extremely

12  definite dollar amount on this album release, and I

13  calculated on my phone calculator before we got here, it's

14  $27,952,000.  I don't see how the plaintiff valuating

15  effectively all the copies or all the NFTs this album could

16  ever sell before the album becomes completely public and

17  released to everybody can be squared with the plaintiff's

18  argument that the amount of money issued here is

19  unfathomable and can't be ascertained and it can't be

20  computed.  It seems that it could be easily computed.  They

21  themselves have put a price on it.

22    THE COURT:  But you have to admit that that's only

23  one way in which they can monetize this, right?  If they

24  decided instead to host a million small listening parties,

25  they could make a lot more, possibly, than 27 million, or

PROCEEDINGS                                        63

1   some number that we can't calculate right now.

2        The question is, there is probably potentially an

3   infinite demand for listening to this album.  I mean, I have

4   to confess, I'm not a Wu-Tang Clan fan like you are, but

5   that's I think where it becomes less knowable.  And it's

6   also about the experience of getting to see it in certain

7   settings, because the plaintiff certainly isn't limited to

8   selling off these NFTs into perpetuity until we reach, you

9   know, the date upon which the album becomes disclosed, or

10  the expiration date, if you will.  And if they chose some

11  other way, how are we going to calculate that?

12       MR. DYKEMA:  I would agree, Your Honor, that

13  they're not limited to only selling it that way, but they

14  have committed themselves to this plan, and I believe it

15  would be a fraud on their existing customer base if they

16  were to stop that plan.

17       THE COURT:  Why?  They just say we decided to

18  discontinue this plan, and if you want it hear it, you've

19  got to sign up to go to the Bahamas and pay $2 million or

20  something like that to sit in a room and listen to it.  I

21  mean, I wouldn't, but that's a possibility, right?

22       MR. DYKEMA:  What would happen to the 351 -- I'm

23  sorry, it's not $351,000 -- the 40,000 people who have

24  purchased it, purchased one of these NFTs in reliance on the

25  fact that it would someday be released or that they could

PROCEEDINGS                                    64

1   buy the rest of the NFTs and release it?

2           So what I'm trying to say, Your Honor, is that

3   while I completely agree with Your Honor that they could

4   host other listening parties, they could sell tickets, so on

5   and so forth, this $27 million figure, in our view,

6   unquestionably is an absolute cap on the damages.  The

7   damages cannot possibly be more than this amount because if

8   they were to be more than that amount, anybody could just

9   buy out the rest of the NFTs and the album becomes public

10  and there's no injustice, there's no trade secret, there's

11  no anything anymore.

12          THE COURT:  Pardon my ignorance about the NFT.

13  Can someone keep listening to the NFT once they have it?  In

14  other words, what is the NFT?  It's not an actual recording

15  of --

16          MR. COOPER:  Just the ownership.  It's like a

17  stake in it.

18          THE COURT:  I see.  So they can't sit there and

19  listen to the album through the NFT?

20          MR. DYKEMA:  Correct.

21          MR. COOPER:  No, because it's encrypted.

22          THE COURT:  Oh, that's right, it is encrypted.

23  And it doesn't become unencrypted until everybody

24  collectively buys enough or enough are sold that the 88

25  years gets diminished to now.

PROCEEDINGS                          65

1          MR. COOPER:  Right, right, which is a long time.

2          THE COURT:  Well, then I think Mr. Dykema has a

3    point.  It does seem to me they are committed to at least

4    that plan because they've promised those people who bought

5    the NFT that they're going to continue to sell these, right?

6    So at some point the encryption won't prevent these folks

7    from listening to it.  Or whatever, you get rid of the

8    encryption so they can listen to it.

9          MR. COOPER:  But that doesn't preclude them from

10   doing other projects with it.  I mean, I couldn't sit here

11   telling you all of the projects that a foundation in digital

12   collectives that has rare art -- I had no idea they were

13   going to do it this way.

14         THE COURT:  Right.

15         MR. COOPER:  They may combine it with other pieces

16   that they have, too.

17         THE COURT:  Well, your argument is it's a floor,

18   not a ceiling for the amount of damages.

19         MR. COOPER:  Absolutely.

20         THE COURT:  It's a minimum that they can expect to

21   get from it because it has the specified sunset period.

22   They have to stick with it for those people who have

23   invested, but they can do other things.

24         MR. DYKEMA:  Respectfully, Your Honor, right now

25   if my client or anybody else had the funds, they could buy

1    up all these NFTs for $27 million and the album would become

2    public and this case would go away.

3             THE COURT:  Right.  But in the interim, you could

4    hypothesize it will happen tomorrow that someone decides to

5    spend that much money.

6             MR. DYKEMA:  Sure.

7             THE COURT:  But the plaintiff's argument is but

8    until that moment happens and all of them get bought out, or

9    enough of them, they could do a myriad of other things to

10   monetize this.

11            MR. DYKEMA:  I agree, Your Honor.  We're not

12   arguing that we need to have evidence or anything else on

13   damages.  We think the plaintiff's whole case is flawed, and

14   we'll get into that in the future.

15            What I'm saying is that with respect to the

16   irreparable harm analysis, because the plaintiff has put a

17   price on the work, the harm is not unquantifiable, and

18   therefore it's not irreparable.

19            THE COURT:  I don't agree with that.  They have

20   put a price of part of how they are monetizing it.  I think

21   we can all agree on that, and it could be as much as

22   $27 million.  But as I said before, that seems to be a floor

23   and not a ceiling.  You say it's a cap, but it's not because

24   they're not precluded from using the album in countless

25   other ways to make money.

PROCEEDINGS                    67

 1         MR. DYKEMA:  Fair enough, Your Honor.  Again, the
 2    issue is not whether their damages case is already sort of
 3    wrapped up in a bow and done.  Their damages case is in all
 4    kinds of copyright issues and there are difficulties in them
 5    and evidentiary issues and so on.  That's a murky area of
 6    how the case is going to happen.
 7         All I'm saying is that the damages flowing from
 8    the sort of public release of the album, releasing it from
 9    their control and allowing them to no longer have any
10    control over its dissemination, that has been quantified by
11    this NFT.  That's my only argument.  It's a small argument,
12    but I don't think that you can say the damages are not
13    quantified -- not you, Your Honor --
14         THE COURT:  I understand your argument.  I just
15    don't happen to agree with you.
16         Did you want to say anything further, Mr. Cooper?
17         MR. COOPER:  Yes, I want to say a few things, Your
18    Honor.  I mean, that was a long argument and so much of it --
19         THE COURT:  Let's just pause for one second.  I
20    want to check on our court reporter.
21         (Pause in proceedings.)
22         THE COURT:  Okay.  Go ahead.
23         MR. COOPER:  That was a long argument.  Most of
24    those points were not in the papers, the 11-page opposition.
25    Most of the points are about merits.  I think it's a bit of

PROCEEDINGS                                      68

1   a subterfuge because the irreparable harm here with this

2   unique object is pretty factually and legally supportable.

3          So I think the issue that you raised on unjust

4   enrichment is accurate, even if you don't want to accept the

5   trade secret argument which is merit based and they didn't

6   argue.  Also tortious interference with agreements.  If they

7   start broadcasting this album, our ability to sell it the

8   way we're selling it now is also going to be diminished, or

9   the rights that the holders have that they paid for is going

10  to be diminished.

11         So you have two common law claims that would give

12  you a basis for the irreparable harm.

13         THE COURT:  And the tortious interference that

14  you're alleging is between plaintiff and their customers?

15         MR. COOPER:  Their customers.  Their ability to

16  sell it.

17         THE COURT:  Okay.

18         MR. COOPER:  As far as this copyright and that

19  they withheld it, despite the fact that there is zero

20  evidence of that, the forfeiture order not only talks about

21  interest, which you identified and spent time on, it also

22  talks about the proceeds, all proceeds traceable thereto,

23  which would absolutely, if there's any doubt, encompass any

24  ability he has to receive money in connection with this in

25  the form of a copyright or other ways.  That's in paragraph 4.

PROCEEDINGS                        69

1          THE COURT:  Let me just say this.  And again, this

2     is for a later date because it's not going to affect my

3     ruling.  But with respect to the tortious interference

4     claim, though, remember that there is a requirement that the

5     alleged prospective business relationship be with a specific

6     third party.  So I don't know if you can broadly say all of

7     our potential customers --

8          MR. COOPER:  Well, there's also tortious

9     interference with prospective relations is based on malice,

10    and I think we clearly have malice here because if you read

11    his social media posts, he's saying they blocked me, screw

12    them, I'm going to do this now and calling us all sorts of

13    names.  There's no question that this individual is

14    motivated by malice.

15          There are a lot of ironies in this argument.

16    Basically what counsel was saying is, I'm using their words.

17    No, they're not; they're using Shkreli's words.  And what we

18    did is in our Complaint and in our papers, we said to the

19    Court this is what he's saying.  I'm not a hundred percent

20    sure if everything he says is accurate.  Frankly, I'll tell

21    you it's probably not because if you read all his postings,

22    he says a lot of things in there that aren't accurate.  The

23    crass reference that he made, did that really happen?  The

24    criminal prosecution, was that really a witch hunt like he

25    says?  He says a lot of things.

PROCEEDINGS                              70

1              But instead of putting him on the stand or putting

2     in an affidavit from him on a motion that was filed two and

3     a half months ago, they just point to the Complaint.  So if

4     they wanted to make these arguments -- then they keep saying

5     we need an evidentiary hearing or they'll come out with the

6     merits, they could have opposed this with evidence and they

7     didn't do it.

8              The other irony is they're basing this all on his

9     wrongdoing.  These posts all post-date the forfeiture.  He

10    wasn't supposed to have this.  So they're basically saying

11    that, you know, it's too late, you know, he did violate the

12    order, he did improper things, but as a result of that

13    they're not really harmed.  First of all, that's not true

14    because the distribution was never widespread, and there's

15    nothing in the Complaint or the record that said there was a

16    widespread distribution of this.  So --

17             THE COURT:  Well, I have to say the fact that

18    351,000 people are spending $1 -- I know it's not a lot --

19    suggests to me that they can't get the album off the

20    internet as you're saying.

21             MR. COOPER:  I was going to make that point too.

22    I picked up on the words they're doing "brisk business."

23    Well, they wouldn't be doing brisk business if this wasn't

24    readily available to people.

25             So he has no rights to this.  He just has no

PROCEEDINGS                                    71

1    rights to it.  He was supposed to forfeit all of it.  He

2    cannot rely on his bad acts as a justification for denying

3    us irreparable harm.  This is equitable relief.  You said it

4    in connection with the unjust enrichment and it's also in

5    connection with irreparable harm.  He's a bad actor, and

6    everything they're relying on are his words.  They could

7    have put in an affidavit saying I, Martin Shkreli,

8    distributed this to 10,000 people, here's the evidence, full

9    album.  I don't think that would have -- even 100,000

10   people.  They could have done that, but they didn't do it

11   because who knows what is true and is not true here.  But

12   clearly they didn't deny it, okay?

13          So I think that it's inappropriate to rely on our

14   recitations of what Shkreli said in social media posts

15   without putting Shkreli's actual words to the test.

16          Let me just see if I have anything else here.

17          (Pause in proceedings.)

18          MR. COOPER:  Final point, and I'm picking up on

19   something Your Honor said, even if there were some

20   distributions, even if there was -- if some people have the

21   whole album.  First of all, Shkreli did not have the right

22   to do that.  He did not have the right to publicly

23   distribute this.  And even if he did, he lost all those

24   rights when he forfeited the album.  But as we are here

25   today, there is potentially some of this in the marketplace.

PROCEEDINGS                                    72

1    There's no evidence that there's a whole 2 hours and

2    11 minutes in the marketplace, and there's certainly no

3    evidence that this is widely distributed.

4         Going forward, there will be irreparable harm,

5    even if there are some bits of this, snippets of this in the

6    marketplace.  There is no question that, one, he shouldn't

7    have this; period, full stop.  He just should not have this

8    and he knows it.  Secondly, that if he continues to do what

9    he's done and has threatened to do, the $4 million that we

10   spent and our ability to monetize -- the $5 million we spent

11   is going to be seriously harmed.

12        None of the three of us, I would submit, can say

13   what an NFT company is going to do to commercialize and

14   monetize this asset.  This is a very new, novel, unknown

15   area.  It's creative.  I don't know that any of us would

16   predict that they did it the way they did it with that

17   launch, which is extremely innovative and new.

18        So there is just no question.  I think this is the

19   quintessential irreparable harm case.  A unique object that

20   clearly he should not have and that is going to cause us to

21   be unable to fully decide when, where, and how to distribute

22   it.

23        (Pause in proceedings.)

24        THE COURT:  With all due respect to both sides'

25   arguments, and I fully do appreciate your arguments,

PROCEEDINGS                                73

1    Mr. Dykema, and I'm saying this because I'm about to issue

2    the preliminary injunction that's requested in large part.

3    I'll just summarize my findings because I think our

4    discussion has been quite fulsome and I think has certainly

5    revealed my analysis and reasoning on these various issues.

6              As everyone knows, a party seeking a preliminary

7    injunction must establish first irreparable harm.  Second,

8    either a likelihood of success on the merits or sufficiently

9    serious questions going to the merits of its claims to make

10   them fair ground for litigation.  Third, a balance of the

11   hardships tipping decidedly in favor of the moving party,

12   which would be plaintiff here.  And fourth, that a

13   preliminary injunction is in the public interest.  I'll cite

14   *Connecticut State Police Union v. Rovella*, R-O-V-E-L-L-A,

15   36 F.4th 54, and the jump site is 62, that's Second Circuit

16   2022.

17             As both parties acknowledge, the showing of

18   irreparable harm is perhaps the single most important

19   prerequisite, and the moving party must show that the injury

20   is likely before the other requirements will be considered.

21   *Kamerling*, K-A-M-E-R-L-I-N-G, *v. Massanari*,

22   M-A-S-S-A-N-A-R-I, 295 F.3d 206.  The quote comes from page

23   214, Second Circuit 2002 case.  And as the parties also are

24   aware, irreparable harm cannot simply be theoretical, but it

25   must be imminent and concrete.

PROCEEDINGS                    74

1    Now, here the big debate has been about whether or

2  not there can be some is quantifiable compensation or

3  damages calculated, but I do find, based on the record

4  before me, that here it would not be possible to do so and

5  that any calculation or that calculating the damages would

6  be inadequate.

7    I do find that this case is almost on all fours

8  with the *Paisley Park* case that we talked about earlier

9  relating to Prince's unreleased recordings, and there were

10 ten of them, ten songs that were not released.  I find the

11 reasoning there persuasive on the fact that the plaintiff

12 had stated irreparable damages because there's something

13 that's impossible almost to calculate about the right to

14 control the when, where, and how the trade secret or the

15 alleged trade secret or work of art would be performed or

16 disclosed.

17    Now, I'm not finding, as I mentioned earlier, any

18 presumption of irreparable harm based on the trade secret

19 statute because, as I said before, I think I would have to

20 make a finding that the album is a trade secret, and I'm not

21 prepared to do that at this time in order to apply the

22 rebuttable presumption.

23    Then the second element is likelihood of success

24 or serious question.  And here I find that there's at least

25 a serious question going to the merits of plaintiff's trade

PROCEEDINGS                    75

1    secret claim, misappropriation of trade secret claim and

2    unjust enrichment.

3         I am not making any finding with respect to the

4    other two claims, the violation of the forfeiture order and

5    tortious interference.  I've expressed my doubts about those

6    during our discussion.  I don't think I need to make a

7    finding as to those because obviously irreparable harm that

8    we're talking about is the same for all of the claims

9    collectively.

10        As I said before in response to Mr. Dykema's very

11   much appreciated and vigorous debate on these issues, I'm

12   not accepting the representations that Mr. Shkreli had the

13   right back in 2015 to disseminate the recordings, nor am I

14   accepting that fact based on his post hoc and

15   post-litigation statements that he did so back then.  And

16   I'll tell you in a moment how I might give the defendant the

17   right to reopen this preliminary hearing if there's actually

18   some proffer of actual evidence that I think might change

19   the result.

20        But based on the record before me, I do not have

21   information indicating that there has been wide enough

22   distribution of the actual thing that could constitute a

23   trade secret; the analog or digitized recording of the album

24   itself.  Therefore, I still find that the plaintiff would

25   suffer irreparable harm should Mr. Shkreli not be enjoined

1  from doing so, from making that recording publicly

2  available, downloadable, replicable in some way.

3          And then the third element is the balancing of the

4  equities here. I do find that those equities tipped

5  decidedly in plaintiff's favor. Based on my prior finding

6  about the non-compensable serious injury plaintiff would

7  suffer, that in and of itself would be sufficient to find

8  this factor met.

9          And then looking on the other side, I don't find

10 that Mr. Shkreli would be harmed in any way by not being

11 allowed to post or distribute or publicize the actual

12 recordings that he has, assuming he actually does have them,

13 as he claims, on CDs or in some other format, because I have

14 serious reservations about whether he has a right to hold

15 those by virtue of the forfeiture order.

16         Even if the plaintiff doesn't have a right to

17 enforce the forfeiture order or isn't the beneficiary, that

18 doesn't mean Mr. Shkreli has the right to possess or use

19 those recordings. Quite frankly, my preliminary finding on

20 that, should it be raised in some fashion or should that

21 claim remain viable, is that he does not, because I think he

22 was required to forfeit all of his interests, including any

23 recordings he might have of the contents of the album under

24 the forfeiture order. And, quite frankly I have no doubt or

25 very little doubt that Mr. Shkreli understood that, but

PROCEEDINGS                    77

1    didn't want to comply.

2            But that's not relevant to me here other than to

3    say I don't find that Mr. Shkreli has some clear right to

4    use the recordings that he has or doesn't have and he won't

5    be harmed because it's not clear to me that if he has used

6    them, that he's used it in a way to make any profit or

7    somehow benefit himself so significantly so as to outweigh

8    the harm the plaintiff will suffer.

9            And then lastly, I do think it's in the public

10   interest to prevent Mr. Shkreli from disseminating the

11   recordings if he has them because I do believe there is an

12   interest in vindicating the Court's authority to have

13   forfeited those, or required him to forfeit those.  I'm not

14   foreclosing some interpretation that suggests he wasn't

15   required to, but it seems pretty clear to me at this moment

16   that my reading of the forfeiture order is that he was not

17   supposed to keep any interest in that album, and that would

18   include recordings and copyrights which he still claims he

19   has, and that I don't agree with either.  So I think it's in

20   the public interest to vindicate the Court's authority to

21   impose such orders and not to allow Mr. Shkreli to flout the

22   Court's forfeiture order.

23           I also think there's a value in protecting what is

24   alleged to be a trade secret that was sold to the plaintiff

25   and not to allow that to be flouted, those protections to be

PROCEEDINGS                                78

1   flouted for Mr. Shkreli's benefit or just out of spite or

2   malice, if that's his motivation, or that is what appears to

3   be his motivation.

4           So I am enjoining Mr. Shkreli from using,

5   disseminating, or selling any interest in the album, that

6   would include any copyrights, any recordings, the data, the

7   files that make up the album, or the contents of the album,

8   or in any way causing further damage to plaintiff respecting

9   the album.  One has to be somewhat careful, I guess, because

10  he might be able to make statements, I guess, that it's a

11  crappy album, I guess he could do that if he wanted to.

12  He's the one person who has heard it.  I don't think I could

13  prevent him from making free speech statements about the

14  quality of the album if he wants to.  But what I'm talking

15  about is in some way using the data that he retained from

16  the album in some way to cause damage to the plaintiff with

17  respect to the album.  So I'm focused on his dissemination

18  of it.

19          I did not say possessing it, though.  I'm not

20  enjoining him -- or let me be more clear.  I'm not enjoining

21  his mere possession.  What I am going to require is that he

22  turn over whatever copies he has to his lawyers to hold

23  during the pendency of this case, or unless I order

24  otherwise.  I know that plaintiff asked for the seizure and

25  disgorgement of his copies of the album.  I'm not prepared

 1    to do that yet, but I also do not trust that Mr. Shkreli

 2    will follow any order enjoining him from distributing them,

 3    and this is based on the history that we discussed during

 4    the course of the criminal trial where he violated the terms

 5    of his supervised release, he also violated the terms of his

 6    bail, causing Judge Matsumoto to revoke it based on a

 7    hearing which investigated or explored the allegations that

 8    Mr. Shkreli was in some way making threatening posts as to

 9    Hillary Clinton when she was a candidate for president.

10    I've read the materials relating to that, to the

11    Government's motion to revoke bail.  Bottom line is Judge

12    Matsumoto found that there was enough to find that he

13    presented a danger to the community such that he should be

14    remanded after having been on bond for a period of time.

15          Mr. Shkreli's repeated comments in social media

16    also indicate to me that he is someone who is quite

17    impetuous, volatile, spiteful, and vindictive.  And so I

18    have some serious concerns that he would violate an order

19    that enjoins him or prevents him from disseminating what he

20    claims are copies he has of the album.

21          I will however, though, allow for his lawyers to

22    take possession of those, and I'm going to ask you to file a

23    letter at some point certifying that you've done so.  So

24    it's incumbent upon you to get your client to comply with

25    you and turn over all copies in whatever format he has to

PROCEEDINGS                          80

1   you so that he's not able to distribute those in any way.

2          Now, there's another aspect of this request which

3   is to order an inventory, an accounting of the copies of the

4   album that Mr. Shkreli retained and the individuals to whom

5   he distributed the data and files and any attendant profits.

6   I am going to order that also because I also think it

7   relates in part to the defendant's claim that somehow there

8   has been some distribution already that destroys any

9   argument or any claim, rather, of irreparable harm.  So I

10  think this is something that the defendants should be doing

11  anyway, is getting to the bottom of these claims he's made

12  now about having previously distributed actual CDs of the

13  album.  I've expressed my skepticism about that in large

14  part because they've never surfaced, and that seems

15  improbable, if not incredible, to me in the eight

16  intervening years or so, nine intervening years.

17         So I am going to order that inventory.  We should

18  try to figure out the mechanics of that.  It would come, I

19  guess, via the counsel providing that inventory.

20         Now, this gets me to what I will say, which is

21  that, Mr. Dykema and Mr. Krimnus, if you decide you have

22  some evidence that you think is relevant to the question of

23  irreparable harm along the lines that we discussed and

24  relating to 2015 or pre-2018, which is when the forfeiture

25  order was issued, dissemination of the copies of the actual

PROCEEDINGS                    81

 1   album, you know, recordings, you can seek to reopen this
 2   preliminary injunction hearing or to present that evidence.
 3   But I would like some kind of affidavit or something by way
 4   of proffer so that I understand what we're talking about,
 5   and I may or may not allow a reopening based on the
 6   submission I receive.  But that's why I think your
 7   investigation is aligned with getting an inventory, as well.
 8   It might end up serving your purpose with respect to either
 9   altering or eliminating the preliminary injunction.
10             So that's my ruling.
11             Is there anything I missed from the plaintiff's
12   perspective that I should address?
13             MR. COOPER:  No.  I do have three clarification
14   questions.
15             THE COURT:  Yes.
16             MR. COOPER:  And I think the first one is
17   self-evident, that Mr. Shkreli is to relinquish all copies
18   to his counsel.
19             THE COURT:  Yes.
20             MR. COOPER:  He is not to retain any of them,
21   correct?
22             THE COURT:  That's right.  In whatever form,
23   wherever they are, he's got to give them to his lawyers for
24   safekeeping.
25             MR. COOPER:  The second question I have is:  The

PROCEEDINGS                                    82

1   inventory or the accounting I would request be in the form

2   of an affidavit because I believe that's the way it's done

3   on the CPLR.  So I would want that.

4              THE COURT:  Okay.

5              Any objection to that, Mr. Dykema?

6              MR. DYKEMA:  No, Your Honor.  I have a logistical

7   question.

8              THE COURT:  Okay.  With respect to that affidavit?

9              MR. DYKEMA:  With respect to turning over the

10  copies to counsel, which is that with respect to physical

11  copies, USB sticks or CDs or whatever, crystal clear.  My

12  understanding is these are computer files that might be on

13  Mr. Shkreli's personal computer.  Is --

14             THE COURT:  Remove the hard drive.  He should get

15  himself a new hard drive.

16             MR. DYKEMA:  Okay.  Understood.

17             THE COURT:  I mean, listen, I'm no computer

18  expert, but I want the actual physical recording of it.  If

19  it's in a hard drive on his personal computer, then he has

20  to take it out and give it to you, or I guess he could

21  delete it from his own computer.

22             MR. DYKEMA:  That was exactly my question, Your

23  Honor.  I wouldn't want to tell him to delete it and then

24  have a spoliation issue.

25             THE COURT:  No.  I mean, if he deletes it, he'll

1    copy it first on to some external hard drive for you, or

2    whatever format you choose, a stick.  I don't know how large

3    the file is.

4            MR. DYKEMA:  Yes, Your Honor.

5            THE COURT:  But you could put it on an external

6    hard drive, I think it's easier probably just to -- although

7    he probably has a lot of things on his hard drive.  So maybe

8    the better course is to remove it from his hard drive,

9    transfer it on to one that you hold and then take possession

10   of that.  And then you're going to need to confirm as an

11   officer of the court that he removed it from his computer.

12           MR. DYKEMA:  I'll do my best, Your Honor.

13           THE COURT:  I'm putting you in a difficult

14   position, I know, but obviously I want to make sure that

15   there's some monitoring of his compliance and he has to

16   understand that, you know, his noncompliance could really

17   put him into some serious trouble as far as I'm concerned.

18           MR. DYKEMA:  One more question with respect to the

19   inventory, Your Honor.

20           THE COURT:  Yes.

21           MR. DYKEMA:  Is this an inventory of the copies in

22   his possession, or is this an inventory of distributions or

23   whatever that he's made?

24           THE COURT:  Both.  So copies in his possession and

25   any that he's distributed to anyone else.  And that's why I

PROCEEDINGS                          84

1  think it goes to your issue about distribution.  If, in

2  fact, he distributed 50 CDs, I want to know where they went

3  to, and he has to provide names and addresses.  You can

4  include redactions if you'd like and file a sealed copy, if

5  you have some concern about people's privacy, and then file

6  a redacted version publicly.  So maybe put it in an

7  attachment or something.

8          MR. COOPER:  I think Mr. Shkreli should also be

9  required to put in an affidavit indicating that he has

10 turned over everything.  I don't want to put his counsel in

11 jeopardy, and I want something definitive where if it's

12 violated --

13         THE COURT:  There's some consequence.

14         MR. COOPER:  -- there's a consequence.

15         THE COURT:  I would actually ask that it be under

16 penalty of perjury that he submit a declaration attesting to

17 who he gave it to.  I agree that I don't want to put you in

18 the position of attesting to facts, although lawyers submit

19 declarations all the time, as happened here, but those are

20 typically things like, this purports to be a CD or something

21 like that.  If he's attesting to a fact that he gave it to

22 you on X date in X format and what he gave them, he should

23 be the one attesting to it under a penalty of perjury so

24 that I can rely on it in some way, if I'm going to rely on

25 it, either for purposes of reopening the preliminary

PROCEEDINGS                                        85

1    injunction hearing or simply for purposes of moving this

2    case forward.

3              MR. DYKEMA:  Understood, Your Honor.  I'm

4    certainly not a fact witness as to what Mr. Shkreli may or

5    may not do, but I'll -- I understand what you're asking for.

6              THE COURT:  So stress the importance of his

7    truthfulness, because there will be a consequence if he

8    signs a declaration under penalties of perjury.  Okay?

9              MR. DYKEMA:  Yes, Your Honor.

10             MR. COOPER:  Can we put a time from on it?  I know

11   this will take a little time, so I don't want to necessarily

12   make it too tight.

13             THE COURT:  How about the end of September, would

14   that suit everyone's purposes?

15             MR. COOPER:  For both, the provision of all of the

16   copies to his counsel and the --

17             THE COURT:  No, that I'd like to have happen

18   sooner.  So let's have two different dates.  The inventory

19   I'm less concerned about.  But I assume that the inventory

20   in some ways will end up being created around the time the

21   copies are being seized, because I assume the next thing

22   you'll need to do is sit down with your client and explain

23   what's happening.

24             So why don't we do this:  Within two weeks I want

25   you to retain all the copies.  I mean, I have a little bit

1    of a concern that this might be -- you know, why don't we

2    make it a week.  It's not that difficult.  You know, he has

3    them.  You've just got to go over there and get them.  So

4    before Labor Day.  I don't want there to be too much time.

5    So a week from now is next Friday.  So that puts us at the

6    31st, I think.

7                    THE COURTROOM DEPUTY:  30th.

8                    THE COURT:  So by the 30th I want you to submit a

9    letter to me indicating that you've taken possession of all

10   copies and that he has no copies, based on his

11   representation to you, of any of the albums, recordings, or

12   contents.  Okay?

13                   MR. DYKEMA:  Yes, Your Honor.

14                   THE COURT:  And that you will hold on to them

15   during the pendency of this case.

16                   And then by the end of September, I would like to

17   have that accounting or inventory.  You could submit it

18   sooner if in some way it supports your request for a

19   reopening of the preliminary injunction hearing.

20                   MR. DYKEMA:  Yes, Your Honor.

21                   I have two more really quick questions.

22                   THE COURT:  Please.

23                   MR. DYKEMA:  So I think I get this.  Will there be

24   a written order?

25                   THE COURT:  No, this is it.  So if you want to get

PROCEEDINGS                                    87

1    a copy of the transcript --

2              MR. DYKEMA:  We will.

3              THE COURT:  -- order it from our court reporter.

4              MR. DYKEMA:  There's two sort of evidentiary

5    issues as we investigate this case and speak with our

6    client.

7              One is on this issue of investigating to see

8    whether there are copies available on the internet.  I don't

9    want to run afoul of any copyright violations in

10   investigating or downloading these things.  If plaintiffs

11   have no objection, could it be made clear that like us

12   attempting to download the files from the internet, if

13   they're out there and already exist, is not going to be some

14   sort of actionable violation?

15             THE COURT:  I think that's clear, because you're

16   doing it at my instruction simply to preserve or remove from

17   his access those files.  You know, the only way to do it,

18   unless you took physical possession and put them in your

19   office, I mean, this is what you have to do.  So I don't

20   think there can be any construction that you're violating a

21   forfeiture order or you're violating any trade secret, I

22   guess.

23             MR. DYKEMA:  I understand, Your Honor.

24   Specifically I believe that the album is available on

25   BitTorrent.

PROCEEDINGS                                        88

1          THE COURT:  Yes.

2          MR. DYKEMA:  So I'd like to go and see if I can

3     download it on BitTorrent and I don't want to be --

4          THE COURT:  Oh, that's fine.

5          MR. DYKEMA:  Okay.

6          THE COURT:  Yeah, that's fine.

7          MR. DYKEMA:  And one other sort of related

8     question is:  So that there's no confusion about whether

9     whatever files we obtain from Mr. Shkreli or from the

10    internet are genuine, and I guess we could wait for this in

11    discovery, but could we get a copy of the relevant files

12    from the plaintiff to be able to make this comparison?

13    Because I myself haven't heard the album and I don't --

14         THE COURT:  No, I know, but you're going to have

15    to turn it over to them and then their client will confirm

16    for you, because I'm not going to let you have a copy of it.

17    And plus they don't know what is purportedly on BitTorrent

18    or in his possession.  So they would end up having to give

19    you the entire album, right?  That's what you'd be asking

20    for.  I know you're a big fan, but this is not a way to get

21    it.

22         MR. DYKEMA:  I understand, Your Honor.  I

23    understand, Your Honor.

24              Ordinarily this would happen in discovery anyways

25    because if we approach the issue of whether there's been an

PROCEEDINGS                                89

1   infringement or a copying, we'd be entitled to have either

2   ourselves or an expert listen to both copies and I wouldn't

3   want to have a chain of custody issue like where I have to

4   submit it to them for them to tell me how they see the

5   evidence.

6          THE COURT:  Mr. Cooper?

7          MR. COOPER:  I think they should just provide it.

8   I don't think there's going to be a big mystery about

9   whether or not this came from the album or didn't come.

10  Mr. Shkreli's going to tell them:  This is one of the things

11  I distributed.  I don't think you need to do a side by side.

12  I don't want to relinquish any possession given what's

13  happened.  If there's a question down the road, we can

14  address it.

15         THE COURT:  At some point in discovery, though,

16  aren't you going to have to provide a copy of the album to

17  them?

18         MR. COOPER:  I don't know.  And it might be

19  attorneys' eyes only.  I don't know.

20         THE COURT:  Well, that's an interesting question.

21         All right.  I think for this purpose, you don't

22  need to get a copy of the album.  Our fabulous Magistrate

23  Judge will resolve later down the road the discovery

24  dispute, if there is one, about how you actually get access

25  to the album.  But why don't you talk to your client, have

PROCEEDINGS                                    90

1    him tell you all the copies he's made.  That's sort of the

2    relevant part.  He may be overly inclusive if he's forgotten

3    where he got some of it from.  But you can obviously compare

4    it to anything that's publicly available, so you can

5    compare those that aren't uniquely on that album.  And the

6    BitTorrent, if you can find it, you can ask your client if

7    that's the one that was on the album before.

8            So let's proceed in that fashion, for now.

9            I wanted to clarify one thing about the schedule.

10           So the September 30th should include an affidavit

11   from Mr. Shkreli by way of an inventory.  In other words,

12   here are all the people I claim I distributed to, on dates,

13   if he has it, and what their names and addresses are.

14           At this point I don't know if there's any reason

15   to have any kind of an affidavit from the attorney, I guess.

16   The only affidavit or at least some statement from you, it

17   can be in a letter, is that I took possession of files from

18   Mr. Shkreli that he advised me were all of his copies of the

19   album's contents and I'm storing them.

20           THE COURTROOM DEPUTY:  August 30th, not

21   September 30th.  I'm sorry.

22           MR. DYKEMA:  There's two different affidavits.

23           THE COURT:  Yes.  August 30th is the one for the,

24   yes, taking possession, that comes from you, Mr. Dykema.

25   And it doesn't have to be an affidavit.  I'll accept your

PROCEEDINGS                    91

1   representation as an officer of the court in a letter

2   format.  And then the affidavit from Mr. Shkreli is due on

3   September 30th.  That's the inventory.

4          MR. COOPER:  Right, but there's another affidavit

5   that would be due August 30th which would be from

6   Mr. Shkreli, essentially a one-paragraph affidavit saying

7   I've provided my counsel with all my copies, versions,

8   et cetera of this, again, so Mr. --

9          THE COURT:  Right.  So there's some consequence if

10  he lies.

11         MR. COOPER:  So Mr. Dykema's not at risk and

12  there's some clarity and there's some consequences.

13         THE COURT:  Okay.  I think that's fair.  I do want

14  Mr. Shkreli to understand that he cannot manipulate you or

15  in some way use you to put forth inaccurate information.  So

16  do have him submit a -- it could be a very simple affidavit

17  saying I have turned over all files in any form.  And this

18  might be things that are stored in a cloud?  I don't know if

19  that's possible.  I assume it is.  All files I have in

20  whatever format and in whatever physical or digital location

21  to my attorney and I do not have any presently accessible to

22  me or something like that.  Okay?

23         MR. DYKEMA:  Understood, Your Honor.

24         THE COURT:  Because here's a potential concern for

25  what it's worth is that if he actually did distribute CDs to

PROCEEDINGS                              92

1   other people, I want him to understand he can't go and

2   access those from them even after he turns over all his

3   copies to you.  Do you understand what I'm saying?

4          In other words, he's not to possess any copies

5   after he turns over everything to you.  So he can't go to a

6   friend, if he actually sent a CD to a friend, and go and get

7   that.  Okay?

8          MR. DYKEMA:  I understand.

9          THE COURT:  So fashion some affidavit and

10  hopefully that will be sufficient.  And that should be

11  turned in with your letter certifying that you've taken

12  possession of all of his files on August 30th.  And then on

13  September 30th, a separate affidavit from Mr. Shkreli

14  indicating an inventory of everyone who he has supposedly

15  provided the digital cloud to.  August 30th, and then

16  September 30th.

17         MR. COOPER:  One last point.  On the

18  September 30th affidavit, we'd also like to have a statement

19  as to what proceeds, revenues he's received in connection

20  with any distribution of the album, that was in our request

21  and I think it makes sense given the nature of it?

22         THE COURT:  Same.  So he should indicate if he's

23  made any proceeds from his distribution or playing of the

24  album or its contents.

25         MR. DYKEMA:  During what time period, Your Honor?

PROCEEDINGS                      93

1          THE COURT:  Since he's had it.  Because remember,

2     I mean, in theory he didn't have it all that long before it

3     was supposed to be forfeited, right?  He bought it in --

4          MR. COOPER:  He bought it in '15.

5          THE COURT:  Right.

6          MR. COOPER:  He was convicted in -- indicted in

7     '17, and I think the forfeiture order was '21.

8          THE COURT:  No --

9          MR. COOPER:  It was '18.

10         THE COURT:  Right, 2018.

11         MR. COOPER:  Right.  There was the conviction, and

12    the forfeiture order was later.

13         THE COURT:  Was March 2018.  So he had it for

14    about three years.  I don't know, but I don't get the

15    impression based on what's before me that he was playing it

16    very often or making money from it.  It's not clear to me at

17    all he made any money from it.  So he should indicate what

18    proceeds he got from any distribution or performing or

19    playing of the album's contents in that declaration.

20         MR. DYKEMA:  Okay.

21         THE COURT:  So I will issue a preliminary

22    injunction, in other words, an actual order, and that will

23    reiterate that aspect of the injunction.

24         MR. DYKEMA:  Thank you, Your Honor.

25         Just one very quick question on the schedule.

PROCEEDINGS                                        94

1          THE COURT:  Yes.

2          MR. DYKEMA:  I haven't spoken a whole lot with

3    Mr. Shkreli.  As I sit here right now, I don't think we're

4    going to have a problem meeting this next Friday deadline.

5    But if we do, I just request the indulgence of the Court

6    that we could submit a letter and explain why.  I don't know

7    if he's at the beach or whatever.  But we'll do our best to

8    hit that deadline.

9          THE COURT:  Yes.  Do explain if you have to get an

10   extension as to why.  Obviously the paramount thing you must

11   communicate to him as soon as you leave here is that he's

12   not allowed to use, disseminate, secret, you know, those

13   recordings if he has any.

14         MR. DYKEMA:  Understood, Your Honor.

15         THE COURT:  And he's enjoined from using them in

16   any way and the only thing he's allowed to do with them

17   right now is turn them over to you.

18         MR. DYKEMA:  Understood, Your Honor.  Thank you.

19         THE COURT:  Good.  Thank you very much.  It was a

20   pleasure meeting everyone.  So we'll issue the order and

21   then we'll move on to the next phase, which is the motion to

22   dismiss.

23         I might actually dispense with the pre-motion

24   conference requirement.  If you folks talk about a schedule

25   for briefing it, because I do think there's going to be a

PROCEEDINGS                    95

1    need to see these arguments, just propose it to me in a

2    letter, because normally you have to file a response to the

3    pre-motion conference request, but let's dispense with that.

4              Thanks, everyone.  Enjoy what little remains of

5    the summer.

6              (Matter adjourned.)

7

8                        *   *   *

9

10                  CERTIFICATE OF REPORTER

11

12   I certify that the foregoing is a correct transcript of the

     record of proceedings in the above-entitled matter.

13

14

     /s/ Kristi Cruz

15   _____

     Kristi Cruz RMR, CRR, RPR
16   Official Court Reporter.

17

18

19

20

21

22

23

24

25