UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

PLEASRDAO, an exempted foundation
company,

                Plaintiff,

     - against -

MARTIN SHKRELI,

                Defendant.

-------------------------------------------------------x

**MEMORANDUM & ORDER**
24-CV-4126 (PKC) (MMH)

PAMELA K. CHEN, United States District Judge:

In 2015, Defendant Martin Shkreli ("Defendant" or "Shkreli") purchased the most expensive musical work ever sold: the only copy of Wu-Tang Clan's album *Once Upon a Time in Shaolin* (the "Album"). (Compl., Dkt. 1, ¶¶ 18–19.) His ownership of the Album, however, was short-lived. In 2017, Shkreli, a former pharmaceutical executive, was convicted on federal securities fraud charges and was subsequently sentenced to seven years in prison and forced to forfeit approximately $7.4 million in assets including, *inter alia*, the Album. (*Id.* ¶ 1.) Plaintiff PleasrDAO ("Plaintiff" or "PleasrDAO") thereafter purchased the Album, and now alleges that Shkreli unlawfully retained and distributed copies of it. (*Id.* ¶ 2.) Plaintiff brings this action against Defendant for: (1) enforcement of the Forfeiture Order entered in Defendant's criminal case, *United States v. Shkreli*, No. 15-CR-0637 (E.D.N.Y. Mar. 26, 2018); (2) violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*; (3) misappropriation of confidential information/trade secrets; (4) tortious interference with prospective economic advantage; (5) unjust enrichment; and (6) recovery of chattel/replevin, New York Civil Practice Law and Rules ("CPLR") § 7101, *et seq.* (*Id.* at 1.) Defendant moves to dismiss the Complaint under Federal

Rule of Civil Procedure ("Rule") 12.  For the reasons set forth below, the Court grants in part and denies in part Defendant's motion to dismiss.

## BACKGROUND

### I.   Factual Background[1]

#### A.   The Wu-Tang Clan Album: *Once Upon a Time in Shaolin*

Between 2007 and 2013, Wu-Tang Clan, a world-famous hip-hop group, recorded *Once Upon a Time in Shaolin*.  (Compl., Dkt. 1, ¶¶ 12–13.)  The Album has 31 tracks and includes guest appearances from notable musicians, actors, and athletes.  (*Id.* ¶ 13.)  Rather than a conventional commercial album release, Wu-Tang Clan produced only one hard copy of the Album, which has never been publicly released.  (*Id.* ¶¶ 15, 17.)  Wu-Tang Clan leader Robert "RZA" Diggs and producer Tarik "Cilvaringz" Azzougarh (the "Producers") packaged the Album in a boxed set which included:

> (i) the only existing hard copy of the record album, burned onto a single, two-disc set; (ii) a hand carved, nickel and silver cased box set, comprised of three integrated nickel and silver boxes, housed by a larger leather box, all designed by the British Moroccan artist Yahya; (iii) a gold leafed certificate of authenticity; (iv) a pair of customized audio speakers; and (v) a 174-page leather-bound manuscript volume containing lyrics, credits and anecdotes on the production and recordings of each song.

---

[1] The facts are derived from Plaintiff's Complaint, (Compl., Dkt. 1), and the following documents, which the Court deems to be incorporated by reference or integral to the Complaint: the Original Purchase Agreement (the "OPA") between Shkreli and the Wu-Tang Clan Producers, (OPA, Dkt. 4-3), Shkreli's criminal Judgment and Forfeiture Order, (J. & Forfeiture Order, Dkt. 4-5), and the Asset Purchase Agreement (the "APA") between the United States and an unknown buyer, (APA, Dkt. 22-3).  *See TileBar v. Glazzio Tiles*, 723 F. Supp. 3d 164, 188 (E.D.N.Y. 2024) ("[On a Rule 12(b)(6) motion,] in addition to the facts alleged in the complaint, the court may also consider documents that are appended to the complaint, incorporated in the complaint by reference, or integral to the complaint, as well as matters of which judicial notice may be taken." (citing *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558–59 (2d Cir. 2016))).  The Court "accept[s] all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in[ P]laintiff's favor."  *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022) (quoting *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010)).

(*Id.* ¶¶ 14–15.)  Wu-Tang Clan intended for the Album to be a "historically unique musical compilation" and "a protest to what they saw as the devaluation of music in the digital era."  (*Id.* ¶¶ 14, 16.)

In 2015, the Producers sold the Album to Shkreli for $2 million, making it the most expensive musical work ever sold, according to the Guinness Book of World Records.  (*Id.* ¶¶ 18–19.)  The sale was executed in the Original Purchase Agreement dated September 3, 2015 (the "OPA").  (*Id.* ¶ 20; OPA, Dkt. 4-3.)  In addition to the physical Album in a boxed set as described above, Shkreli received 50% of the copyrights and renewal copyrights in the recordings and musical compositions of the Album.  (OPA, Dkt. 4-3, at 5.)  In return, the OPA bound Shkreli by several usage restrictions for a period of 88 years.  (*Id.*)  It states that the buyer "may duplicate or replicate the Work[2] for private use, but shall not duplicate, replicate, and/or exploit the Work for any commercial or other non-commercial purposes" other than certain permitted uses limited to: "the private or public exhibition or playing of the Work, with or without charge, in locations such as Buyer's home, museums, art galleries, restaurants, bars, exhibition spaces, or other similar spaces not customarily used as venues for large musical concerts, as well as the advertising and/or promotion of such exhibition or playing of the Work."  (*Id.* at 5–6.)  The Producers retained a right to a portion of any net profits from the permitted uses.  (*Id.* at 6.)  The OPA also gave Shkreli

---

[2] "The Work" is defined in the OPA as, together,

"a musical work by the Wu-Tang Clan entitled 'Once Upon a Time in Shaolin….', all of Sellers' rights as specified in this Agreement including fifty percent (50%) of the copyrights in and to the recordings and musical compositions embodied in said musical work, a hand-carved casing in which the two compact discs containing the musical work is housed, all materials delivered therewith (e.g., the speakers described below), and certain other related materials and rights as described in this Agreement."

(OPA, Dkt. 4-3, at 1.)

"[t]he right to sell the Work to a third party under the same terms and conditions as described herein." (*Id.*)

**B.     Shkreli's Conviction and Forfeiture Order**

In 2017, Shkreli was convicted by a federal jury in the United States District Court for the Eastern District of New York on two counts of securities fraud and one count of conspiracy to commit securities fraud. (Compl., Dkt. 1, ¶ 25.) In March 2018, the Honorable Kiyo A. Matsumoto, the judge who presided over Shkreli's criminal case, sentenced Shkreli to seven years in prison and entered a money judgment against Shkreli for $7,360,450 in proceeds from his fraudulent scheme (the "Forfeiture Money Judgment"), along with a forfeiture order to satisfy the judgment (the "Forfeiture Order"). (*Id.* ¶¶ 26–27; *see* J. & Forfeiture Order, Dkt. 4-5.) The Forfeiture Order required Shkreli to turn over to the United States his interest in certain assets (the "Substitute Assets") including, *inter alia*, "the album 'Once Upon a Time in Shaolin' by the Wu-Tang Clan." (Compl., Dkt. 1, ¶ 27; J. & Forfeiture Order, Dkt. 4-5, at ECF[3] 10–11.)

The Forfeiture Order, "in order to preserve the value of the Substitute Assets," barred Shkreli and anyone acting on his behalf from taking "any action that would have the effect of diminishing, damaging and/or dissipating the Substitute Assets, or any funds and/or assets that may be used to satisfy the Forfeiture Money Judgment." (J. & Forfeiture Order, Dkt. 4-5, at ECF 12.) Shkreli was further restrained "from taking any action that would affect the availability, marketability or value of the Substitute Assets," and was required to "take all reasonable steps, and bear all costs necessary, to ensure that all the Substitute Assets are preserved and maintained

---

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

in good and marketable condition, and are not damaged, diluted or diminished in value as a result of any actions taken or not taken by the defendants and his representatives." (*Id.* at ECF 13.)

## C. PleasrDAO's Purchase of the Album

PleasrDAO is an exempted foundation company established in the Cayman Islands[4] "that collects and publicly displays culturally significant media and materials with the intent of creating ecosystem experiences that encourage participation and interaction throughout the United States and other countries." (Compl., Dkt. 1, ¶¶ 3, 8.) In July 2021, PleasrDAO purchased the Album— specifically, "the physical asset and exclusive right to play the audio tracks"—for approximately $4 million. (*Id.* ¶ 29.) The Complaint does not identify from whom Plaintiff purchased the Album; rather, the Complaint refers to and attaches an Asset Purchase Agreement dated July 19, 2021, (the "APA"), executed by the United States Marshals Service ("USMS") on behalf of the United States memorializing the United States' sale of the Album to undisclosed buyers for an undisclosed amount. (APA, Dkt. 22-3, at 1.) In January 2024, PleasrDAO purchased the "copyrights in and exclusive right to exploit the recordings for approximately $750,000." (Compl., Dkt. 1, ¶ 29.)

## D. Shkreli's Retention and Distribution of the Album

In May 2022, Shkreli was released from prison and began serving a three-year term of supervised release. (Compl., Dkt. 1, ¶ 32.) Since his release from prison, Shkreli has frequently participated in online "live stream" activity on various social media platforms. (*Id.* ¶¶ 34–35.) During a live stream on June 18, 2022, Shkreli admitted that he had played the Album for his

---

[4] The Cayman Islands' Foundation Companies Act of 2017 established the "foundation company," a new type of Cayman company that "shar[es] many of its features with regular exempted Cayman companies." 3 Asset Prot.: Domestic & Int'l L. & Tactics § 33:31 (Nov. 2022); *see* Ryan Levin, Comment, *Bankrupting the Matrix: DAOs and the Code*, 40 Emory Bankr. Devs. J. 455, 466 (2024) ("The Cayman Islands recognizes [Decentralized Autonomous Organizations or 'DAOs'] as a type of 'foundation company,' which operates similarly to incorporated trusts, while retaining a separate legal personality and the limited liability of a company.").

followers, stating, "Yeah, that's the Wu-Tang album for all you crazy streamer people." (*Id.* ¶ 36.)
During a live stream on YouTube on June 22, 2022, Shkreli was asked if he had still retained a
copy of the Album and responded, "I do. I was playing it on YouTube the other night even though
somebody paid $4 million for it." (*Id.* ¶ 37.) During a live stream on June 30, 2022, Shkreli played
a portion of the Album and stated, "of course I made MP3 copies, they're like hidden in safes all
around the world . . . I'm not stupid. I don't buy something for two million dollars just so I can
keep one copy." (*Id.* ¶ 38.)

On April 13, 2024, after a member of PleasrDAO posted a photo of the Album on the social
media platform X (formerly Twitter), Shkreli commented on PleasrDAO's post: (i) "LOL i have
the mp3s you moron"; (ii) "i literally play it in my discord all the time. you're an idiot."; (iii) "so
what are you arguing about? this thread is about someone listening to a CD > 5000 people
have . . ."; and (iv) "yeah i have the music, sold the plastic." (*Id.* ¶ 39.) In response to another
user who commented, "You don't understand my jealously level," Shkreli wrote, "just give me
your email lol." (*Id.* ¶ 40.) In response to another comment, he wrote, "i can just upload the mp3s
if you want? email addy?" (*Id.*)

On May 13, 2024, Shkreli appeared on a podcast posted on YouTube during which he
stated that he had "burned the album and sent it to like, 50 different chicks." (*Id.* ¶ 41.) He then
asked the interviewer, "Do you know how many blowjobs that album got me? You think I didn't
make a fucking copy of it? Are you joking?" (*Id.*) He also stated that "thousands of people have
listened to it. I sent the mp3s to all these people." (*Id.*) On May 14, 2024, Shkreli posted a photo
of PleasrDAO's website on his X account with a caption stating, "look out for a torrent im sick of
this shit @PleasrDAO." (*Id.* ¶ 42.) In response to a comment on the post, Shkreli wrote, "ive
already sent it to 50 ppl." (*Id.*) On June 9, 2024, Shkreli wrote on his X account, "well @pleasrdao

blocked me from their account so I think I will play the album on spaces now." (*Id.* ¶ 43.) The @MartinShkreli X account then hosted a "Spaces" session entitled "Wu tang official listening party" and tweeted "Never heard before wu tang stream." (*Id.*) During the session, for which 4,900 listeners "tuned in" according to X, Shkreli played music from the Album that any participant could hear. (*Id.*)

## II. Procedural History

Plaintiff filed this action against Defendant on June 10, 2024, for: (1) enforcement of the Forfeiture Order; (2) violations of the DTSA; (3) misappropriation of confidential information/trade secrets; (4) tortious interference with prospective economic advantage; (5) unjust enrichment; and (6) recovery of chattel/replevin. (Compl., Dkt. 1, at 1.) Along with its Complaint, Plaintiff filed a motion for a temporary restraining order ("TRO"), which the Court granted the following day. (*See* Mem. Supp. Mot. TRO, Dkt. 4; TRO, Dkt. 10.) On August 23, 2024, following a hearing, the Court granted Plaintiff a Preliminary Injunction, finding that Plaintiff had "raise[d] sufficiently serious questions going to the merits of its claims," and that "Plaintiff will suffer immediate and irreparable injury if a preliminary injunction is not entered." (Prelim. Inj. Order, Dkt. 30, at 2.) The Preliminary Injunction restrained and enjoined Defendant from possessing, using, disseminating, or selling any interest in the Album or in any way causing further damage to Plaintiff through conduct pertaining to the Album. (*Id.*) Defendant was ordered to "sequester and turn over all of his copies, in any form, of the Album or its contents to defense counsel" and file an affidavit under penalty of perjury certifying his compliance with the Order. (*Id.*)

On September 6, 2024, Plaintiff moved for contempt proceedings against Defendant, arguing that Defendant had failed to comply with the Preliminary Injunction, and requesting that the Court order Defendant to "undertake a complete search, and supplement his declaration to

assure complete compliance with the Order." (Contempt Mot., Dkt. 33, at 1.) Plaintiff pointed to Defendant's previous public statements that he had hidden MP3 copies of the Album "in safes around the world," and other public statements regarding Defendant sending the Album's contents to others. (*Id.*) On November 11, 2024, after Defendant responded and the Court ordered Defendant to supplement his affidavit on compliance with the injunction, the Court held a hearing on Plaintiff's contempt motion at which Defendant appeared and testified. (*See* 11/20/2024 Min. Entry.) Following the hearing, the parties submitted supplemental filings, and the Court ultimately denied Plaintiff's contempt motion after finding that Defendant was not in contempt of the Preliminary Injunction. (*See* 1/21/2025 Dkt. Order; 2/20/2025 Dkt. Order.)

On January 6, 2025, Defendant filed his motion to dismiss the Complaint in its entirety for failure to state a claim, which was fully briefed on the same day. (*See* Dkts. 47–49.)

## LEGAL STANDARD

"To survive a motion to dismiss" pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). In addressing the sufficiency of a complaint, a court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [it is] not required to credit conclusory allegations or legal conclusions couched as

factual allegations." *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 90–91 (2d Cir. 2021) (quoting *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020)).

## DISCUSSION

Defendant moves to dismiss the Complaint on the grounds that (i) Plaintiff lacks standing to enforce the Forfeiture Order; (ii) Plaintiff's trade secret claims under federal and state law should be dismissed for failure to plead a "secret"; and (iii) Plaintiff's tortious interference, unjust enrichment, and recovery of chattel/replevin claims are preempted by the Copyright Act and are otherwise inadequately pleaded. (Def.'s Mem. Supp. Mot. Dismiss ("Def.'s Br."), Dkt. 47-1, at 1.) Defendant also argues that if the Court does not dismiss the Complaint in its entirety, it should order joinder of the Producers as necessary parties. (*Id.*) For the reasons that follow, the Court grants Defendant's motion to dismiss Count I seeking enforcement of the Forfeiture Order, Count IV alleging tortious interference with prospective economic advantage, and Count V alleging unjust enrichment, and denies Defendant's motion to dismiss Counts II and III alleging misappropriation of trade secrets and Count VI alleging recovery of chattel/replevin.

## I.    Enforcement of the Forfeiture Order

Under Count I of the Complaint, Plaintiff alleges that Defendant has violated the Forfeiture Order's terms requiring that he forfeit his interest in the Album and refrain from taking action that will diminish, damage, or dissipate the Album, or that will affect its availability, marketability, or value. (Compl., Dkt. 1, at ¶¶ 55–64; *see* J. & Forfeiture Order, Dkt. 4-5, at ECF 10–13.) Plaintiff seeks enforcement of the Forfeiture Order and claims PleasrDAO is an "intended beneficiary of the Forfeiture Order's provisions protecting the value of the Substitute Assets and falls within the zone of interests protected by the Forfeiture Order's provisions on asset forfeiture" pursuant to Rule 71 of the Federal Rules of Civil Procedure. (Compl., Dkt. 1, at ¶¶ 55–64.) Defendant moves

to dismiss Count I, arguing that Plaintiff lacks standing to enforce the Forfeiture Order. (Def.'s Br., Dkt. 47-1, at 5.) The Court agrees with Defendant.

Rule 71 provides that "[w]hen an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party." Fed. R. Civ. P. 71. "Rule 71 was intended to assure that process be made available to enforce court orders in favor of and against persons who are properly affected by them, even if they are not parties to the action." *Berger v. Heckler*, 771 F.2d 1556, 1565 (2d Cir. 1985) (quoting *Lasky v. Quinlan*, 558 F.2d 1133, 1137 (2d Cir. 1977)).[5] A non-party may seek enforcement of a court order pursuant to Rule 71 only if they are an intended beneficiary of the order and if they have standing under the "zone-of-interests" test, i.e., if the non-party's complaint falls within the zone of interests protected by the order. *Hanyzkiewicz v. Allegiance Retail Servs., LLC*, No. 22-CV-4051 (ALC), 2023 WL 2758355, at *3 (S.D.N.Y. Apr. 3, 2023) (citing *EEOC v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Local 580*, 139 F. Supp. 2d 512, 520 (S.D.N.Y. 2001)).

Plaintiff contends that Defendant misconstrues the scope of an intended beneficiary under Rule 71 to mean that the party seeking relief must be "a named party" to the Forfeiture Order. (Pl.'s Mem. Opp'n Mot. Dismiss ("Pl.'s Br."), Dkt. 49, at 7–8.) Plaintiff cites *Berger* for the proposition that, "'as a practical matter,' an order cannot name all 'past, present and future' beneficiaries of an order when it benefits *a class* of nonparties." (*Id.* at 7 (quoting *Berger*, 771 F.2d at 1565)). Though Plaintiff is correct that an intended beneficiary need not be explicitly named, this argument is an oversimplification of Defendant's position and does not save Plaintiff's first cause of action. Plaintiff draws comparison to cases, which Defendant originally cited, in

---

[5] Though Rule 71 has been amended since *Berger* and *Lasky* were decided, the 1987 Amendment was purely "technical," and the 2007 Amendment was "intended to be stylistic only." Fed. R. Civ. P. 71 advisory committee's notes to 1987 and 2007 amendments.

which non-parties to government consent decrees seek to enforce those consent decrees as intended beneficiaries within the zone of interest of the relief granted. (*Id.* at 8–9); *see Hanyzkiewicz*, 2023 WL 2758355, at *3 (finding that, "as a person who is visually impaired seeking to enforce rights under a contract for the benefit of the visually impaired and federal disability rights law, [p]laintiff [fell] within the zone of interest of the consent decree"); *Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Local 580*, 139 F. Supp. 2d at 521–22 (holding that union members had standing to enforce a consent judgment that was "intended to benefit all present and future non-white members of" the union, and finding that the consent judgment did "not vest an exclusive right of enforcement in the original parties"). In its attempt to liken those cases to this one, Plaintiff presumes that the Forfeiture Order grants relief to *any* class of potential beneficiaries beyond the named parties. It does not.

Here, the purpose of the Forfeiture Order was to satisfy the nearly $7.4 million Forfeiture Money Judgment entered against Defendant in favor of the United States following his criminal conviction. (*See* J. & Forfeiture Order, Dkt. 4-5, at ECF 9–10.) Though the Forfeiture Order certainly contemplates that there would be buyers for Plaintiff's assets to carry out that purpose, nothing in the Forfeiture Order suggests that its terms were intended *for the benefit of* those buyers. (*See generally id.*) Rather, it states that the provisions enjoining Defendant from taking action that would impact the assets' value or marketability are meant "to preserve the value of the Substitute Assets and ensure that any other funds and/or assets available to satisfy the *Forfeiture Money Judgment* [owed to the United States] are not diminished, damaged and/or dissipated pending any appeal," and "to ensure that such Substitute Assets, and any proceeds traceable thereto, up to the amount of the Forfeiture Money Judgment, remain available to be forfeited pending the conclusion of any appeal." (*Id.* at ECF 12 (emphasis added).) Thus, Defendant's obligations under the

Forfeiture Order were for the sole purpose of ensuring that the Forfeiture Money Judgment in favor of the United States could be satisfied. As such, the Forfeiture Order is not one that, under Rule 71, "grants relief for" the benefit of any party besides the United States or that, therefore, can be enforced by any other party besides the United States. Indeed, the buyers of Defendant's forfeited assets are, in reality, the vehicles by which the United States realizes the benefits owed to it under the Forfeiture Order, rather than the beneficiaries of that order.

For the same reasons, the Court cannot find that Plaintiff's allegations are within the zone of interest sought to be protected by the Forfeiture Order. This is not to say that Plaintiff has failed to allege an injury flowing from Defendant's conduct with respect to alleged violations of the Forfeiture Order.[6] But that is a separate question from whether Plaintiff's interests fall within the scope of the Forfeiture Order such that Plaintiff has standing to enforce it. As the Second Circuit found in *United States v. American Society of Composers, Authors & Publishers*,

> Rule 71 . . . expressly requires that the order sought to be enforced by the nonparty be made in favor of that person. Here, no order was made in [the non-party's] favor. No monetary or other relief was specifically granted to [the non-party]—it was not even named in the judgment—and it is not enough to say that [the non-party] was indirectly or economically benefited by the decree.

341 F.2d 1003, 1008 (2d Cir. 1965).[7]

---

[6] Indeed, it may well be the case that the United States was injured by Shkreli's alleged copying and distribution of the Album before it was sold to PleasrDAO, for which the proper remedy would be for the United States to seek relief for a violation of the Forfeiture Order in Defendant's criminal case.

[7] Even if the Court were to find that non-parties who purchased Plaintiff's assets from the United States were intended beneficiaries under the Forfeiture Order, Plaintiff has failed to specifically allege that it was the government's buyer. Plaintiff only pleads the following with respect to the sale: "PleasrDAO acquired the Album in two transactions. In July 2021, it bought the physical asset and exclusive right to play the audio tracks for approximately $4,000,000. In January 2024, it bought the copyrights in and exclusive right to exploit the recordings for approximately $750,000." (Compl., Dkt. 1, ¶ 29.) Plaintiff does not set forth the name of the seller, the precise dates for those transactions, or any additional information about the contracts of

Thus, because Plaintiff is not an intended beneficiary that falls within the zone of interests protected by the Forfeiture Order, Plaintiff lacks standing to enforce the Forfeiture Order, and Count I must be dismissed.

## II.    Trade Secret Claims

In Counts II and III of the Complaint, Plaintiff alleges that Defendant misappropriated Plaintiff's trade secret—the Album—in violation of the DTSA, 18 U.S.C. § 1836, *et seq.*, and New York common law. (Compl., Dkt. 1, at ¶¶ 65–87.) Defendant seeks to dismiss these claims on the ground that Plaintiff has failed to plead that the Album is a "trade secret." (Defs.' Br., Dkt. 47-1, at 8–12.) The parties dispute whether the Album is sufficiently "secret" to warrant protection. (*See id.*; Pl.'s Br., Dkt. 49, at 12–16.)

The elements required to establish misappropriation of trade secrets under the DTSA and New York law are "fundamentally the same" and "[d]istrict courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (citation omitted). "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate," first, "that it possessed a trade secret, and" second, "that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."

---

sale and their terms. (*Id.*) Instead, Plaintiff relies on the APA (in which the name of the buyer is redacted), (*see* APA, Dkt. 22-3), to argue that Plaintiff's "allegations that it purchased 'the physical asset and exclusive right to play the audio tracks' Album in July 2021, the same time that the APA was executed, is sufficient to demonstrate that [PleasrDAO] purchased the Album from the USMS and that its enforcement claim thus falls within the zone-of-interests protected by the Forfeiture Order." (Pl.'s Br., Dkt. 49, at 10.) Even accepting as true these separate factual allegations, the Court finds the inference that Plaintiff purchased the Album from the government too speculative. Any number of undisclosed transactions between intermediaries could have occurred between the government's sale and Plaintiff's purchase of the Album.

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999)).

"The DTSA defines 'trade secret' to include 'all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes,' so long as: (1) 'the owner thereof has taken reasonable measures to keep such information secret'; and (2) 'the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'" *Iacovacci*, 437 F. Supp. 3d at 380 (alteration in original) (quoting 18 U.S.C. § 1839(3)).

New York courts typically consider the following six factors in determining whether information qualifies as a trade secret under either the DTSA or state law:

> (1) The extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (cleaned up) (quoting *Integrated Cash Mgmt. Servs., Inc. v. Digit. Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990)) (hereinafter the "*Integrated Cash* factors"). "These factors are guideposts, not elements, and it is not necessary to plead every single factor to state a claim." *Id.* (quoting *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 514 (S.D.N.Y. 2015)). "Although there is no heightened pleading requirement on actions brought under the DTSA, . . . district courts in this circuit routinely require that plaintiffs plead their trade secrets

with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." *Id.* (quotation marks and citations omitted). "The existence, *vel non*, of a trade secret usually is treated as a question of fact." *Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 29 (2d Cir. 1987) (collecting cases).

First, though neither party addresses this, the Court notes that this is a somewhat unusual application of the trade secret doctrine or statutes. Plaintiff alleges that the trade secret at issue is the unreleased Album, comprising of the only copy of *Once Upon a Time in Shaolin*, including its data and files. (Compl., Dkt. 1, ¶ 69.) However, the Album does not fit squarely within a category of business information or data that is traditionally protectable as trade secrets, such as an internal customer list. *See., e.g.*, *CapRate Events, LLC v. Knobloch*, No. 17-CV-5907 (NGG) (SJB), 2018 WL 4378169, at *3 (E.D.N.Y. Mar. 9, 2018) (noting that the Second Circuit has "repeatedly concluded" that customer lists are trade secrets (citing *N. Atl. Instruments, Inc.*, 188 F.3d at 44)). Nor does it clearly resemble a secret recipe or formula used to make a product, such as the formula for Coca-Cola. *See Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 107 F.R.D. 288, 294 (D. Del. 1985) (holding that the Coca-Cola Company's secret formulae are trade secrets). The Album's data and files arguably fall somewhere between information "used in *running* [Plaintiff's] business" and information that is "its *product*." *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986) (emphasis in original). Still, "[t]rade secrets include *all forms and types* of business information" so long as the criteria described above pertaining to "reasonable measures" to maintain secrecy and the "independent economic value" from that secrecy are met. *Superb Motors Inc. v. Deo*, 776 F. Supp. 3d 21, 76 (E.D.N.Y. 2025) (emphasis added) (quotation marks and citations omitted). Given this broad definition and Defendant's seeming concession that the trade secret statutes might apply to this type of information, the Court will apply the *Integrated Cash*

factors to determine whether Plaintiff has sufficiently pleaded that the Album is a "trade secret" under the DTSA and New York law.

### A.  The Extent the Album is Known Inside and Outside the Business

The first two *Integrated Cash* factors touch upon "(1) [t]he extent to which the information is known outside of [the] business; [and] (2) the extent to which it is known by employees and others involved in [the] business." *Integrated Cash Mgmt. Servs., Inc.*, 920 F.2d at 173 (citation omitted). "While 'absolute secrecy is not required,' '[i]f an individual discloses [their] trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, [their] property right is extinguished.'" *Structured Cap. Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 832 (S.D.N.Y. 2016) (first quoting *Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 232 (S.D.N.Y. 1988); and then quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)).  Defendant relies on this principle to argue that he "did not maintain secrecy, and so there is no 'secret' at issue."  (Def.'s Br., Dkt. 47-1, at 11–12.)

Though Defendant claims that he "did not maintain secrecy" when the Album was in his lawful possession, (Def.'s Br., Dkt. 47-1, at 11), the Court must accept Plaintiff's well-pleaded facts as true, *see Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 202 (2d Cir. 2013) ("We do not consider matters outside the pleadings in deciding a motion to dismiss for failure to state a claim." (citing *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154–55 (2d Cir. 2006))), and the facts of the Complaint paint a different picture.  The Complaint states that the "Album is confidential and proprietary," and "[t]he contents of the Album's data and files remain unknown to the public at large."  (Compl., Dkt. 1, ¶¶ 24, 79.)  And "[u]nlike conventional commercial album releases, Wu-Tang produced only one copy of the Album.  That copy has never been publicly released."  (*Id.* ¶ 17.)  Furthermore, when the Album was in Defendant's possession, it was subject to significant restrictions regarding its distribution

under the OPA. (OPA, Dkt. 4-3.) Nothing in the Complaint suggests that before Plaintiff purchased "the physical asset and exclusive right to play the audio tracks," as well as the "copyrights in and exclusive right to exploit the recordings," (Compl., Dkt. 1, ¶ 29), the contents of the Album were known by anyone outside of those in the chain of ownership subject to the restrictions in the OPA, discussed in more detail below.[8]

### B. The Measures Taken to Guard the Album's Secrecy

The third relevant factor is "the extent of measures taken by [the business] to guard the secrecy of the information." *Integrated Cash Mgmt. Servs., Inc.*, 920 F.2d at 173. The DTSA requires a showing that the owner of the trade secret at issue has "taken reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A). Though the DTSA does not provide clear guidance on what constitutes "reasonable measures," "[m]ost courts in this Circuit look to contractual confidentiality agreements or physical security measures" to determine whether reasonable measures were taken. *Negative, Inc. v. McNamara*, 770 F. Supp. 3d 472, 479 (E.D.N.Y. 2025) (citation omitted), *appeal withdrawn*, No. 25-876, 2025 WL 1927865 (2d Cir. June 26, 2025). Plaintiff asserts that after purchasing the Album, "[a]t all relevant times, PleasrDAO moved the Album by secure transport and/or kept [the Album] in a secure location." (Compl., Dkt. 1, ¶ 30.) "The security measures undertaken included the use of armed security guards, secure entrance and exit points, and continual video surveillance, oversight and checks on the Album's condition." (*Id.* ¶ 31.) "[T]he 'reasonableness' of any protective measure is a case-specific inquiry and a question of fact." *Catalyst Advisors, LP v. Catalyst Advisors Invs. Glob.*

---

[8] In fact, based on the evidence adduced in connection with the contempt proceedings, it seems that Shkreli's online claims about widely sharing the Album's contents with others are grossly exaggerated. (*See, e.g.*, Shkreli Decl., Dkt. 54, ¶ 3 (listing nine individuals as "a comprehensive list of every person to whom [Defendant] may have personally given a copy of any part of the Musical work").

*Inc.*, No. 21-CV-4855 (KPF), 2024 WL 522751, at *21 (S.D.N.Y. Feb. 9, 2024). Here, the Court finds that Plaintiff has plausibly alleged that it has taken reasonable measures to guard the secrecy of the information.

### C. The Value of the Album to Plaintiff and its Competitors

The fourth relevant factor is "the value of the information to [the business] and [its] competitors." *Integrated Cash Mgmt. Servs., Inc.*, 920 F.2d at 173. Under the DTSA, for information to be a trade secret it must "derive[] independent economic value, actual or potential, from not being generally known to . . . another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B). Plaintiff argues that the factual allegations in the Complaint are sufficient to show that the Album's data and files are of significant value to Plaintiff's business, and that "the value rests on it having *not* been heard by the public." (Pl.'s Br., Dkt. 49, at 15.) Though the Court agrees with Plaintiff on this factor, it cannot be understated that the application of trade secret doctrine to the unique facts of this case is unchartered territory.

With respect to its actual value, the Album was originally sold to Defendant for $2 million, making it "the most expensive musical work ever sold," according to the Guinness Book of World Records. (Compl., Dkt. 1, ¶ 19.) Plaintiff later purchased the exclusive rights to the Album for over $4 million.[9] (*Id.* ¶ 29.) Plaintiff's business is one that "collects . . . culturally significant media and materials with the intent of creating ecosystem experiences that encourage participation and interaction throughout the United States and other countries." (*Id.* ¶ 8.) It is certainly reasonable to conclude on these facts that the Album holds significant value to Plaintiff.

---

[9] The significant amount of money Plaintiff expended to acquire the Album also speaks to the fifth *Integrated Cash* factor—"the amount of effort or money expended by the business in developing the information"—even though Plaintiff did not "develop" the information itself. (Compl., Dkt. 1, ¶ 29); *Integrated Cash Mgmt. Servs., Inc.*, 920 F.2d at 173.

Most importantly, however, Plaintiff must adequately allege that it is the *secrecy* of the Album that makes the information so valuable to its business. Here, Wu-Tang Clan "produced only one copy of" the Album, which "has never been publicly released." (*Id.* ¶ 17.) The OPA bound Defendant and any subsequent purchasers of the Album to certain confidentiality and usage restrictions for a period of 88 years. (*Id.* ¶ 20; OPA, Dkt. 4-3, at 5–6.) Though it permits duplicating or replicating the contents of the Album "for private use," it prohibits duplicating, replicating, or exploiting the Album for "any commercial or other non-commercial purposes" other than certain permitted uses, including "the private or public exhibition or playing of the Work," in spaces "not customarily used as venues for large musical concerts." (OPA, Dkt. 4-3, at 5–6.) Plaintiff has alleged that the OPA expresses the Producers' intention to create only one copy of the Album "as a protest to what they saw as the devaluation of music in the digital era," and "to keep ownership of the Album in one person's hands at a time." (Compl., Dkt. 1, ¶¶ 16–17, 21.) In other words, the secret and exclusive nature of the Album is a large part of its intrinsic value.

On the other hand, some courts have found that trade secret protection does not, or is unlikely to, extend to certain unreleased musical works. In *Paisley Park Enters., Inc. v. Boxill*, for example, the plaintiffs sought trade secret protection for five unreleased recordings of Prince songs. 253 F. Supp. 3d 1037, 1041, 1046 (D. Minn. 2017). The District of Minnesota held that the plaintiffs' trade secrets claim under Minnesota law was unlikely to succeed on the merits because the "only economic value of the recordings derives from the right to sell the recordings to the public," and thus the plaintiffs could not "realize any independent economic value by keeping the contents of the recordings secret." *Id.* at 1046. Similarly, in *Anderson v. Jackson*, the Central District of California held that an unreleased Janet Jackson song was not a trade secret under California law because, among other reasons, the "[p]laintiffs fail[ed] to identify anything in or

about the song that derived 'independent economic value' by virtue of its secrecy." No. 04-CV-2649 (CAS) (JWJx), 2005 WL 8166024, at *6 (C.D. Cal. Aug. 8, 2005).

It certainly can be argued that the difference between the Album and the musical works at issue in *Paisley Park* and *Jackson* is one of degree, rather than a difference in kind. The Court accordingly has considered the question: if the contents of the Album *always* remain secret, will it still hold economic value? Arguably, the value of the Album to PleasrDAO's business is only realized by sharing the Album's contents with others, at least in some form. But unlike *Paisley Park*, where the plaintiffs "[did] not derive any competitive advantage in the marketplace from the secrecy" of the musical works because "[n]o other artist or record company could take market share from [the plaintiffs] by discovering the contents of the disputed recordings," 253 F. Supp. 3d at 1046, PleasrDAO's business model is unique. PleasrDAO "collects . . . culturally significant media and materials" to create "ecosystem experiences." (Compl., Dkt. 1, ¶ 8.) The independent economic value of the Album comes from Plaintiff's ability to exploit its exclusivity to create an "experience" that its competitors cannot, rather than from a public commercial release or from traditional forms of music distribution that the courts in *Paisley Park* and *Jackson* seemingly considered. As explained *supra*, the Album is still subject to significant usage and distribution restrictions under the OPA, which preserve the Wu-Tang Clan Producers' intention "to keep ownership of the Album in one person's hands at a time," "as a protest to what they saw as the devaluation of music in the digital era." (Compl., Dkt. 1, ¶¶ 16–17, 21.) For these reasons, the Court finds that the unique facts alleged in the Complaint sufficiently distinguish the Album from typical recorded musical works that might not otherwise be afforded trade secret protection. On these facts, at the pleading stage, Plaintiff has adequately alleged that the Album derives independent economic value from its secrecy.

### D. The Ability to Acquire or Duplicate the Album

The final relevant factor to Plaintiff's trade secret claims is "the ease or difficulty with which the information could be properly acquired or duplicated by others." *Integrated Cash Mgmt. Servs., Inc.*, 920 F.2d at 173. Defendant argues that the Album is not a trade secret because he "was expressly authorized to disclose the information in limited circumstances, to an unlimited number of parties." (Def.'s Br., Dkt. 47-1, at 10 (emphasis removed).) Defendant's position is that the execution of the OPA extinguished any trade secret protection the Album might have previously had. (*Id.* at 11–12.) The parties dispute the scope of the restrictions under the OPA, which speaks to whether the information can be easily acquired or duplicated by others.

Defendant's contention that he "was at liberty to disclose the [Album] to the world" is an exaggeration of the rights conferred by the OPA and ignores the significant usage restrictions in place. (Def.'s Reply, Dkt. 48, at 5; *see* OPA, Dkt. 4-3.) Defendant is correct that these restrictions did not require *complete* confidentiality, and that the OPA seems to contemplate that at least some third parties would hear the contents of the Album. (*See* OPA, Dkt. 4-3.) However, it cannot be reasonably inferred that Defendant was "under no obligation to protect the confidentiality of the information," such that any "property right is extinguished" as a matter of law. *Structured Cap. Sols., LLC*, 177 F. Supp. 3d at 832 (quoting *Ruckelshaus*, 467 U.S. at 1002).

As Plaintiff notes, Defendant could only duplicate the work "for private use," and could only sell the Album to "a third party under the same terms and conditions" as the OPA. (Pl.'s Br., Dkt. 49, at 14 (emphasis removed).) While the OPA contemplates that the owner of the Album would "exhibit or play" the Album for third parties in certain limited settings, this is different from permitting disclosure or transfer of the Album's data to third parties such that it could be acquired or distributed by others. For this reason, this case differs from the authority relied upon by Defendant to assert that there is no "secret" at issue. *See, e.g.*, *Bear, Stearns Funding, Inc. v.*

*Interface Grp.-Nevada, Inc.*, 361 F. Supp. 2d 283, 305 (S.D.N.Y. 2005) (dismissing trade secret claims where information could be disclosed "to unlimited parties" such that "any capital market purchaser of the security could acquire and distribute the information"); *Structured Cap. Sols., LLC*, 177 F. Supp. 3d at 834 (finding no trade secret where company was free to disclose information to third parties "at its discretion"); *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 520–23 (S.D.N.Y. 2017) (finding no trade secret where company gave customers "unfettered access" to the information during training sessions without notice "that its software or any of its components are confidential"). Indeed, there can be no serious debate that the value of the Album, when it was initially purchased by Defendant for $2 million, and when it was later purchased by Plaintiff for approximately $4 million, was largely based on its secret and exclusive nature.

Thus, the Court finds that Plaintiff has sufficiently alleged that the Album is "cloaked with a 'substantial element of secrecy'" in order to survive this motion. *Broker Genius, Inc.*, 280 F. Supp. 3d at 514 (quoting *A.H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 16 (2d Cir. 1968)).

\*     \*     \*

Ultimately, whether the Album, and the information contained therein, is a trade secret is a question of fact. *Chevron U.S.A., Inc.*, 813 F.2d at 29. Given the weight of the *Integrated Cash* factors and the unique facts of this case, the Court finds that Plaintiff has adequately pleaded a "trade secret" under the DTSA and New York law. Accordingly, Defendant's motion to dismiss Counts II and III for failure to plead a "secret" is denied.

## III.    Copyright Act Preemption

Defendant moves to dismiss Plaintiff's remaining state law claims—tortious interference with prospective economic advantage, unjust enrichment, and recovery of chattel/replevin—on the grounds that these claims are preempted by the Copyright Act. (Def.'s Br., Dkt. 47-1, at 12–14.) "Section 301 of the Copyright Act expressly preempts a state law claim only if (i) the work at issue

'come[s] within the subject matter of copyright' and (ii) the right being asserted is 'equivalent to any of the exclusive rights within the general scope of copyright.'" *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012) (quoting 17 U.S.C. § 301(b)). "The first prong of this test is called the 'subject matter requirement,' and the second prong is called the 'general scope requirement.'" *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004) (citing *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 848 (2d Cir. 1997)). If a state law claim is completely preempted by the Copyright Act, "the court must then dismiss the claim for failing to state a cause of action." *Id.* at 309 (citations omitted). Here, the Court finds that Plaintiff's tortious interference and unjust enrichment claims are preempted, but its claim for recovery of chattel/replevin is not.

A. **Subject Matter Requirement**

The subject matter requirement of the copyright preemption inquiry "looks at the work that would be affected by the plaintiff's exercise of a state-created right, and requires (as an essential element of preemption) that the work come within the subject matter of copyright as specified by sections 102 and 103" of the Copyright Act. *ML Genius Holdings LLC v. Google LLC*, No. 20-3113, 2022 WL 710744, at *2 (2d Cir. Mar. 10, 2022) (quoting *In re Jackson*, 972 F.3d 25, 42 (2d Cir. 2020)) (internal quotation marks omitted). This prong is satisfied when "the claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works." *Briarpatch Ltd., L.P.*, 373 F.3d at 305 (citation omitted). "Accordingly, if the work against which the plaintiff claims rights is a 'literary work[],' a 'musical work[],' a 'sound recording[],' or any other category of 'work[] of authorship' within the 'subject matter of copyright' (even if the subject of the claim is for some reason ineligible for copyright protection) the plaintiff's claim is subject to the possibility of statutory preemption." *In re Jackson*, 972 F.3d at 42–43 (quoting 17 U.S.C. § 102(a)).

There is little doubt that the Album—a musical work—falls within the subject matter of copyright, and the parties do not belabor this point.  To the extent Plaintiff notes that it is unable to register the Album with the Copyright Office because it would require depositing a "complete copy or phonorecord" accessible at the Library of Congress and would therefore undercut the "point and worth of the Album," (Pl.'s Br., Dkt. 49, at 17 (quoting 17 U.S.C. § 408)), this does not change the subject matter requirement analysis.  Copyright preemption may apply "even if the subject of the claim is for some reason ineligible for copyright protection," *In re Jackson*, 972 F.3d at 42, and "extends to causes of action concerning unregistered works, as well as registered works," *Alexander Interactive, Inc. v. Leisure Pro Ltd.*, No. 14-CV-2796 (PKC), 2014 WL 4651942, at *6 (S.D.N.Y. Sep. 16, 2014) (citation omitted).  The fact that Plaintiff does not want to register the Album with the Copyright Office does not take the Album outside the subject matter of copyright.

### B.    General Scope Requirement

The general scope or "equivalence" requirement of the copyright preemption inquiry "is satisfied only when the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law." *Briarpatch Ltd., L.P.*, 373 F.3d at 305 (citing *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992)).  "In other words, the state law claim must involve acts of reproduction, adaptation, performance, distribution or display." *Id.*  A claim is only preempted if it does not "include any extra elements that make it qualitatively different from a copyright infringement claim." *Id.* (citations omitted).  But "not all 'extra elements' are sufficient to remove the claim from the 'general scope' of copyright." *In re Jackson*, 972 F.3d at 43.  Rather, the inquiry is holistic, and "[a]n action will not be saved from preemption by elements . . . which alter the action's *scope* but not its *nature*." *Id.* at 44 (quoting *Computer Assocs. Int'l, Inc.*, 982 F.2d at 717).  Thus, "[t]o determine whether a claim is qualitatively different, we look at 'what [the] plaintiff seeks to protect, the theories in which the

24

matter is thought to be protected and the rights sought to be enforced.'" *Briarpatch Ltd., L.P*, 373

F.3d at 306 (quoting *Computer Assocs. Int'l, Inc.*, 982 F.2d at 716).

Defendant asserts that each of Plaintiff's remaining state law claims "suffer the same fatal

flaw: they are predicated on Shkreli's allegedly unlawful retention and distribution of copies" of

the Album.  (Def.'s Br., Dkt. 47-1, at 13.)  Defendant argues that the relief Plaintiff seeks—

including "an award of damages," "any profits Shkreli made from retaining or disclosing the

Album," and "seizure of property necessary to prevent the propagation or dissemination of the

Album"—is analogous to remedies available under the Copyright Act such as "impounding and

disposition of infringing articles" and "actual damages and profits."  (*Id.* at 14 (citing Compl.,

Dkt. 1, ¶¶ 95, 102, 108)); *see* 17 U.S.C. §§ 503–04.  In opposition, Plaintiff responds that it seeks

to vindicate non-copyright equivalents because its "right to the exclusive ownership of those

recordings and musical compositions—including the right to keep them secret—is qualitatively

and fundamentally different than the basic rights commonly protected through the Copyright Act."

(Pl.'s Br., Dkt. 49, at 17.)  The Court addresses each of Plaintiff's state law claims—tortious

interference with prospective economic advantage, unjust enrichment, and recovery of

chattel/replevin—in turn.[10]

### 1.    Tortious Interference with Prospective Economic Advantage

To state a claim for tortious interference with prospective economic advantage under New

York law, a plaintiff must show that "(1) it had a business relationship with a third party; (2) the

_____

[10] To the extent Plaintiff relies on case law finding that trade secret claims are not preempted in order to draw a distinction between the rights at issue here and those protected by copyright law, (*see* Pl.'s Br., Dkt. 49, at 17), the Court notes that Defendant does not argue that the Copyright Act preempts Plaintiff's New York trade secret claim; it does not, and Plaintiff's argument on this point is therefore inapposite.  *See Broker Genius, Inc.*, 280 F. Supp. 3d at 522 (noting the "the unanimous conclusion that federal copyright law does not preempt state law regarding misappropriation of trade secrets").

defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 336 (E.D.N.Y. 2014) (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003)). Plaintiff's theory for its tortious interference claim is that "Shkreli's retention of the Album's data and files has interfered with PleasrDAO's economic prospects by diminishing the value of the Album in any future use, sale, or transaction." (Compl., Dkt. 1, ¶ 90.)

"In the Second Circuit, it is well settled that claims for tortious interference based on the unauthorized publication of a work protected by the Copyright Act are preempted." *Ranieri v. Adirondack Dev. Grp., LLC*, 164 F. Supp. 3d 305, 357 (N.D.N.Y. 2016) (quoting *Am. Movie Classics Co. v. Turner Ent. Co.*, 922 F. Supp. 926, 932 (S.D.N.Y. 1996) (internal quotation marks omitted)). Though tortious interference claims include an extra element of intentional interference, "[a]wareness or intent . . . are not extra elements that make a state law claim qualitatively different." *Briarpatch Ltd., L.P.*, 373 F.3d at 306; *see Red Apple Media, Inc. v. Batchelor*, 729 F. Supp. 3d 350, 365 (S.D.N.Y. 2024) (noting that tortious interference claims are generally preempted "notwithstanding the fact that such a claim includes the 'additional elements of awareness and intentional interference,' because these elements are not, by themselves, sufficient to remove a claim for tortious interference from Copyright Act preemption" (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 201 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985))). Still, whether this claim is preempted by the Copyright Act "must depend upon the *nature*" of Plaintiff's underlying allegations. *Red Apple Media, Inc.*, 729 F. Supp. 3d at 365 (emphasis added).

Plaintiff argues that its claim is materially distinct from a Copyright Act claim—and from other cases where tortious interference claims were preempted—because it is premised on the diminished value of the Album caused by Defendant's retention and threatened dissemination rather than on unauthorized publication.  (Pl.'s Br., Dkt. 49, at 19–20.)  While it is true that at least part of Plaintiff's claim differs from a traditional copyright infringement claim in this way, the Court does not find this distinction sufficient to change the underlying *nature* of the claim when considering "what [Plaintiff] seeks to protect" and "the rights sought to be enforced."  *Briarpatch Ltd., L.P.*, 373 F.3d at 306 (quoting *Computer Assocs. Int'l, Inc.*, 982 F.2d at 716).  At its core, Plaintiff's claim stems from Defendant's alleged unauthorized copying, retention, *and* distribution of the Album.  (Compl., Dkt. 1, ¶¶ 90–91.)  The right Plaintiff seeks to protect is its exclusive right to make use of the Album, which largely tracks the Copyright Act's protection of the "exclusive rights" to "reproduce," "distribute," "perform," or "display" a copyrightable work.  17 U.S.C. § 106.  As such, the Court does not find Plaintiff's tortious interference claim to meaningfully differ from others that have been dismissed as preempted under the Copyright Act.  *See, e.g.*, *Ranieri*, 164 F. Supp. 3d at 358 (finding tortious interference claim preempted where plaintiff sought "to redress a legal or equitable right that is equivalent to exclusive rights protected by the Copyright Act, namely his exclusive rights to sell, copy and distribute his designs under his own name"); *Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, 713 F. Supp. 2d 215, 228 (S.D.N.Y. 2010) (finding tortious interference claim preempted because it was "solely grounded on unauthorized copying" (citation omitted)); *Am. Movie Classics Co.*, 922 F. Supp. at 932 (finding claim for tortious interference with a contract preempted because plaintiff's "contractual right to exclusivity [was] equivalent to its exclusive right of public performance under the Copyright Act").

Under these circumstances, the Court finds that the copyright preemption requirements are met, and Plaintiff's claim for tortious interference with prospective economic advantage must be dismissed for failure to state a claim.

2.     Unjust Enrichment

To state a claim for unjust enrichment under New York law, "a plaintiff must allege '(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" *Techno-Comp, Inc. v. Arcabascio*, 130 F. Supp. 3d 734, 743–44 (E.D.N.Y. 2015) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)). "[T]he essential inquiry . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Id.* (citation omitted). Plaintiff's unjust enrichment claim is based on allegations that Defendant has profited from his "unauthorized retention of the Album's data and files," "sale of unlawfully retained MP3 copies of the Album," and unauthorized "distribution" of the Album at Plaintiff's expense. (Compl., Dkt. 1, ¶¶ 97–100.)

Courts in this Circuit have frequently found unjust enrichment claims preempted where they "derive from the reproduction, use, or misappropriation of material covered by copyright protection." *Am. Movie Classics Co.*, 922 F. Supp. at 934 (collecting cases); *see also Alexander Interactive, Inc.*, 2014 WL 4651942, at *6 ("In this Circuit, unjust enrichment claims premised on unauthorized use of material protected by copyright are preempted by the Copyright Act which provides an exclusive remedy." (citation omitted)). But an unjust enrichment claim "may survive a preemption challenge '[t]o the extent plaintiffs can show that defendants have been unjustly enriched by material beyond copyright protection.'" *Am. Movie Classics Co.*, 922 F. Supp. at 934 (quoting *Selmon v. Hasbro Bradley, Inc.*, 669 F. Supp. 1267, 1273 (S.D.N.Y. 1987)). Plaintiff asserts that its unjust enrichment claim seeks to vindicate non-copyright equivalent rights for material that is "beyond copyright protection." (Pl.'s Br., Dkt. 49, at 17–19.) However, the Court

finds that Plaintiff's unjust enrichment claim is not qualitatively different from a copyright claim and is therefore preempted.

Here, like Plaintiff's tortious interference claim, the unjust enrichment claim is premised on Defendant's alleged unauthorized "retention," "sale," and "distribution" of the Album, (Compl., Dkt. 1, ¶¶ 97–100), and thus "derive[s] from the reproduction, use, or misappropriation of material covered by copyright protection." *Am. Movie Classics Co.*, 922 F. Supp. at 934 (collecting cases). Plaintiff argues that its claim is "wholly distinct from the unjust enrichment claims in the cases Shkreli cites," (Pl.'s Br., Dkt. 49, at 18), yet fails to sufficiently explain *how*. Again, the Court does not find Plaintiff's unjust enrichment claim to meaningfully differ from others that have been dismissed as preempted under the Copyright Act. *See, e.g.*, *Adina's Jewels, Inc. v. Shashi, Inc.*, 442 F. Supp. 3d 766 (S.D.N.Y. 2020) (dismissing unjust enrichment claim as preempted where plaintiff alleged harms arising from alleged copying of its jewelry designs); *Briarpatch Ltd., L.P.*, 373 F.3d at 306 (dismissing unjust enrichment claim for unauthorized adaptation as preempted where the "enrichment element" limited the scope of the claim but left its "fundamental nature unaltered"); *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1322 (S.D.N.Y. 1997) (dismissing unjust enrichment claim as preempted where "the gravamen of the unjust enrichment claim is unauthorized exploitation"). Plaintiff's claim is no more than a "thinly disguised effort" to prevent Defendant's exploitation of material that falls within the subject matter of the Copyright Act. *Cf. In re Jackson*, 972 F.3d at 54 (dismissing right to publicity claim as preempted, despite an extra element, because it was "'virtually synonymous [with a claim for] wrongful copying' and [was] 'in no meaningful fashion distinguishable from infringement of a copyright.'" (second alteration added) (quoting *Motorola*, 105 F.3d at 851)).

Under these circumstances, the Court finds that the copyright preemption requirements are met, and Plaintiff's claim for unjust enrichment must be dismissed for failure to state a claim.

3.    <u>Recovery of Chattel/Replevin</u>

Finally, Plaintiff brings a state law claim for recovery of chattel/replevin. "The doctrine of replevin governs actions for the recovery of stolen or wrongfully detained property." *Spectre Air Cap., LLC v. WWTAI AirOpCo II DAC*, 737 F. Supp. 3d 195, 207 (S.D.N.Y. 2024). Under New York law, a plaintiff bringing a claim for replevin must show: "1) that it has a possessory right to property superior to that of the party currently in possession of the property; and 2) that it is entitled to the immediate possession of that property." *Syl Consulting LLC v. Cmty. USA II LLC*, No. 23-CV-1377 (CM) (KHP), 2024 WL 340966, at *3 (S.D.N.Y. Jan. 30, 2024).

Courts in this Circuit have found that "a state law claim is qualitatively different if it requires such elements as . . . possession and control of chattels." *Briarpatch Ltd., L.P.*, 373 F.3d at 306. Plaintiff's claim for recovery of chattel/replevin therefore differs from its other state law claims to the extent it seeks recovery of specific tangible property separate from its intellectual property rights. *See Lennon v. Seaman*, 63 F. Supp. 2d 428, 436 (S.D.N.Y. 1999) ("Where a state law claim is based on interference with tangible property rather than the intangible copyrights, the claim is not the equivalent of rights protected by the copyright laws."). For example, a conversion claim for "exclusive domain over a tangible object . . . 'survives' copyright preemption because it concerns only possession of a specific item and has nothing to do with, *e.g.*, copying, displaying, or distributing the item, or creating derivative works based on it." *See Buttner v. RD Palmer Enters., Inc.*, No. 13-CV-0342 (LEK) (ATB), 2013 WL 6196560, at *2 (N.D.N.Y. Nov. 27, 2013). While it cannot be said that Plaintiff's claim has *nothing* to do with "copying, displaying, or distributing the item," *id.*, the Court finds this claim sufficiently distinct from a copyright claim in light of Plaintiff's allegation that it has an exclusive right to own the only physical copy of the

Album and thus is "entitled to *possession* of Shkreli's retained copies." (Compl., Dkt. 1, ¶ 104 (emphasis added)). For this reason, Plaintiff's recovery of chattel/replevin claim is qualitatively different from a copyright claim and not preempted.

## IV. Recovery of Chattel/Replevin

Though the Court finds that Plaintiff's recovery of chattel/replevin claim is not preempted by the Copyright Act, Defendant also seeks dismissal for failure to state a claim. (Def.'s Br., Dkt. 47-1, at 18–19.) Defendant argues that this claim fails because "Plaintiff's recovery of chattel claim is available only to restore physical possession of tangible items once owned by Plaintiff," and "Plaintiff has not alleged that at any point, copies of the Musical Work retained by Defendant were in the Plaintiff's possession." (*Id.* at 19.) However, to state a claim for replevin under New York law, a plaintiff need only adequately allege "1) that it has a possessory right to property superior to that of the party currently in possession of the property; and 2) that it is entitled to the immediate possession of that property." *Syl Consulting LLC*, 2024 WL 340966, at *3.

Plaintiff asserts that it has a superior "right to possess the only existing copy of the Album," that Defendant retained "copies of the Album's data and files on his personal computer and elsewhere," and thus Plaintiff is "entitled to possession of [Defendant's] copies of the Album." (Compl., Dkt. 1, ¶¶ 62, 104–06.) The Complaint contains factual allegations that Defendant "forfeit[ed] his interests in, and all proceeds traceable to," the Album pursuant to the Forfeiture Order, and that Plaintiff purchased what "was supposed to constitute the sole existing copy of the record, music, data and files, and packaging." (*Id.* ¶¶ 2, 27.) To the extent Defendant seeks to differentiate the tangible versus intangible aspects of the Album to defeat this claim, the Court notes that "[c]ourts have sustained claims for replevin where the underlying property is a digital asset." *Syl Consulting LLC*, 2024 WL 340966, at *3 (citation omitted). Accepting Plaintiff's well-

pleaded allegations as true, the Court finds that Plaintiff has plausibly alleged a claim for replevin, and Defendant's motion to dismiss Count VI of the Complaint is therefore denied.

## V.     Joinder of Necessary Parties

Defendant requests, "[i]n the event that this Court finds that dismissal of the Complaint in its entirety is not warranted . . . that this Court order the joinder of all necessary third parties to this action," specifically the Producers: Robert Diggs and Tarik Azzougarh.  (Def.'s Br., Dkt. 47-1, at 21.)  Defendant contends that as partial owners of the copyrights to the Album, the Producers are indispensable parties.  (*Id.* at 22.)  The Court defers ruling on this request until the issue can be fully briefed, and a separate scheduling order with a briefing schedule will follow this decision.

## CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Defendant's motion to dismiss.  Count I for enforcement of the Forfeiture Order is dismissed for lack of standing, and Counts IV and V for tortious interference with prospective economic advantage and unjust enrichment under New York law are dismissed as preempted under the Copyright Act.  Counts II and III for misappropriation of trade secrets under the DTSA and New York law, as well as Count VI for recovery of chattel/replevin, shall proceed.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 25, 2025
       Brooklyn, New York